# Appendix Unpublished Opinion No. 1

## Grasso v. Katz



**User Name:** Joe Grady
**Date and Time:** Tuesday, April 2, 2024 3:04:00PM EDT
**Job Number:** 220978833

## Document (1)

1. _Grasso v. Katz, 2023 U.S. App. LEXIS 18285_
   **Client/Matter:** 20659.24026
   **Grasso v. Katz, 2023 U.S. App. LEXIS 18285, *8, 2023 WL 4615299 (3d Cir. July 19, 2023):**
   **Search Type:** nat
   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

 Neutral

As of: April 2, 2024 7:04 PM Z

# *Grasso v. Katz*

United States Court of Appeals for the Third Circuit

June 23, 2023, Submitted Under Third Circuit L.A.R. 34.1(a); July 19, 2023, Opinion Filed

No. 22-2896

## Reporter

2023 U.S. App. LEXIS 18285 *; 2023 WL 4615299

MICHAEL GRASSO, Individually and trading as General Partner of GF 2014, L.P., Appellant v. TOBY KATZ

**Notice:** NOT PRECEDENTIAL OPINION UNDER THIRD CIRCUIT INTERNAL OPERATING PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT REGARDED AS PRECEDENTS WHICH BIND THE COURT.

PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [*1]** On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. No. 2-21-cv-05472). District Judge: Honorable Cynthia M. Rufe.

*Grasso v. Katz, 2022 U.S. Dist. LEXIS 176991, 2022 WL 4586125 (E.D. Pa., Sept. 28, 2022)*

## Core Terms

subpoenas, tortious interference, abuse of process, allegations, declaratory judgment, legal process, injury in fact, third party, Entireties, concrete

## Case Summary

### Overview

HOLDINGS: [1]-Appellant failed to state a claim for abuse of process, as appellant did not challenge subpoenas issued to himself, but to third parties; [2]-Appellant had not stated a claim for tortious interference with an existing contract, as the subpoena sought relevant information about the assets of appellant's son, a judgment debtor; [3]-Appellant had not stated a claim for tortious interference with a prospective business relationship, as he rooted his prospective contract expectations in the mere hope that there would be a future contract.

### Outcome

Affirmed and remanded.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State a Claim

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

*HN1*[⬇] **Standards of Review, Abuse of Discretion**

An appellate court exercises plenary review over the district court's decision to dismiss claims under *Fed. R. Civ. P. 12(b)(1)* and *12(b)(6)*. And the appellate court reviews its decision to dismiss with prejudice for abuse of discretion. The appellate court may affirm on any ground supported by the record, even if the district court's judgment did not rest on this same ground.

Civil Procedure > ... > Justiciability > Standing > Injury in Fact

Constitutional Law > ... > Case or

Controversy > Standing > Elements

**HN2**[⬇] **Standing, Injury in Fact**

To establish standing and show that he has some personal stake in the case, a plaintiff must allege (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. When the case is still at the pleading stage, the plaintiff must allege facts, taken as true, that plausibly demonstrate the elements of standing for each claim.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Preliminary Considerations > Justiciability > Standing

**HN3**[⬇] **Motions to Dismiss, Failure to State Claim**

A valid claim for relief is not a prerequisite for standing, otherwise every challenge under *Fed. R. Civ. P. 12(b)(6)* would spiral into an U.S. Const. art. III standing evaluation, So courts must maintain a fundamental separation between standing and merits at the dismissal stage by assuming for the purposes of a standing inquiry that a plaintiff has stated valid legal claims.

Torts > Intentional Torts > Abuse of Process > Elements

**HN4**[⬇] **Abuse of Process, Elements**

The abuse of process tort traces to English common law and guards against the use of legal process, whether criminal or civil, against another to accomplish a purpose for which it is not designed. This means that the interest against abusive legal process has long been considered judicially cognizable. The common law may itself create legally protected interests.

Civil Procedure > Preliminary Considerations > Justiciability > Standing

Constitutional Law > ... > Case or Controversy > Standing > Elements

**HN5**[⬇] **Justiciability, Standing**

Allegations of tangible, economic harm satisfy the concreteness requirement for standing.

Civil Procedure > ... > Justiciability > Ripeness > Imminence

Constitutional Law > The Judiciary > Case or Controversy > Ripeness

Civil Procedure > ... > Justiciability > Ripeness > Rationale for Ripeness

**HN6**[⬇] **Ripeness, Imminence**

Like any other type of claim, a declaratory-judgment action must satisfy U.S. Const. art. III's case-or-controversy requirement. At a minimum, this means the dispute must be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. The United States Court of Appeals for the Third Circuit has cast these requirements in terms of ripeness, which prevents courts from entangling themselves in abstract agreements.

Constitutional Law > ... > Case or Controversy > Standing > Third Party Standing

**HN7**[⬇] **Standing, Third Party Standing**

It is a fundamental restriction on the court's authority that in the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.

Civil Procedure > ... > Justiciability > Ripeness > Tests for Ripeness

Constitutional Law > The Judiciary > Case or Controversy > Ripeness

<u>HN8</u>[⬇] **Ripeness, Tests for Ripeness**

A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all. Claims based merely upon assumed potential invasions of rights are not enough to warrant judicial intervention.

> Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

> Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

<u>HN9</u>[⬇] **Motions to Dismiss, Failure to State Claim**

To survive a motion to dismiss under <u>Fed. R. Civ. P. 12(b)(6)</u>, the complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. Though the court is required to accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, it need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss.

> Torts > Intentional Torts > Abuse of Process > Elements

<u>HN10</u>[⬇] **Abuse of Process, Elements**

To state a claim for abuse of process under Pennsylvania law, the plaintiff must allege that the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed, and (3) harm has been caused to the plaintiff.

> Torts > ... > Contracts > Intentional Interference > Elements

> Torts > ... > Prospective Advantage > Intentional Interference > Elements

<u>HN11</u>[⬇] **Intentional Interference, Elements**

To prevail on either interference with an existing contract or interference with prospective business under Pennsylvania law, the plaintiff must allege: (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

> Evidence > Burdens of Proof > Allocation

> Torts > Business Torts > Commercial Interference

<u>HN12</u>[⬇] **Burdens of Proof, Allocation**

Under Pennsylvania law, the plaintiff, as part of his prima facie case for tortious interference, must show that the defendant's conduct was not justified.

> Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

<u>HN13</u>[⬇] **Discovery, Relevance of Discoverable Information**

<u>Pa.R.C.P. 3117</u> permits a plaintiff to take the testimony of any person for the purpose of discovery of assets of the defendant. Pennsylvania courts have held that <u>Rule 3117</u> allows broad discovery even of persons known not to possess assets of the defendant where such discovery could provide information which would be relevant to the plaintiff's efforts to locate assets.

> Torts > ... > Prospective Advantage > Intentional Interference > Elements

<u>HN14</u>[⬇] **Intentional Interference, Elements**

In Pennsylvania, a plaintiff alleging tortious interference must base his claim that there was a prospective contractual relationship on something other than an existing or current relationship.

**Counsel:** For MICHAEL GRASSO, Individually and,

2023 U.S. App. LEXIS 18285, *1

trading as: General Partner of GF 2014, L.P., Plaintiff - Appellant: William A. Harvey, Esq., Jordan M. Rand I, Esq., Teri M. Sherman, Esq., Klehr Harrison Harvey Branzburg, Philadelphia, PA.

For TOBY KATZ, Defendant - Appellee: Kendra L. Baisinger, Esq., David Dormont, Esq., Montgomery McCracken Walker & Rhoads, Philadelphia, PA.

**Judges:** Before: CHAGARES, Chief Judge, BIBAS, and MATEY, Circuit Judges.

**Opinion by:** MATEY

## Opinion

OPINION[*]

**MATEY**, *Circuit Judge*.

Marshall Katz obtained a $23 million default judgment against Joseph Grasso. Joseph has not paid, Marshall has passed away, Toby Katz (Marshall's widow) wants to execute on the judgment, and Michael Grasso (Joseph's father) opposes Toby's efforts.[1] But Michael cannot resort to the federal courts' help as his tort claims do not plausibly entitle him to relief, and his request for a declaratory judgment is unripe. So we will affirm the District Court's judgment.

I.

Twists and turns abound in this action, so we include only a summary. First, there is the real estate. Before litigation **[*2]** on the default judgment began, Michael gifted Joseph and his wife a 99% limited partnership interest in "a real estate holding company" named "GF 2014." App. 96 ¶ 53. Joseph and his wife took possession of the interest as tenants by the entireties. Michael remains General Partner of GF 2014.

At the time of the transfer, GF 2014 owned several assets including a property located at 649 Dodds Lane, Gladwyne, Pennsylvania ("Dodds Lane Property"). After a gas leak destroyed a mansion on the Dodds Lane Property, GF 2014 filed an insurance claim that Clarke

& Cohen adjusted. The insurance company paid $3 million for the loss and specified $120,375.92 as the "[u]ndisputed amount of second partial payment," although the record does not disclose whether Michael or GF 2014 ever received this second payment. App. 117.

Second, there are the subpoenas Toby issued to Michael's adult family members and entities connected to Joseph's assets. One demand went to Clarke & Cohen, and another to Fox & Roach, a real estate company hired by GF 2014 to sell the Dodds Lane Property after the explosion.[2]

Michael, in his individual capacity and as General Partner of GF 2014, sued Toby. After Toby removed to federal **[*3]** court, Michael filed an Amended Complaint bearing three claims: abuse of process, tortious interference with existing and prospective business relationships, and declaratory judgment. The District Court dismissed the abuse of process and declaratory judgment claims for lack of subject matter jurisdiction under Article III. It dismissed the tortious interference claim for failure to state a claim. And the District Court dismissed all the claims with prejudice, concluding further amendments would be futile.[3]

II.

---

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

[1] Given the shared last names among the family members relevant to this dispute, this opinion follows the parties' convention of using first names as descriptors.

[2] The sale was pending when Michael filed his Amended Complaint. The sale closed for $2 million in February 2022 after briefing on the motion to dismiss had concluded. Toby provided a certified public record confirming the sale and amount, facts we may consider as a matter of judicial notice. *See* **Fed. R. App. P. 10(a)**; *Landy v. Fed. Deposit Ins. Corp., 486 F.2d 139, 151 (3d Cir. 1973)*.

[3] **HN1[⬆]** We have jurisdiction to review the District Court's final judgment under *28 U.S.C. § 1291*, although we cannot reach the merits if we determine the District Court lacked subject matter jurisdiction under Article III. *See Finkelman v. Nat'l Football League, 810 F.3d 187, 192 n.31 (3d Cir. 2016)*. We exercise plenary review over the District Court's decision to dismiss Michael's claims under *Rules 12(b)(1)* and *12(b)(6)*. *See id. at 192*. And we review its decision to dismiss with prejudice for abuse of discretion. *See Ramsgate Ct. Townhome Ass'n v. West Chester Borough, 313 F.3d 157, 161 (3d Cir. 2002)*. We may affirm on any ground supported by the record, even if the District Court's judgment did not rest on this same ground. *See Ridley Sch. Dist. v. M.R., 680 F.3d 260, 282 & n.14 (3d Cir. 2012)*.

2023 U.S. App. LEXIS 18285, *3

## A. Tort Claims

Toby argues Michael lacks standing to bring claims for abuse of process and tortious interference. *HN2*[↑] To establish standing and show that he has some "personal stake in the case," Michael must allege "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203, 210 L. Ed. 2d 568 (2021)* (cleaned up); *see also Clemens v. ExecuPharm Inc., 48 F.4th 146, 152 & n.3 (3d Cir. 2022)*. Because this case is still at the pleading stage, Michael must allege facts, taken as true, that "plausibly," *Thole v. U.S. Bank N.A., 140 S. Ct. 1615, 1621, 207 L. Ed. 2d 85 (2020),* demonstrate the elements of "standing for each claim," *TransUnion, 141 S. Ct. at 2208*.

### 1. Abuse of Process

Toby argues Michael failed to [*4] plead a legally protected interest because the Amended Complaint omits allegations for one of the abuse-of-process elements: use of "legal process *against the plaintiff*." *Rosen v. Am. Bank of Rolla, 426 Pa. Super. 376, 627 A.2d 190, 192 (Pa. Super. Ct. 1993)* (emphasis added). But leaning this heavily on the "legally protected interest" language "blend[s] standing and merits together in a manner that the Supreme Court has exhaustively cautioned courts against." *Cottrell v. Alcon Lab'ys, 874 F.3d 154, 165 (3d Cir. 2017)*. *HN3*[↑] "[A] valid claim for relief is *not* a prerequisite for standing," *id. at 166,* otherwise every challenge under *Federal Rule of Civil Procedure 12(b)(6)* would spiral "into an Article III standing evaluation," *id. at 164*. So courts must "maintain [a] fundamental separation between standing and merits at the dismissal stage" by "assum[ing] for the purposes of [a] standing inquiry that a plaintiff has stated valid legal claims." *Id. at 162*.

Assuming the validity of Michael's claim leaves no doubt that he has asserted a legally protected interest. *HN4*[↑] The abuse of process tort traces to English common law and guards against "the use of legal process, whether criminal or civil, against another to accomplish a purpose for which it is not designed." 1 William L. Prosser, Handbook of the Law of Torts 892 (1941). Meaning the interest against abusive legal process has long been considered judicially [*5] cognizable. *See Cottrell, 874 F.3d at 164* (stating the "common law" may itself create "legally protected interests").

Michael's allegations also establish an injury in fact that was "likely caused" by Toby's conduct and "would likely be redressed by judicial relief." *TransUnion, 141 S. Ct. at 2203*. The injury in fact is plain enough. *HN5*[↑] Michael alleges he and GF 2014 incurred "inordinate expenses associated with responding to [Toby's] abusive process," App. 98 ¶ 72, and we have held that allegations of "tangible, economic harm . . . satisf[y] the concreteness requirement." *Cottrell, 874 F.3d at 167*. Michael has also alleged that he and GF 2014 have already incurred these expenses, making the injury more than "merely 'conjectural or hypothetical.'" *Id. at 168* (quoting *Spokeo, Inc. v. Robins, 578 U.S. 330, 136 S. Ct. 1540, 1548, 194 L. Ed. 2d 635 (2016)*). Moreover, the expenses are fairly traceable to Toby's subpoenas and could be redressed by a favorable monetary award. *See Clemens, 48 F.4th at 158*. All meaning that Michael has standing to pursue his abuse of process claim, and that it was error for the District Court to conclude otherwise.

### 2. Tortious Interference

Like abuse of process, tortious interference enjoys a rich common law pedigree, *see* 1 Prosser, *supra*, at 972, and Michael has satisfied the three "irreducible" elements of standing for this claim, *Spokeo, 136 S. Ct. at 1547*. He has alleged a concrete injury in fact by claiming [*6] that Toby's subpoenas interfered with his and GF 2014's relations with Fox & Roach to the point that the firm "now refuses to engage in basic communication." App. 95 ¶ 50; *see TransUnion, 141 S. Ct. at 2208* (stating that "reputational harm" can qualify as a concrete injury in fact). And these reputational harms are fairly traceable to Toby's alleged interference, which could be redressed by a favorable decision awarding monetary damages and injunctive relief. Accordingly, Michael has standing to bring his tortious interference claim.

## B. Declaratory Judgment Claim

*HN6*[↑] Like any other type of claim, a "declaratory-judgment action[] must satisfy Article III's case-or-controversy requirement." *California v. Texas, 141 S. Ct. 2104, 2115, 210 L. Ed. 2d 230 (2021)*. At a minimum, this means the dispute must be "'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical

state of facts.'" *MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007)* (alteration in original) (quoting *Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41, 57 S. Ct. 461, 81 L. Ed. 617 (1937)*). We have cast these requirements in terms of ripeness, which "prevents courts from 'entangling themselves in abstract agreements.'" *Surrick v. Killion, 449 F.3d 520, 527 (3d Cir. 2006)* (quoting *Abbott Lab'ys v. Gardner, 387 U.S. 136, 148, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967)*).

As General **[\*7]** Partner of GF 2014, Michael seeks a judgment "declaring that the Entireties Interest [is] not subject to execution with respect to [Toby's] judgment against only Joseph." App. 100 ¶ 83. This claim is unripe. "Adversity requires opposing legal interests." *Lewis v. Alexander, 685 F.3d 325, 341 (3d Cir. 2012)*. **HN7**[⬆] And it is "a 'fundamental restriction on our authority' that '[i]n the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.'" *Hollingsworth v. Perry, 570 U.S. 693, 708, 133 S. Ct. 2652, 186 L. Ed. 2d 768 (2013)* (alteration in original) (quoting *Powers v. Ohio, 499 U.S. 400, 410, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991)*). But Joseph and his wife own the Entireties Interest—it does not belong to Michael, even as General Partner of GF 2014. App. 92 ¶ 26. Deeming *their* interest nonexecutable would amount to an advisory opinion on the "legal rights or interests" of third parties. *Hollingsworth, 570 U.S. at 708*. Something we cannot do.

**HN8**[⬆] Additionally, "[a] dispute is not ripe for judicial determination 'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Wyatt, Virgin Islands, Inc. v. Gov't of Virgin Islands, 385 F.3d 801, 806 (3d Cir. 2004)* (citation omitted). "Claims based merely upon assumed potential invasions of rights are not enough to warrant judicial intervention." *Id.* (quoting *Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 325, 56 S. Ct. 466, 80 L. Ed. 688 (1936)*) (quotation marks omitted). Michael has not alleged that **[\*8]** Toby has attempted to execute on the Entireties Interest—much less that a threat of execution is "imminent." *MedImmune, 549 U.S. at 128*. For these reasons, the District Court properly concluded that Michael's declaratory judgment claim was unripe.

III.

**HN9**[⬆] To survive a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (citation omitted). Though "we are required to accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom," we "need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)* (citation omitted). Neither of Michael's remaining claims survive this standard. So we will remand for the District Court to dismiss the abuse of process claim for failure to state a claim, and affirm its dismissal of the tortious interference claim.

A. Abuse of Process

**HN10**[⬆] To state a claim for abuse of process under Pennsylvania law, the plaintiff must allege that "the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed[,] and (3) harm has been **[\*9]** caused to the plaintiff." *Rosen, 627 A.2d at 192*. The first element is key to this appeal. Michael does not challenge the subpoena Toby served on him; instead, he claims Toby unlawfully subpoenaed *other* entities and individuals, such as Fox & Roach, Clarke & Cohen, and family members. By challenging subpoenas issued to third parties instead of himself, Toby claims Michael failed to allege the use of "legal process against the plaintiff." Response Br. 40.

Michael admits his claim does not stem from subpoenas that were "directed to or served upon the plaintiff," Reply Br. 2, but argues he may proceed anyway because he was the "legal object" of the subpoenas sent to Fox & Roach and Clarke & Cohen, Opening Br. 17-21. In making this argument, Michael primarily relies on two cases: *Cruz v. Princeton Insurance Co., 2007 PA Super 152, 925 A.2d 853 (Pa. Super. Ct. 2007)*, *rev'd on other grounds*, *597 Pa. 67, 950 A.2d 269 (Pa. 2008)* (per curiam); and *Allied Med. Assocs. v. State Farm Mut. Auto. Ins. Co., No. 08-cv-02434, 2008 U.S. Dist. LEXIS 101659, 2008 WL 4771850 (E.D. Pa. Oct. 30, 2008)*. But we agree with the District Court: neither offer Michael a path forward.

*Cruz* allowed parents to bring an abuse of process claim against an attorney who filed a petition to appoint a guardian ad litem for their minor son. *925 A.2d at 857*.

2023 U.S. App. LEXIS 18285, *9

But the petition in *Cruz* was "captioned against" the parents "in their own right" and "was directed at [them] individually." *Id.* And the Superior Court found that the petition's [*10] undeniable aim was the removal of [the parents] as [the child's] guardians." *Id.* The same cannot be said for Toby's subpoenas to Clarke & Cohen and Fox & Roach. Those subpoenas were directed solely to those entities and did not have the "undeniable aim" of impacting Michael or GF 2014's interests. *Id.* Michael also overreads *Allied*. That case involved a defendant that served legal process on third parties to "obtain information" *from the plaintiff* to "drive it out of business" by uncovering "reason[s] to avoid remitting reimbursement payments." *2008 U.S. Dist. LEXIS 101659, 2008 WL 4771850, at *7-8*. The Amended Complaint, by contrast, does not allege Toby's subpoenas to Fox & Roach and Clarke & Cohen sought information from Michael or GF 2014.

Because Michael's Amended Complaint fails to establish one of the elements for abuse of process—the use of process against the plaintiff—we will remand for the District Court to dismiss this claim under *Rule 12(b)(6)*.

## B. Tortious Interference

The District Court correctly dismissed Michael's tortious interference claim under *Rule 12(b)(6)*. The Amended Complaint alleges two types of tortious interference: interference with an existing contract and interference with prospective business. *HN11*[⬆] To prevail on either type of claim under Pennsylvania [*11] law, the plaintiff must allege:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

*Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 212 (3d Cir. 2009)*. The Amended Complaint falls short of plausibly alleging all of these elements.

1. Existing Contract

Michael identifies only one contract with which Toby allegedly interfered: GF 2014's agreement with Fox & Roach to sell the Dodds Lane Property. *HN12*[⬆] Under Pennsylvania law, "the plaintiff, as part of his prima facie case, [must] show that the defendant's conduct was not justified." *Id. at 214*. But Toby issued the Fox & Roach subpoena under *HN13*[⬆] *Pennsylvania Rule of Civil Procedure 3117*, which permits a plaintiff to "take the testimony of any person" "for the purpose of discovery of assets of the defendant." Pennsylvania courts have held that *Rule 3117* allows [*12] broad "discovery even of persons known *not* to possess assets of the defendant where such discovery could provide information which would be relevant to the plaintiff's efforts to locate assets." *PaineWebber, Inc. v. Devin, 442 Pa. Super. 40, 658 A.2d 409, 415 (Pa. Super. Ct. 1995)*.

The Fox & Roach subpoena sought relevant information about Joseph's assets. Michael generally alleges that "[t]here is no information that can be obtained from Fox & Roach that could in any way impact execution on the [Joseph] Grasso Judgment." App. 96 ¶ 54. But this is a bare bones allegation premised on a legal conclusion— that the Entireties Interest associated with the Dodds Lane Property is categorically exempt from execution. Even assuming the legal conclusion is correct (an issue we do not address), the Fox & Roach subpoena sought information about other assets possibly connected to Joseph beyond the Dodds Lane Property.

2. Prospective Contracts

Michael finally alleges that Toby tortiously interfered with his and GF 2014's "prospective business relationships." App. 98. Specifically, he claims he and GF 2014 "reasonably expected to continue to do business" with Fox & Roach and Clarke & Cohen. App. 99 ¶ 76. Those relationships do not count. *HN14*[⬆] In Pennsylvania, a plaintiff alleging tortious [*13] interference must "base [his] claim that there was a prospective contractual relationship on something other than an existing or current relationship." *Acumed, 561 F.3d at 213* (citing *Phillips v. Selig, 2008 PA Super 244, 959 A.2d 420, 429 (Pa. Super. Ct. 2008)*). Because Michael roots his prospective contract expectations in the "mere hope that there will be a future contract," he cannot state a claim for tortious interference with prospective business. *Id.*

* * *

To sum up, Michael has standing to bring his tort claims but they fail on the merits. So the District Court should

2023 U.S. App. LEXIS 18285, *13

have dismissed both for failure to state a claim under *Rule 12(b)(6)*. The District Court properly dismissed Michael's declaratory judgment claim on ripeness grounds.[4] So we will affirm the District Court's judgment, but remand for the District Court to dismiss Michael's abuse of process claim for failure to state a claim under *Rule 12(b)(6)*.

---

**End of Document**

---

[4] Seeing no abuse of discretion, we will affirm the District Court's dismissal with prejudice.

Joe Grady

# Appendix Unpublished Opinion No.2

## Oh v. Phila. County Bd. of Elections



**User Name:** Joe Grady
**Date and Time:** Tuesday, April 2, 2024 3:03:00PM EDT
**Job Number:** 220978722

## Document (1)

1. *Oh v. Phila. County Bd. of Elections, 2008 U.S. Dist. LEXIS 101656*

   **Client/Matter:** 20659.24026

   **Search Terms:** Oh v. Phila. County Bd. of Elections, 2008 U.S. Dist. LEXIS 101656, *6-9, 2008 WL 4787583 (E.D. Pa. 2008)

   **Search Type:** Natural Language - Expanded Results

   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

**A** Neutral

As of: April 2, 2024 7:03 PM Z

# *Oh v. Phila. County Bd. of Elections*

United States District Court for the Eastern District of Pennsylvania

October 31, 2008, Decided; October 31, 2008, Filed

CIVIL ACTION NO. 08-0081

**Reporter**

2008 U.S. Dist. LEXIS 101656 *; 2008 WL 4787583

DAVID OH v. PHILADELPHIA COUNTY BOARD OF ELECTIONS, et al.

**Prior History:** *Oh v. Phila. County Bd. of Elections, 2008 U.S. Dist. LEXIS 54604 (E.D. Pa., July 16, 2008)*

## Core Terms

Elections, defendants', rights, voters, motion to dismiss, voting rights, candidate, alleges, absentee ballot, plaintiff's claim, deprivation, ballots, failure to state a claim, equal protection, election law, due process, constitutional violation, due process of law, amended complaint, absentee, parties

## Case Summary

### Procedural Posture

Plaintiff, a candidate for a local elected office, sued defendants, a county board of elections, judges, and a supervisor, individually and in their official capacity and alleged that they violated *42 U.S.C.S. § 1983*, the Voting Rights Act, *42 U.S.C.S. § 1971*, and the *First, Fourth* and *Fourteenth Amendments*, by failing to adhere to proper procedures for absentee ballot voting. Defendants moved to dismiss.

### Overview

The candidate alleged that defendants did not follow state election law in handling absentee ballots associated with several nursing homes in the area. The court focused on the sufficiency of the candidate's claims. The candidate had not alleged that defendants impinged upon his *First Amendment* right to free speech in any way, so he had not sufficiently alleged a constitutional violation to give rise to a claim under *42 U.S.C.S. § 1983*. The candidate had not alleged that defendants searched, seized, issued a warrant without probable cause or otherwise violated the *Fourth Amendment*, so he had not sufficiently alleged a constitutional violation to give rise to a claim under *42 U.S.C.S. § 1983*. As to the candidate's equal protection claims, the candidate's allegations were vague and conclusory and did not survive a motion to dismiss. Among other things, the candidate failed to allege that his absentee ballots were treated differently by the Board than those of any other candidate. Finally, as the candidate was an unsuccessful candidate for public office, his injury did not arise under the Voting Rights Act and he did not have standing as an individual to bring this suit.

### Outcome

Defendants' motion to dismiss was granted on all counts. Judgment was entered in favor of defendants and against the candidate. Defendants' motion for reconsideration of denial of motion to dismiss and a motion to intervene were denied.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

**HN1**[⬇] **Motions to Dismiss, Failure to State Claim**

*Fed. R. Civ. P. 12(b)(6)* permits a court to dismiss all or part of an action for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. In ruling on a *Rule 12(b)(6)* motion, a court must accept as true all well-pleaded allegations of fact, and any reasonable inferences that may be drawn therefrom, in plaintiff's complaint and must determine whether under any reasonable reading of the pleadings, the plaintiff may be entitled to relief. Typically, a complaint attacked by a

*Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, though plaintiffs' obligation to state the grounds of entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact). A well-pleaded complaint may proceed even if it appears that recovery is very remote and unlikely. When considering a *Rule 12(b)(6)* motion, a court does not inquire whether the plaintiff will ultimately prevail, only whether he is entitled to offer evidence to support his claims.

Civil Rights Law > ... > Elements > Color of State Law > General Overview

Civil Rights Law > ... > Section 1983 Actions > Elements > Protected Rights

*HN2*[⬇] **Elements, Color of State Law**

*42 U.S.C.S. § 1983* is not a source of substantive rights; rather *§ 1983* authorizes a person to file a private cause of action against state actors for a deprivation of rights protected by a federal statute or the United States Constitution. *42 U.S.C.S. § 1983*. Thus, in order to state a claim under *§ 1983*, plaintiff must allege: (1) a violation of a right secured by the Constitution or the laws of the United States and (2) that the deprivation is committed by a person acting under the color of state law.

Civil Rights Law > Protection of Rights > Section 1983 Actions > General Overview

*HN3*[⬇] **Protection of Rights, Section 1983 Actions**

See *42 U.S.C.S. § 1983*.

Civil Rights Law > ... > Section 1983 Actions > Elements > Protected Rights

*HN4*[⬇] **Elements, Protected Rights**

In satisfying the constitutional violation requirement of *42 U.S.C.S. § 1983*, it is not enough for plaintiff to show that he has suffered a deprivation. A plaintiff must allege

that he is deprived of a constitutionally protected interest without due process of law. Therefore, plaintiff will be entitled to relief only if his complaint sufficiently alleges deprivation of any right secured by the U.S. Constitution.

Civil Rights Law > Protection of Rights > Section 1983 Actions > General Overview

*HN5*[⬇] **Protection of Rights, Section 1983 Actions**

A *42 U.S.C.S. § 1983* complaint must contain a modicum of factual specificity, identifying the particular conduct of defendants that is alleged to have harmed plaintiffs. A civil rights complaint that relies on vague and conclusory allegations does not provide fair notice and will not survive a motion to dismiss. However, where sufficient facts are alleged in the complaint so that the court is satisfied that the complaint is not frivolous and that the defendants have been provided with adequate notice so that they can answer the complaint, then the complaint will be deemed sufficient and will be sustained. Ultimately, the sufficiency of a civil rights complaint must be determined on a case-by-case basis. On the one hand, courts have held a *§ 1983* complaint to be sufficient where the court is satisfied from the factual scenario alleged that the defendants' conduct could have violated plaintiff's rights. On the other hand, courts have dismissed *§ 1983* complaints where the court has "concluded that the plaintiff could not allege a viable civil rights complaint.

Constitutional Law > Bill of Rights > Fundamental Freedoms > General Overview

*HN6*[⬇] **Bill of Rights, Fundamental Freedoms**

See *U.S. Const. Amend. I*.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN7*[⬇] **Search & Seizure, Scope of Protection**

See *U.S. Const. Amend. IV*.

Constitutional Law > Equal Protection > General

2008 U.S. Dist. LEXIS 101656, *101656

Overview

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > General Overview

Constitutional Law > Substantive Due Process > General Overview

Constitutional Law > Privileges & Immunities

*HN8*[🔽]  **Constitutional Law, Equal Protection**

See U.S. Const. Amend. XIV, § 1.

Constitutional Law > Equal Protection > General Overview

*HN9*[🔽]  **Constitutional Law, Equal Protection**

The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.

Constitutional Law > Privileges & Immunities

Governments > Local Governments > Elections

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Constitutional Law > Substantive Due Process > Scope

Governments > State & Territorial Governments > Elections

*HN10*[🔽]  **Constitutional Law, Privileges & Immunities**

Under the doctrine of substantive due process, the U.S. Supreme Court has recognized that the *Fourteenth Amendment's Due Process Clause* guarantees more than fair process and the absence of physical restraint, but provides heightened protection against government interference with certain fundamental rights and liberty interests. The Supreme Court has held that even an

unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause. The right to become a candidate for state office is a right or privilege of state citizenship, not of national citizenship which alone is protected by the privileges and immunities clause. Similarly, even an unlawful denial of municipal office is not a denial of a right of property or liberty under the due process clause.

Civil Procedure > ... > Justiciability > Standing > Burdens of Proof

Constitutional Law > ... > Case or Controversy > Standing > Elements

Civil Procedure > ... > Justiciability > Standing > Injury in Fact

*HN11*[🔽]  **Standing, Burdens of Proof**

In order to have standing to raise a claim before a court, a plaintiff must establish that he meets the three constitutional requirements for standing and the prudential considerations that courts have applied in determining standing. To meet the constitutional requirements for standing, plaintiff must: (1) have suffered an injury in fact; (2) there must be a causal connection between the injury and the conduct complained of and (3) it must be likely and not speculative that the injury will be remedied by a favorable decision.

Civil Procedure > ... > Justiciability > Standing > General Overview

Constitutional Law > ... > Case or Controversy > Standing > Elements

*HN12*[🔽]  **Justiciability, Standing**

The prudential principles applied in determining whether there is standing are: (1) the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties; (2) even when the plaintiff has alleged redressable injury sufficient to meet the requirements of

2008 U.S. Dist. LEXIS 101656, *101656

Article III, the federal courts will not adjudicate abstract questions of wide public significance which amount to generalized grievances shared and most appropriately addressed in the representative branches; and (3) the plaintiff's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

Civil Procedure > ... > Justiciability > Standing > Injury in Fact

Constitutional Law > ... > Case or Controversy > Standing > General Overview

**HN13**[⬇] **Standing, Injury in Fact**

An injury in fact is an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.

Civil Rights Law > Protection of Rights > Voting Rights > Enforcement Actions

Civil Rights Law > ... > Voting Rights > Voting Rights Act > General Overview

**HN14**[⬇] **Voting Rights, Enforcement Actions**

Standing to sue under the Voting Rights Act, *42 U.S.C.S. § 1971*, is limited to the U.S. Attorney General and to aggrieved persons, a category limited to persons whose voting rights have been denied or impaired.

Civil Rights Law > Protection of Rights > Voting Rights > Enforcement Actions

Civil Rights Law > ... > Voting Rights > Voting Rights Act > General Overview

**HN15**[⬇] **Voting Rights, Enforcement Actions**

Unsuccessful candidates for office lack standing to bring an action under the Voting Rights Act, *42 U.S.C.S. § 1971*.

Civil

Procedure > ... > Justiciability > Standing > Injury in Fact

Constitutional Law > ... > Case or Controversy > Standing > Elements

Constitutional Law > ... > Case or Controversy > Standing > General Overview

**HN16**[⬇] **Standing, Injury in Fact**

A generalized grievance shared in substantially equal measure by all or a large class of citizens is not sufficient to confer standing. Injury must be concrete and particularized.

Civil Procedure > ... > Justiciability > Standing > Injury in Fact

Constitutional Law > ... > Case or Controversy > Standing > General Overview

**HN17**[⬇] **Standing, Injury in Fact**

An asserted right to have the government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court.

**Counsel:** **[*1]** For DAVID OH, INDIVIDUALLY & ON BEHALF OF THE VOTERS OF PHILADELPHIA, Plaintiff: JEREMY IBRAHIM, JEREMY H. GONZALEZ IBRAHIM, LEAD ATTORNEYS, LAW OFFICES OF JEREMY H. GONZALEZ IBRAHIM, CHADDS FORD, PA.

For PHILADELPHIA COUNTY BOARD OF ELECTIONS, CITY HALL, ROOMS 130-134, HON. MARGARET M. TARTAGLIONE, HON. EDGAR A. HOWARD, HON. JOSEPH J. DUDA, SUPERVISOR DENNIS KELLY, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITY, Defendants: MARK R. ZECCA, LEAD ATTORNEY, REID I. HOWELL, CITY OF PHILADELPHIA - LAW DEPARTMENT, PHILADELPHIA, PA.

For COUNCILMAN JACK KELLY, Movant: DAVID P. HEIM, GEORGE BOCHETTO, SCOTT P. SIGMAN, BOCHETTO & LENTZ PC, PHILADELPHIA, PA.

**Judges:** THOMAS N. O'NEILL, JR., United States District Judge.

**Opinion by:** THOMAS N. O'NEILL, JR.

# Opinion

O'NEILL, J.

MEMORANDUM

On March 25, 2008, plaintiff David Oh filed an amended complaint on behalf of himself as a voter and a candidate and of all voters alleging that defendants Philadelphia County Board of Elections and Judges Margaret M. Tartaglione, Edgar A. Howard and Joseph J. Duda and Supervisor Dennis Kelly individually and in their official capacity violated _42 U.S.C. § 1983_ and _42 U.S.C. § 1971_ by failing to adhere to proper procedures for absentee ballot voting. **[*2]** Specifically, plaintiff contends that he was denied equal protection and due process of law as a voter and a candidate. I have jurisdiction pursuant to _42 U.S.C. § 1331_. Presently before me are defendants' motion to dismiss, plaintiff's response and defendants' reply thereto.

BACKGROUND

Plaintiff David Oh, a resident of Philadelphia, was a Republican Party candidate for a City Council-at-Large seat in the 2007 election. Defendant Board of Elections is a municipal entity whose mission is to administer voter registration and conduct elections in accordance with state and federal voter registration and election laws. Defendants Judge Margaret Tartaglione, Judge Edgar Howard, Judge Joseph Duda and Supervisor Dennis Kelly are residents of Philadelphia and have served on the Board of Elections.

Under the Philadelphia City Charter, five of the seven at-large members of the Council may be of the dominant party, so the minority Republican Party was entitled to two at-large Council seats in the 2007 election. Plaintiff was one of the top two vote recipients after the count of machine and provisional ballot votes but placed third overall among Republican at-large candidates after inclusion of absentee **[*3]** ballot votes. After the final tally, Jack Kelly was the second-place vote recipient for the Republican Party. Kelly presently serves on the Council.

Plaintiff alleges that defendants did not follow state election law in handling absentee ballots associated with several nursing homes in the Philadelphia area. Plaintiff claims that: (1) residents of these homes were issued absentee ballots without having submitted the proper applications; (2) the ballots were hand-carried to these locations by an unauthorized individual; (3) the ballots were filled out by an unidentified and unauthorized third party other than the named voter; (4) the ballots were hand-delivered by an individual from the nursing home to the Board of Elections; (5) the ballots were not delivered to their corresponding polling places; and (6) the ballots were neither opened nor counted until after Election Day.

Following the election, plaintiff raised absentee ballot challenges to the Board during the canvassing process but did not appeal the Board's adverse decisions pursuant to _25 P.S. § 3146.8(e)_. Under this law, plaintiff had until two days after the Board of Elections ruled on the parties' respective objections during **[*4]** the canvassing process to file an appeal to the Court of Common Pleas. As plaintiff did not pursue his state appellate rights under the Pennsylvania Election Code, the Board's decision became a final ruling. On November 26, 2007, the Board certified Councilman Jack Kelly as the winner of the November 6, 2007 election. Plaintiff initiated this action 39 days after the certification, on January 4, 2008.

STANDARD OF REVIEW

_HN1_[⬆] _Federal Rule of Civil Procedure 12(b)(6)_ permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." _Fed. R. Civ. P. 12(b)(6)_. In ruling on a 12(b)(6) motion, I must accept as true all well-pleaded allegations of fact, and any reasonable inferences that may be drawn therefrom, in plaintiff's complaint and must determine whether "under any reasonable reading of the pleadings, the plaintiff[] may be entitled to relief." _Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)_ (citations omitted). Typically, "a complaint attacked by a _Rule 12(b)(6)_ motion to dismiss does not need detailed factual allegations," though plaintiffs' obligation to state the grounds of entitlement to relief "requires more than labels and conclusions, **[*5]** and a formulaic recitation of the elements of a cause of action will not do." _Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)_. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." _Id._ (citations omitted). A well-pleaded complaint may proceed even if it appears "that recovery is very remote and unlikely." _Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)_. When considering a _Rule_

12(b)(6) motion, I do not "inquire whether the plaintiff[] will ultimately prevail, only whether [he is] entitled to offer evidence to support [his] claims." Nami, 82 F.3d at 65, citing Scheuer, 416 U.S. at 236.

DISCUSSION

In his amended complaint, plaintiff claims that defendants denied him due process under 42 U.S.C. § 1983 by violating his First, Fourth and Fourteenth Amendment rights and that defendants violated the Voting Rights Act, 42 U.S.C. § 1972. Defendants moved to dismiss on several grounds including failure to state a claim and lack of standing or a case or controversy.

I. Claims under Section 1983

Plaintiff claims that "as a direct and proximate result of [*6] all defendants' conduct, committed under color of state law, plaintiff was deprived of equal protection and due process of law and of his right to pursue public office without fraud and/or abuse in the Absentee Vote process governed by Pennsylvania state election law" in violation of the First, Fourth and Fourteenth Amendments of the U.S. Constitution and 42 U.S.C. § 1983. [1] Defendants respond that plaintiff fails to state an equal protection claim because he does not allege that he was treated differently from other candidates. They also argue that he fails to state either a procedural or substantive due process claim.

HN2[↑] Section 1983 [2] is not a source of substantive

_____

[1] Plaintiff's now claims in his response to defendants' motion to dismiss that the permanent injunction issued by Judge Newcomer violated his rights to equal protection and due process and implicated his rights under the Voting Act. This claim was not raised in the Amended Complaint, and thus I will not address it.

[2] Section 1983 provides:

> HN3[↑] Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive [*8] relief shall not be granted unless a declaratory decree was violated

rights; rather § 1983 authorizes a person to file a private cause of action against state actors for a deprivation of rights protected by a federal statute or the United States Constitution. 42 U.S.C. § 1983 (2004); [*7] West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988). Thus, in order to state a claim under § 1983, plaintiff must allege: (1) a violation of a right secured by the Constitution or the laws of the United States and (2) that the deprivation was committed by a person acting under the color of state law. Abraham v. Raso, 183 F.3d 279, 287 (3d Cir. 1999). Here, it is undisputed that defendants were acting under color of state law as the Board of Elections and its members. I will, therefore, focus on the sufficiency of plaintiff's claims that defendants violated his constitutional rights.

Defendants argue that plaintiff fails to allege that he has been deprived of a constitutionally protected right under the First, Fourth or Fourteenth Amendments. HN4[↑] In satisfying the constitutional violation requirement "it is not enough for plaintiff to show that [he] suffered a deprivation. A plaintiff must allege that [he] was deprived of a constitutionally protected interest without due process of law." Hammond v. Creative Fin. Planning Org., Inc., 800 F. Supp. 1244, 1248 (E.D. Pa. 1992) citing Parratt v. Taylor, 451 U.S. 527, 535, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981). Therefore, plaintiff will be "entitled to relief [only] if [his] complaint sufficiently alleges deprivation of any right secured by the Constitution." Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996).

HN5[↑] A § 1983 complaint must "contain a modicum of factual specificity, identifying the particular conduct of defendants that is alleged to have harmed plaintiffs." Freedman v. City of Allentown, Pa., 853 F.2d 1111, 1114 (3d Cir. 1988). "A civil rights complaint that relies on vague and conclusory allegations does not provide 'fair [*9] notice' and will not survive a motion to dismiss." Dist. Council 47, Am. Fed'n of State County and Municipal Employees, AFL-CIO v. Bradley, 795 F.2d 310, 313 (3d Cir. 1986). However, where "sufficient facts are alleged in the complaint so that the court is satisfied that the complaint is not frivolous and that the defendants have been provided with adequate notice so that they can answer the complaint, then the complaint will be deemed sufficient and will be sustained." Id. Ultimately, "the sufficiency of a civil rights complaint must be determined on a case-by-case basis."

_____

or declaratory relief was unavailable.

42 U.S.C. § 1983 (2004).

*Freedman v. City of Allentown, Pa., 853 F.2d 1111, 1114 (3d Cir. 1988)*. On the one hand, courts have held a *§ 1983* complaint to be sufficient where the court is "satisfied from the factual scenario alleged that the [defendants'] conduct could have violated plaintiff's rights." *Id.* On the other hand, courts have dismissed *§ 1983* complaints where the court has "concluded that the plaintiff could not allege a viable civil rights complaint." *Id. at 1115*.

### A. *First Amendment*

Plaintiff claims in his amended complaint that defendants violated his *First Amendment* rights, but he fails to allege any facts to support this claim. **[*10]** The *First Amendment to the United States Constitution* states:

> **HN6**[↑] Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S.C.A. *Const. Amend. I*. Here, plaintiff has not alleged that defendants impinged upon his *First Amendment* right to free speech in any way, so he has not sufficiently alleged a constitutional violation to give rise to a claim under *§ 1983*. I will therefore grant defendants' motion to dismiss on this claim for failure to state a claim.

### B. *Fourth Amendment*

Plaintiff claims in his amended complaint that defendants violated his *Fourth Amendment* rights, but he fails to allege any facts to support this claim. The *Fourth Amendment to the United States Constitution* states:

> **HN7**[↑] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and **[*11]** the persons or things to be seized.

U.S.C.A. *Const. Amend. IV*. Here, plaintiff has not

alleged that defendants searched, seized, issued a warrant without probable cause or otherwise violated the *Fourth Amendment*, so he has not sufficiently alleged a constitutional violation to give rise to a claim under *§ 1983*. I will therefore grant defendants' motion to dismiss on this claim for failure to state a claim.

### C. *Fourteenth Amendment*

Plaintiff claims in his amended complaint that defendants violated his rights to equal protection under the law and due process of law under the *Fourteenth Amendment*. The *Fourteenth Amendment to the U.S. Constitution* states in relevant part:

> **HN8**[↑] No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S.C.A. Const. Amend. XIV § 1.

#### 1. Equal Protection

Plaintiff claims that defendants violated his right to equal protection through "fraud and/or abuse in the Absentee Vote process governed by Pennsylvania state election law." As **[*12]** previously noted, "[a] civil rights complaint that relies on vague and conclusory allegations does not provide 'fair notice' and will not survive a motion to dismiss." *Bradley, 795 F.2d at 313*. The plaintiff's allegations are vague and conclusory and do not survive a motion to dismiss.

> **HN9**[↑] The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.

*Snowden v. Hughes, et al., 321 U.S. 1, 8, 64 S. Ct. 397, 88 L. Ed. 497 (1944)*. First, plaintiff fails to allege that his absentee ballots were treated differently by the Board of Elections than those of any other candidate. Additionally, he does not allege that the parties he claims denied him equal protection knowingly or intentionally violated the election laws. His complaint alleges that unknown individuals and third parties treated absentee ballots unlawfully, but he alleges no knowing or intentional conduct by any of the named

defendants. He does not allege that their actions resulted in his being treated differently from others. He [*13] has failed to state a valid equal protection claim, so he has not sufficiently alleged a constitutional violation to give rise to a claim under *§ 1983*. I will therefore grant defendants' motion to dismiss on this claim for failure to state a claim.

*2. Due Process*

Plaintiff claims defendants violated his substantive due process right to a free and fair election under *Reynolds v. Sims, 377 U.S. 533, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964)*. The *Due Process Clause* "was intended to prevent government from abusing its power, or employing it as an instrument of oppression." *Biener v. Calio, 361 F.3d 206, 216 (3d Cir. 2004)*, citing *DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 196, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989)* (internal citations and quotations omitted). *HN10*[⬆] Under the doctrine of substantive due process, the Supreme Court has recognized that the *Fourteenth Amendment's Due Process Clause* . . . guarantees more than fair process and the absence of physical restraint, but "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Com. v. Bullock, 590 Pa. 480, 913 A.2d 207, 214 (Pa. 2006)*, citing *Washington v. Glucksberg, 521 U.S. 702, 719-20, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997)*. The threshold issue is whether plaintiff [*14] possesses a protected liberty or property interest in the absentee vote count process. The Supreme Court has held that even "an unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the *due process clause*." *Snowden, 321 U.S. at 7*. "The right to become a candidate for state office . . . is a right or privilege of state citizenship, not of national citizenship which alone is protected by the privileges and immunities clause." *Id. at 6-7* (internal citations omitted). Similarly, even an unlawful denial of municipal office is not a denial of a right of property or liberty under the *due process clause*. Therefore, even if the absentee vote count process created the unlawful denial of municipal office it did not create an enforceable property or liberty right.

Plaintiff has not alleged that defendants abused their power or used governmental power as an instrument of oppression. The case law that he cites in his response is inapposite as the cases address candidate access to the ballot and the right of citizens to vote which are not at issue in this case. Plaintiff does not have a protected liberty or property interest [*15] in winning a municipal office, so he has not sufficiently alleged a constitutional violation to give rise to a claim under *§ 1983*. I will therefore grant defendants' motion to dismiss on this claim for failure to state a claim for a substantive due process violation.

Although a claim for a violation of plaintiff's right to procedural due process is not apparent in his pleadings, as defendants' address it in their response I will address this argument. Plaintiff received a full hearing before the Board of Elections and was provided an opportunity to raise any concerns about the election at that time, including an opportunity to challenge any absentee ballot brought to the Board. Although he had an opportunity to appeal the Board's decision before certification pursuant to *25 P.S. § 3146.8(e)*, he chose to forego his state appellate opportunities provided under the state election law for the purpose of giving candidates a meaningful opportunity to challenge the Board's certification. As he has cited no denial of any procedural right and, indeed, I can find none, plaintiff has failed to state a claim of procedural due process. I will therefore grant defendants' motion to dismiss on this [*16] claim for failure to state a claim of procedural due process.

*II. Voting Rights Act*

Plaintiff lacks standing to sue under the Voting Rights Act, either individually or on behalf of the voters of Philadelphia. *HN11*[⬆] In order to have standing to raise a claim before this Court, plaintiff must establish that he meets the three constitutional requirements for standing and the prudential considerations that courts have applied in determining standing. *Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 296 (3d Cir. 2003)*. To meet the constitutional requirements for standing, plaintiff must: (1) have suffered an injury in fact; (2) there must be a causal connection between the injury and the conduct complained of and (3) it must be likely and not speculative that the injury will be remedied by a favorable decision. *Id.* See also *Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. *HN12*[⬆] The prudential principles applied in determining whether there is standing are:

(1) the Plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties; (2) even when the Plaintiff has alleged redressable injury sufficient [*17] to meet the requirements of

Article III, the federal courts will not adjudicate abstract questions of wide public significance which amount to generalized grievances shared and most appropriately addressed in the representative branches; and (3) the Plaintiff's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

*Miller v. Nissan Motor Acceptance Corp., 362 F.3d 209, 221 (3d Cir. 2004)* (citations omitted). Plaintiff fails to satisfy both the constitutional and prudential standing requirements.

Plaintiff has not established the first requirement that he has suffered an injury in fact. **HN13**[↑] An injury in fact is " an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical . . . ." *Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 296 (3d Cir. 2003)*. In plaintiff's complaint, he alleges that "the standard, practice, and/or procedure in the Absentee Ballot process implemented by the Defendants was unfair and unlawful thereby permitting absentee ballots to be fraudulently cast. . . . [and] deprived Plaintiff of his rights [*18] enfranchised in the Voting Rights Act."

As noted in *Conway School Dist. v. Wilhoit, 854 F. Supp. 1430, 1432 -1433 (E.D. Ark. 1994)*, the Voting Rights Act originally conferred standing in express terms only upon the U.S. Attorney General. However, the Supreme Court held in *Allen v. State Board of Elections, 393 U.S. 544, 89 S. Ct. 817, 22 L. Ed. 2d 1 (1969)* that private litigants attempting to protect their voting rights were also proper parties to bring about the goals of the Act, thus granting standing to aggrieved voters "seeking judicial enforcement of the prohibition" against infringements upon the right to vote based on race. *Id. at 557*. Congress responded to the Supreme Court's holding in *Allen* by amending the Voting Rights Act to confer standing expressly upon "aggrieved persons" to enforce their voting rights. *42 U.S.C. 1973a*. The Eighth Circuit has held that **HN14**[↑] "standing to sue under [the Voting Rights Act] is limited to the [U.S.] Attorney General and to 'aggrieved persons,' a category that we hold to be limited to persons whose voting rights have been denied or impaired." *Roberts v. Wamser, 883 F.2d 617, 624 (8th Cir. 1989)*. [3]

――――――――――――――――

[3] The Roberts court explained:

We conclude that an unsuccessful candidate attempting

Specifically, *Roberts* held that **HN15**[↑] unsuccessful candidates for office lack standing to bring an action under the Voting Rights Act. *Id., see also White-Battle v. Democratic Party of Va., 323 F. Supp.2d 696, 703 (E.D. Va. 2004)*, holding that "[t]he purpose of the Voting Rights Act is to protect minority voters, not to give unsuccessful candidates for state or local office a federal forum in which to challenge elections;" *McGee v. City of Warrensville Heights, 16 F. Supp.2d 837, 846 (N.D. Ohio 1998)*, finding that "[p]laintiffs were not denied access to the ballot on account of their race nor do plaintiffs make more than a conclusory allegation in the complaint that individuals within the community were denied the right to vote for plaintiffs on the basis of their race. As plaintiff is an unsuccessful candidate for public office, his injury does not arise under the Voting Rights Act and he does not have standing as an individual to bring this suit.

Additionally, while plaintiff claims to be bringing this suit "individually and on behalf of voters of Philadelphia," he alleges no redressable injury to the voters - only to himself. According to his theory of [*21] the case, the only aggrieved parties are himself as an unsuccessful candidate and any absentee voters whose votes were allegedly mishandled during the vote-counting process. However, as he does not allege that the "voters of Philadelphia," whoever they may be, [4] were injured by

――――――――――――――――

[*19] to challenge election results does not have standing under the Voting Rights Act. Although the "aggrieved person" language might be stretched to include an unsuccessful candidate such as Roberts, we are unconvinced that Congress intended it to be stretched that far. The purpose of the Voting Rights Act is to protect minority voters, not to give unsuccessful candidates for state or local office a federal forum in which to challenge elections. In addition, we see good reasons why Congress would not have wished to confer standing on defeated candidates. First, because of the potential divergence between the interests of a candidate seeking office and citizens attempting to enforce their right to vote, it is difficult to see an aggrieved candidate as being a proper party to bring a Voting Rights Act action. And second, because state and local election contests are quintessential state and local matters, to extend standing to an unsuccessful candidate to challenge his electoral defeat under the Voting Rights Act would violate principles of federalism in a highly radical way-an intention that we should not attribute to Congress except upon its unmistakably clear manifestation in the statutory [*20] language. *Roberts, 883 F.2d at 621*.

[4] In his response, plaintiff claims to bring a claim on behalf of "all Philadelphia voters, regardless of their party affiliation or

the absentee ballot process, he has not established an injury in fact for that claim and therefore lacks standing for their claim as well. The prudential principles support that he cannot rest his claim to relief on the legal rights or interests of the voters. The claim plaintiff alleges on behalf of these voters, even if substantiated, would amount to *HN16*[↑] a "'generalized grievance' shared in substantially equal measure by all or a large class of citizens" and is not sufficient to confer standing. *Warth v. Seldin, 422 U.S. 490, 499, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)*; *see also* *Lujan, 504 U.S. at 560*, noting that the injury must be "concrete and particularized;" *Whitmore v. Arkansas 495 U.S. 149, 160, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990)*, holding that "the 'generalized interest of all citizens in constitutional governance' . . . is an inadequate basis on which to grant" standing; *Allen v. Wright, 468 U.S. 737, 754, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)*, noting that *HN17*[↑] "an asserted right to have the Government **[\*22]** act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court"; *Public Interest Research Group v. Magnesium Elektron, 123 F.3d 111, 121 (3d Cir. 1997)*, stating that "[t]he legal 'right' to have corporations obey environmental laws cannot, by itself, support standing."

Because plaintiff has not established the required elements to demonstrate that he has standing under the Voting Rights Act, I will grant defendants' motion to dismiss this claim. [5]

An appropriate Order follows.

ORDER

AND NOW, this 31st day of October 2008, upon consideration of defendants' motion to dismiss, plaintiff's response and defendants' reply, it is ORDERED that defendants' motion to dismiss on all counts is GRANTED. Judgment is entered in favor of defendants Philadelphia County Board of Elections, Judge Margaret

Tartaglione, Judge Edgar Howard, Judge Joseph Duda and Dennis Kelly and against plaintiff David Oh. Defendants' motion for reconsideration of denial of motion to dismiss and Jack Kelly's motion to intervene are DENIED as moot.

/s/ THOMAS N. O'NEILL, JR.

THOMAS N. O'NEILL, JR., J.

---

---

whom they voted for in the election."

[5] As I will dismiss all claims on other grounds, I will not address defendants' arguments regarding laches, his standing to bring a claim on behalf of voters on the *Section 1983* claim, a lack of case or controversy, impertinent material in the caption, eliminating the Board of Elections as a party, the redundancy of the remaining claims against the commissioners, the claims against defendants Tartaglione and Duda being dismissed because they did not sit as the Board in this election, the damages claim being stricken, failure to join an **[\*23]** indispensable party and abstention.

# Appendix Unpublished Opinion No.3

## Huertas v. City of Camden



**User Name:** Joe Grady
**Date and Time:** Tuesday, April 2, 2024 3:02:00PM EDT
**Job Number:** 220978558

## Document (1)

1. *Huertas v. City of Camden, 2004 U.S. Dist. LEXIS 34053*
   **Client/Matter:** 20659.24026
   **Search Terms:** Huertas v. City of Camden, 2004 U.S. Dist. LEXIS 34053, *22 (D.N.J. 2008)
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

Ⓐ Neutral

As of: April 2, 2024 7:02 PM Z

# *Huertas v. City of Camden*

United States District Court for the District of New Jersey

June 30, 2004, Decided; June 30, 2004, Filed

Civil Action No. 03-4025 (FLW)

**Reporter**

2004 U.S. Dist. LEXIS 34053 *

HECTOR L. HUERTAS, Plaintiff v. CITY OF CAMDEN, ET AL., Defendants

**Notice:** NOT FOR PUBLICATION

## Core Terms

alleges, police officer, violations, rights, employees, investigate, Municipal, asserts, alleged violation, deprivation, Ordinance, assault, courts, custom, burglary, malicious prosecution, constitutional right, abuse of process, police report, retaliation, summons, substantive due process, malicious use, discriminatory, disability, harassed, intentional infliction of emotional distress, procedural due process, fail to state a claim, proof of claim

**Counsel:** **[*1]** Hector L. Huertas, Plaintiff, Pro se, Camden, NJ.

For Melvin Primas, Gwendolyn Faison, Morton Bonaparte, Mr. Flax, Diane Hood, Cheryl Campbell, M. Zayas, Detective Woodward, and Tyrone Johnson, Defendant: Mark M. Cieslewicz, Assistant City Attorney, Office of City Attorney, Camden, NJ.

For 7-Eleven, Inc., Defendant: Walter H. Iacovone, Margolis Edelstein, Westmont, NJ.

**Judges:** Honorable Freda L. Wolfson, United States District Judge.

**Opinion by:** Freda L. Wolfson

## Opinion

**WOLFSON, District Judge**:

This matter has come before the Court upon two separate Motions to Dismiss Plaintiff's Complaint and Amended Complaint pursuant to *Fed. R. Civ. P.*

*12(b)(6)*.[1] The Motions to Dismiss were filed by Defendants Melvin Primas, Gwendolyn Faison, Morton Bonaparte, Mr. Flax, Diane Hood, Cheryl Campbell, M. Zayas, Detective Woodward, and Tyrone Johnson ("City Defendants"); and by Defendant 7-Eleven, Inc., on October 20, 2003 and March 25, 2004, respectively. This Court has jurisdiction pursuant to *28 U.S.C. §§ 1331*, *1343*, and *1367*. For the reasons discussed herein, the Court grants the Motion to Dismiss of Defendant 7-Eleven, and grants in part and denies in part the Motion to Dismiss of the City Defendants.

## I. PROCEDURAL HISTORY AND FACTS

On August 25, 2003, Plaintiff filed a complaint **[*2]** alleging violations of *42 U.S.C. §§ 1981*, *1982*, *1983*, and *1985(2)-(3)*; harassment; "threats"; libel; slander; intentional infliction of emotional distress; assault and

―――――――――――――――――――

[1] Plaintiff also filed a Motion for Partial Summary Judgment on January 8, 2004; a Motion for Sanctions against the City of Camden on February 23, 2004; and a Motion for Summary Judgment against 7-Eleven, Inc., Chan Mo Yang and Bobby Gopal on March 2, 2004. In response to Plaintiff's Motion for Summary Judgment, Defendant 7-Eleven filed the March 25, 2004 brief as a Motion to Dismiss, or Alternatively for Summary Judgment; the Court will only address the arguments that may properly be considered on a Motion to Dismiss. *Pension Benefit Guar. Corp. v. White Consol. Indust., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)* ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."). Plaintiff has also appealed Magistrate Judge Rosen's Order Staying Discovery in this case on April 29, 2004. The Court hereby directs that this decision shall dispose of all of Plaintiff's pending motions, in light of the narrowing of Plaintiff's claims. Plaintiff may file a Summary Judgment motion, consistent with this Opinion, for the claims which are not being dismissed.

2004 U.S. Dist. LEXIS 34053, *2

battery. Plaintiff filed an Amended Complaint[2] on November 17, 2003, asserting all of the claims listed above, and additional violations under 42 U.S.C. § 12132; 42 U.S.C. § 2000(d); and 42 U.S.C. § 3789d(c), as well as claims for "malicious prosecution, malicious use of process, [and] abuse of process."[3] Plaintiff's 168-paragraph Amended Complaint contains a laundry list of allegations that can be separated into several seemingly different and unrelated episodes, during which time Plaintiff alleges that he was wronged.

**A. Events Occurring at the 7-Eleven**

In paragraphs 1-31, Plaintiff describes an incident that allegedly occurred on June 22, 2003, at approximately 8:40 P.M., at a 7-Eleven store located at 2106 Federal Street in Camden. Plaintiff alleges that as he tried to give directions to I-95 to a store customer, Defendant B. Sewell, a N.J. Transit bus driver, told the customer that "he [Plaintiff] is going to mess you up," and gave the man different directions. ¶ 10. Defendant Sewell then allegedly yelled at and shoved Plaintiff repeatedly ¶¶ 11, 14, 16. Plaintiff also alleges that during the altercation, **[*3]** he was approached by a 7-Eleven employee who told Plaintiff that he was "always having problems with people." ¶ 13. Plaintiff called 911 to report this incident. ¶ 17. Plaintiff alleges that the 7-Eleven employees told the police officer who arrived that Plaintiff "[is] having problems with all the people around here," and "continued to wrongfully accuse" Plaintiff. ¶¶ 21, 23-27. Plaintiff alleges that the police officer told him that "[y]ou have to chill out," and left the scene, and that contrary to the police report, he was never "advised on complaint procedures." ¶¶ 29-31.

Paragraphs 32-59 describe an incident that occurred the next day, June 23, 2003, at the same 7-Eleven store. Plaintiff states that he "pointed his right index finger to his own right temple area and looked through the glass enclosure" at one of the 7-Eleven employees who was

present the day before, and that he "intended such gesture to indicate that [he] feels apprehension towards the incident of June 22, 2003." ¶¶ 32-33. Plaintiff alleges that in response, the employee yelled at Plaintiff and punched the window from inside the store. ¶ 33. Plaintiff views these actions as "hostile" towards him. ¶ 36. Plaintiff **[*4]** then told the 7-Eleven employee that he would be pressing charges against him and the other 7-Eleven employee who "made false statements to the police the night before." ¶ 39. Plaintiff alleges that in response, the 7-Eleven employee became "extremely threatening" and yelled at him. ¶ 40. Plaintiff again called 911. ¶ 41.

Plaintiff states that he discussed the incident of that evening with Police Officer Cheryl Campbell and another police officer who arrived to investigate, and that he was told that he would receive a police report. ¶ 42-43. Plaintiff alleges that at that time, he also complained about credit card fraud, which he believes was committed by 7-Eleven employees in March 2003, when he left his credit card at the store and incurred allegedly fraudulent charges. ¶¶ 44-46. Police Officer Campbell allegedly told Plaintiff that she was only able to investigate that evening's incident. ¶ 47. Plaintiff also alleges that Police Officer Campbell and the other police officer told him that they could put him in jail for pointing his finger at his head, and that he was "having problems" with the people at 7-Eleven. ¶ 49, 52, 54. He further alleges that they did not do anything to investigate **[*5]** the alleged "ulterior motive" of the 7-Eleven employees to keep him out of the store to cover up the fraudulent credit card charges or the "false statements" made to the police officers the evening before. ¶ 50, 51. Plaintiff maintains that the police report describing the incident is "fraudulent," and that because he was not acting in a threatening or disorderly manner and had not committed any criminal offenses, the police officers were threatening him with illegal incarceration. ¶¶ 58-59. Plaintiff alleges that "at all times during the events described above, the defendant police officers were engaged in a joint venture," because "they lent their physical presence and support and the authority of their office to each other during the said events and to the 7-Eleven employees and to N.J. Transit Bus Driver B. Sewell." ¶ 59.

**B. Events Occurring at the Tax Office for the City of Camden**

In paragraphs 61-86, Plaintiff alleges that he was wronged by the employees of the Tax Office for the City

---

[2] Plaintiff submitted his Amended Complaint with his Motion for Leave to Amend Complaint on November 17, 2003, which was granted by Magistrate Judge Joel B. Rosen on December 22, 2003. Citations to the Amended Complaint hereinafter will be denoted as ¶ __.

[3] Plaintiff attached several exhibits to his initial Complaint that were not attached as exhibits to the Amended Complaint. The Court will consider these exhibits, incorporated by reference in his Amended Complaint, for the purpose of ruling on Defendants' motions to dismiss.

of Camden. Plaintiff came to the Tax Office for the City of Camden on July 3, 2003, to investigate a tax lien attached to his property that was supposed to be identified in his bankruptcy filing. **[*6]** ¶ 62. Plaintiff alleges that when he told a person who identified himself as Mr. Flax that he was receiving bills in the mail from the Municipal Utilities Authority for about $ 5,000, Mr. Flax informed him that he should call the Municipal Utilities Authority to inquire about a proof of claim, and to inform the bankruptcy trustee about these bills. ¶¶ 65-67. Plaintiff alleges that he requested a proof of claim, and Mr. Flax told him he would call him about it the following week. ¶¶ 68-69. Plaintiff states that he returned to the office on July 10, 2003, and asked for a printout of his property tax account, which Mr. Flax at first refused to give him, but gave to him before he left the office. ¶¶ 78, 80. Plaintiff alleges, however, that he asked again for a proof of claim for the line items on the account, including "other charges," and was told that it would be mailed to him, but as of the time of the Amended Complaint, he had not received the proof of claim. ¶¶ 83-85.

### C. Alleged Burglary that Occurred on July 21, 2003

Paragraphs 87-113 discuss the Camden Police Department's investigation of a burglary that allegedly occurred at Plaintiff's unoccupied residence at 134 N. 32nd Street **[*7]** on July 21, 2003. Plaintiff believes that an individual whom he paid to cut the grass a few days earlier, named "Marcel" or "Home Depot," burglarized the property. ¶¶ 87-92. Plaintiff alleges that he relayed this belief to Police Officer Zayas, who responded to his 911 call. ¶ 90-92. Plaintiff alleges that Zayas' police report is fraudulent because it does not accurately represent the statements made by Plaintiff. ¶ 98. Defendant Detective Johnson called Plaintiff to tell him about an individual matching Plaintiff's description of the man who he believes burglarized his property, and told Plaintiff that he was seen attempting to sell an air conditioner at a store. ¶¶ 99-101. Plaintiff states that Detective Johnson told Plaintiff that he would call him back, but never did so, and failed to respond to his "numerous other messages." ¶¶ 103, 108.

### D. Ordinance MC-266-26K

Paragraphs 114-139, added to the Amended Complaint, describe an incident from November 10, 2003. Plaintiff alleges that he had a telephone conversation with City of Camden Public Works Supervisor Munoz about a

Municipal Court summons regarding trash and weeds in his yard in violation of a city ordinance that was "intentionally **[*8]** mailed to an erroneous address." ¶ 114. Plaintiff alleges that "Defendant Munoz' information"[4] was defective on account of a lack of specificity. ¶¶ 128-136. Plaintiff also argues that the ordinance for which he received the summons is unconstitutional as applied to Plaintiff, because it was selectively enforced against Plaintiff on account of his ethnicity, disabilities, and the filing of the instant complaint. ¶¶ 161-167.

### III. DISCUSSION

To accompany his laundry list of allegations, Plaintiff also asserts a laundry list of claimed violations.

Plaintiff claims that as a result of the two incidents at 7-Eleven, his "civil rights pursuant to *42 U.S.C. § 1981, 1983, 1985(2)* and *(3)*" were violated because of the allegedly falsified police report and because the police allegedly took sides "with N.J. Transit Bus Driver B. Sewell because he is African American," and "with the 7-Eleven Employees because they are Asian and from India which is a civil rights violation because Hector L. Huertas is a Hispanic minority." ¶ 60a. Plaintiff also claims that as a result of the 7-Eleven incidents, his *First*, *Fourth*, and *Fourteenth Amendment* rights were violated because of the alleged interference with his access to the City of Camden justice system. ¶ 60b. **[*9]** He also alleges violations of the *First*, *Fourth*, and *Fourteenth Amendments* because he was allegedly harassed "based upon his race and ethnicity of Hispanic" when Officer Campbell and her partner (1) allegedly falsified a police report, (2) allegedly threatened Plaintiff with illegal incarceration, and (3) allegedly deterred Plaintiff from shopping at the 7-Eleven; and because the 7-Eleven employees demanded that the officers threaten Plaintiff, which made Plaintiff fearful of personally serving them with a complaint. ¶ 60c.

Plaintiff also asserts substantive due process violations

---

[4] It is unclear from the Amended Complaint whether Plaintiff means the Summons and Complaint or his conversation with Munoz when referring to the defects of "Defendant Munoz' information." The Court will therefore discuss this claim as if he has alleged both. *Becker v. C.I.R., 751 F.2d 146, 149 (3d Cir. 1984)* (allegations by pro se Plaintiffs are to be "liberally construed") (citing *Haines v. Kerner, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972))*.

under the *Fifth* and *Sixth Amendments* for "abuses of executive power and conduct intended to injure unjustified by any city governmental interests." ¶ 60d. He further asserts procedural due process violations under the *Equal Protection Clause* and the *Fifth* and *Sixth Amendments* for refusing to investigate and for refusing to provide instructions regarding how to file a complaint against B. Sewell and 7-11 employees for harassment and false statements made regarding Plaintiff, and for failing to provide Plaintiff with Defendant Sewell's address information. ¶ 60e.

Plaintiff alleges that with respect to his encounters with the Tax Office for the City of Camden, his *First*, *Fourth* and *Fourteenth Amendment* rights were violated because Defendant **[*10]** Flax "effectively deterred Hector L. Huertas from obtaining a printout from the tax assistant regarding his property tax account" and harassed Plaintiff by stating that such a printout "will confuse you." ¶ 86a. Plaintiff further alleges violations of *§ 1981*, *§ 1983* and substantive due process violations under the *Fifth* and *Sixth Amendments* for "abuses of executive power, abuse of process, malicious use of process, monetary loss, and conduct intended to injure unjustified by any city governmental interests because Hector L. Huertas is a Hispanic minority." ¶ 86b. Plaintiff also asserts procedural due process violations under the *Equal Protection Clause* and the *Fifth* and *Sixth Amendments* for harassing Plaintiff and refusing to provide him with a proof of claims and instructions for filing a complaint or appeal with respect to the alleged errors contained in Plaintiff's property tax account. ¶ 86c.

With respect to the investigation of the alleged burglary of his house, Plaintiff claims that (1) the police officers' alleged refusal to investigate the alleged burglary at his house; (2) their alleged refusal to provide instructions for filing a complaint against the suspect identified by Plaintiff; (3) their alleged failure to provide Plaintiff with "an appropriate **[*11]** burglary/incident report"; (4) their alleged failure to provide Plaintiff with the names and addresses of the suspect identified by Plaintiff; and (5) the alleged falsification of police reports violated his rights under *§§ 1981*, *1983*, *1985(2)* and *(3)* because he is Hispanic, and constituted "procedural due process violations under the *Equal Protection Clause* and the *Fifth* and *Sixth Amendments*." ¶ 113a. Plaintiff also asserts that his *First*, *Fourth* and *Fourteenth Amendment* rights were violated because his access to the courts to pursue the criminal suspect's violations of "municipal and federal criminal civil rights statutes" was interfered with by the police officers. ¶ 113b. He further

asserts "[c]ivil rights violations pursuant to *§§ 1981*, *1983* and substantive due process violations under the *Fifth* and *Sixth Amendments* for abuses of executive power, abuse of process, malicious abuse of process, monetary loss, and conduct intended to injure unjustified by any city governmental interests." ¶ 113c.

Plaintiff asserts that the enforcement of the Municipal Ordinance and mailing of the summons to an erroneous address violate his *First Amendment* rights because such actions were designed to retaliate against Plaintiff for filing the instant complaint against City Officials. ¶¶ 138, 166. Plaintiff also alleges that this incident constituted **[*12]** violations of "his constitutional rights of equal protection under the *First*, *Fourth*, and *Fourteenth Amendments to the United States Constitution* for intentionally discriminating against Plaintiff because of his national origin, ethnicity, race, and permanent disability." ¶ 142. Plaintiff further alleges that the Ordinance for which he received a summons, MC-266-26K, is unconstitutional and violates federal disability statutes. ¶ 161.

In addition to the specific incidents discussed above, Plaintiff also alleges that prior to November 8, 2003, the City of Camden developed and maintained policies, practices, or customs exhibiting "deliberate indifference to the constitutional rights of persons in Camden, including Hispanic individuals, which caused the violation of Hector L. Huertas' rights." ¶ 157.

Plaintiff alleges that citizen victim complaints are improperly investigated, including crimes committed by African-Americans against Hispanics generally, and the following specific incidents: (1) Plaintiff was wrongfully singled out for having tall weeds in his backyard even though "all individuals on planet earth" had such tall weeds, on or about September 27, 1993; (2) Plaintiff was wrongfully accused of "breach of peace" on or about September 2, 1998 **[*13]** for an incident with an African-American man who chose not to pursue charges; (3) Plaintiff's claim that he was allegedly assaulted on or about December 21, 2001 was improperly investigated, and instead Plaintiff was wrongfully accused of trespassing on the alleged assaulter's property; and that the police failed to file a report about this incident; (4) an African-American police officer injured Plaintiff's cousin "for no good reason"; (5) White and African-American detectives failed to investigate an incident "on or about spring of 1996 or 1997" when Mr. Huertas was allegedly assaulted by an African-American woman at a Dunkin Donuts store; (6) an African American police officer failed to investigate

2004 U.S. Dist. LEXIS 34053, *13

an incident on or about the summer of 1989 when Plaintiff was assaulted at a gas station; (7) authorities have failed to investigate the house fires, drug dealing, and prostitution that occur in Hispanic neighborhoods; (8) an African-American police officer verbally abused Plaintiff while walking toward the McDonalds on Haddon Avenue when he told him to "come here," and "next time I tell you to come here you better come to me." ¶ 158. Plaintiff also alleges that it was the policy, practice **[\*14]** and custom of the City of Camden to inadequately supervise and train its police officers and City employees. ¶ 159.

Plaintiff also points to the implementation of a majority run-off statute within the City of Camden shortly after the city's first Hispanic mayor was elected as evidence of African-American officials' purposeful discrimination against Hispanics. ¶ 141.

## A. Motion to Dismiss Standard

A federal court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Doe v. Delie, 257 F.3d 309, 313 (3d Cir. 2001)* (citation omitted). Civil rights plaintiffs are not subject to a heightened pleading requirement, but rather must only contain a "short and plain statement" of the claim pursuant to *Fed. R. Civ. P. 8(a)*. *Alston v. Parker, 363 F.3d 229, 233-34 (3d Cir. 2004)*. In addition, pro se complaints are held to less stringent standards than formal pleadings drafted by lawyers, and the allegations are to be "liberally construed." *Becker v. C.I.R., 751 F.2d 146, 149 (3d Cir. 1984)* (citation omitted). Thus, the Court will "apply the applicable law, irrespective of whether the pro se litigant has mentioned it by name." *Dluhos v. Strasberg, 321 F.3d 365, 369 (3d Cir. 2003)* (citing *Higgins v. Beyer, 293 F.3d 683, 688 (3d Cir. 2002))*. However, although the Court must accept as true all factual allegations in the complaint, it "need not credit **[\*15]** a complaint's 'bald assertions' or 'legal conclusions'" when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)*.

## B. *42 U.S.C. § 1981* and *§ 1982*

Plaintiff alleges that each of the incidents described above give rise to a claim under *42 U.S.C. § 1981*. *Section 1981* prohibits racial discrimination in the making and enforcement of contracts and property

transactions. *Brown v. Phillip Morris Inc., 250 F.3d 789, 796 (3d Cir. 2001)* (citation omitted).[5] In order to state a claim under *§ 1981*, a Plaintiff "must allege facts in support of the following elements: (1) [that Plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the Defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute...." Id. (citation omitted). *Section 1982* prohibits racial discrimination in transactions relating to real or personal property. *Id. at 797*.[6] In order bring an action under *§ 1982*, a plaintiff "must allege with specificity facts sufficient to show or raise a plausible inference of (1) the defendant's racial animus; (2) intentional discrimination; and (3) that the defendant deprived plaintiff of his rights because of race." Id. (citation omitted).

Plaintiff has not pled facts indicating that he was the victim of racial discrimination relating to the making and enforcement of contracts and property **[\*16]** transactions. Id. Plaintiff's claims under *§§ 1981* and *1982* must therefore be dismissed.

## C. *42 U.S.C § 1983*[7]

*Section 1983* provides a cause of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected" any person to the deprivation of any right protected by federal law or the United States

---

[5] "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." *42 U.S.C. § 1981*.

[6] "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." *42 U.S.C. § 1982*.

[7] Because *Section 1983* affords Plaintiff remedies for any constitutional violations that can be established, the Court will confine its discussion of Plaintiff's constitutional claims to whether Plaintiff has presented constitutional claims that suffice to form the basis of an action under *§ 1983*. See *Rogin v. Bensalem Township, 616 F.2d 680, 686-87 (3d Cir. 1980)*.

2004 U.S. Dist. LEXIS 34053, *16

Constitution. Because *§ 1983* only provides for a remedy where the alleged deprivation is caused or committed by a state actor, Plaintiff's 1983 claims against the 7-Eleven defendants must be dismissed. See *Higgins, 293 F.3d at 688*.

*Section 1983* does not create substantive rights, but "merely provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." *Estate of Smith v. Marasco, 318 F.3d 497, 505 (3d Cir. 2003)* (citing *Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996))*.[8] Thus, to demonstrate entitlement to a *§ 1983* remedy, a Plaintiff must prove a deprivation of a constitutional or federal right. Plaintiff alleges numerous violations of constitutional rights, specifically, rights under the *First*, *Fourth*, *Fifth*, *Sixth*, and *Fourteenth Amendments*. ¶¶ 60, 86, 113, 140, 168.

**1. *Fourth*, *Fifth* and *Sixth Amendments***

Plaintiff alleges violations of the *Fourth Amendment*, applicable to the states through the *Fourteenth Amendment*.[9] Plaintiff has stated no facts indicating that he was searched. Plaintiff also states no facts demonstrating **[*17]** that he was seized. "A seizure within the meaning of the *Fourth Amendment* occurs 'whenever a police officer accosts an individual and restrains his freedom to walk away.'" *Leveto v. Lapina, 258 F.3d 156, 166 (3d Cir. 2001)* (citing *Terry v. Ohio, 392 U.S. 1, 16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968))*. Nor does Plaintiff allege facts supporting a *Fourth Amendment* claim for the excessive use of force by a police officer in the course of an arrest, as Plaintiff makes no allegations that he was arrested. *Graham v. Connor, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)* (holding that claims that law officers used excessive force should be analyzed under the *Fourth Amendment*).

_____

[8] *Section 1983* provides for redress against any person who is subjected to the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." by the hands of a state actor. *42 U.S.C. § 1983*.

[9] The *Fourth Amendment* provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *U.S. Const. amend. IV*.

Plaintiff also alleges due process violations under the *Fifth* and *Sixth Amendments*. ¶ 60d (substantive), ¶ 60e (procedural), ¶ 86c (procedural), ¶ 113c (substantive). There is no *Sixth Amendment* due process right, and the Court perceives no other grounds for a *Sixth Amendment* violation in Plaintiff's case, as he is not a criminal defendant.[10] The *due process clause of the Fifth Amendment* applies only to the federal government, and Plaintiff does not state a claim against the federal government. *Schweiker v. Wilson, 450 U.S. 221, 227 n. 6, 101 S. Ct. 1074, 67 L. Ed. 2d 186 (1981)*. Plaintiff therefore does not state a claim for violations under the *Fourth*, *Fifth* or *Sixth Amendments*.

**2. *First Amendment***

Plaintiff does not point to any state action specifically abridging his rights of freedom of speech, the press, assembly, petition, or association. There are no speech interests implicated by Plaintiff's claim he was "effectively deterred... from engaging in lawful activity, **[*18]** e.g., shopping at the 7-Eleven convenience store." To the extent that Plaintiff is attempting to state a claim for a violation for freedom of association, this claim fails. There are two types of freedom of association that are constitutionally protected: intimate association and expressive association. *Roberts v. United States Jaycees, 468 U.S. 609, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)*.[11] Plaintiff

_____

[10] The *Sixth Amendment* provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." *U.S. Const. amend. VI*.

[11] The Roberts court discussed the two strands of freedom of association: "In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the *First Amendment*--speech, assembly, petition

here does not allege a violation of either type of right.

Plaintiff also appears to allege a claim for retaliation based on the exercise of his *First Amendment* rights in filing the instant lawsuit. To state a *§ 1983* claim for such retaliation, a plaintiff must allege that: (1) the plaintiff engaged in protected activity; (2) the government responded with retaliation; and (3) the protected activity was the cause of the retaliation. *Estate of Smith, 318 F.3d at 512*. Plaintiff asserts that "the City's enforcement activities and mailing of the Municipal Summons to an erroneous address are designed to retaliate against plaintiff for filing his lawsuit against City officials, which violate plaintiff's *First Amendment* rights." ¶ 139. The Court finds, however, that such a statement is precisely the type of bald assertion that it need not credit: Plaintiff states in the very next sentence of his complaint that "[a]fter all, Camden City Municipal **[*19]** Judge James W. Faison III seems to be related, i.e. son, to defendant Mayor Gwendolyn Faison." ¶ 139. Plaintiff's conclusion that the summons was retaliatory because the judge to whom the case was assigned has the same last name as the Mayor indicates the frivolity of this claim.

Plaintiff also alleges a violation of denial of access to the courts, which is rooted in the *First Amendment*, as well as the Article IV Privileges and Immunities Clause, the *Fifth Amendment*, and the *Fourteenth Amendment*. *Christopher v. Harbury, 536 U.S. 403, 415 n. 12, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002)*. To state a claim for failure of access to the courts, plaintiff must state an "actual injury." *Lewis v. Casey, 518 U.S. 343, 351, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996)*. Plaintiff is proceeding with an access to the courts claim in light of his allegations that Camden police officers filed false reports, and failed to properly investigate the burglary of his house. ¶ 60b, ¶ 113b.

The filing of false police reports is not in and of itself a constitutional violation. *Bush v. City of Philadelphia, 1999 U.S. Dist. LEXIS 11428, 1999 WL 554585, at *4 (E.D.Pa. July 5, 1999)* (collecting cases). Moreover, a bad police investigation is actionable under *§ 1983* only if it results in a constitutional deprivation of some right. *Id. at *5* (collecting cases). When an alleged access to courts violation occurs prior to the filing of an action, a plaintiff must establish that defendants' actions

foreclosed him from filing suit in state court or **[*20]** rendered ineffective any state court remedy he previously may have had, such that "effective" and "meaningful" access to the courts has been denied. *Swekel v. City of River Rouge, 119 F.3d 1259, 1263-4 (6th Cir. 1997)* (noting that there is no access to courts violation where plaintiff knows the identity of defendants and has all of the requisite access to the facts to file suit). Plaintiff fails to allege any facts indicating that he was foreclosed from filing a lawsuit, or that he was not aware of all of the facts required to file a suit. In fact, he has filed the instant lawsuit, which appears to contain all of Plaintiff's underlying claims.

Allegations of retaliation for filing lawsuits would state a claim under *§ 1983* because it implicates access to the courts. *Grimm v. Borough of Norristown, 226 F. Supp. 2d 606, 639 n. 24 (E.D. Pa. 2002)*. As discussed above, however, the Court finds that Plaintiff does not properly assert a retaliatory motive. Therefore, Plaintiff's claim against the City Defendants based on access to the counts must be dismissed.

### 3. *Fourteenth Amendment*[12]

Although Plaintiff asserts due process violations under the *Fifth* and *Sixth Amendments*, as discussed above, instead of the *Fourteenth Amendment*, the Court will discuss the adequacy of Plaintiff's due process allegations under the *Fourteenth Amendment*, the law that should be applied to these claims. *Dluhos, 321 F.3d at 368*.

#### a. Procedural Due Process

Claims for violations **[*21]** of procedural due process under *§ 1983* are analyzed under a two-step inquiry. First, the court must inquire whether "the asserted individual interests are encompassed within the *Fourteenth Amendment's* protection of 'life, liberty, or property.'" *Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)* (citing *Robb v. City of Philadelphia, 733 F.2d 286,*

---

for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties. *Id. at 618*.

---

[12] The *Fourteenth Amendment* provides, in part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

2004 U.S. Dist. LEXIS 34053, *21

292 (3d Cir. 1984)) . Second, the court is to inquire whether the procedures available provided the plaintiff with "due process of law." Id. Since Plaintiff has not identified an interest in life, liberty or property that has been violated, the Court need not reach the second step in the analysis. With respect to the various statements that Plaintiff alleges were made to harass him, the Supreme Court specifically has held there is no liberty or interest based on defamation or property damage to reputation that can form the basis of a claim under § 1983. Paul v. Davis, 424 U.S. 693, 712, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976).

### b. Substantive Due Process

In order to establish a violation of substantive due process, as with procedural due process, a plaintiff must first establish the existence of a constitutionally protected property or liberty interest. Woodwind Estates, Ltd. v. Gretkowski, 205 F.3d 118, 123 (3d Cir. 2000), abrogated on other grounds, United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392 (3d Cir.2003). A plaintiff must also show that government officials have acted in violation of that interest in a manner that "shocks the conscience." County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998). Substantive due process protections have [*22] generally been limited to "matters relating to marriage, family, procreation, and the right to bodily integrity," and the Supreme Court has been reluctant to expand its boundaries. Albright v. Oliver, 510 U.S. 266, 272, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) (plurality opinion). Plaintiff does not identify an interest that fits within any of these categories. The Court finds that Plaintiff has not stated a claim for a violation of substantive due process under the Fourteenth Amendment.

### c. Equal Protection

Equal protection violations under the Fourteenth Amendment must be supported by proof of racially discriminatory intent or purpose. City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., 538 U.S. 188, 194, 123 S. Ct. 1389, 155 L. Ed. 2d 349 (2003) (citation and quotes omitted). There are three ways in which purposeful discrimination can be demonstrated. First, a law or policy that classifies citizens on the basis of race on its face is constitutionally suspect and subject to strict scrutiny. Hunt v. Cromartie, 526 U.S. 541, 546, 119 S. Ct. 1545, 143 L. Ed. 2d 731 (1999). Second, a suspect classification is created where a law that is neutral on its face is administered in a discriminatory manner. Yick Wo v. Hopkins, 118 U.S. 356, 6 S. Ct. 1064, 30 L. Ed. 220 (1886). Third, a law that is neutral on its face and is applied in accordance with its terms may violate the equal protection clause if motivated by a discriminatory intent and having a discriminatory impact. Rodgers v. Lodge, 458 U.S. 613 (1982).

Plaintiff's allegations all fall under the second of these categories: that Plaintiff was the victim of laws or policies [*23] that, although neutral on their face, are being administered in a discriminatory manner. The Court interprets Plaintiff's Amended Complaint to allege that the Camden Police were filing false police reports and failing to investigate the burglary at his home because he is Hispanic. The Court also interprets Plaintiff's Amended Complaint to allege that the Municipal Ordinance was being selectively enforced against him because he is Hispanic. Under the liberal pleading standard set forth in Alston, 363 F.3d at 233-34, the Court finds that Plaintiff's claim complies with Rule 8(a), and is not subject to Fed. R. Civ. P. 12(b)(6). The Court thus finds that Plaintiff may proceed with his claim under § 1983 for violations of the equal protection clause of the Fourteenth Amendment, but only with respect to the incidents at the 7-Eleven, the investigation of the burglary of his home, and the enforcement of the municipal ordinance.[13] The Court finds that Plaintiff fails to state a claim for which relief can be granted for his encounter with the Tax Office of the City of Camden. Thus, Plaintiff's claim can go forward only against the Defendant Police Officers and Mr. Munoz, as well as the City of Camden, as discussed below.

### 4. Other Allegations Under § 1983

Plaintiff appears to believe that Detective Johnson's [*24] failure to return his phone calls and the

_____

[13] The Court is not ruling upon the viability of the claim regarding the enforcement of the Municipal Ordinance because this was raised for the first time in the Amended Complaint, filed after the City Defendants' Motion to Dismiss. Further, the Court is not ruling on whether Plaintiff has adequately stated a claim against the City of Camden that the enforcement of the Municipal Ordinance was a policy that constituted deliberate indifference to his Fourteenth Amendment rights. See Part C.5, infra. The Defendants may file a Motion to Dismiss and/or for Summary Judgment as to these claims, if deemed to be appropriate.

police department's failure to apprehend the suspect identified by Plaintiff give rise to a violation for "malicious prosecution." To the extent that his *§ 1983* claim is based on malicious prosecution, it must be dismissed, as (1) plaintiff has never been prosecuted (2) even if Plaintiff had been prosecuted, such a claim would not accrue until proceedings against the defendant are dismissed. *Smith v. Holtz, 87 F.3d 108, 110 (3d Cir. 1996)*. To the extent that Plaintiff's *§ 1983* claim is based on a constitutional right to be free from threats of arrest, such a claim must fail, as no such constitutional right exists. See, e.g., *Dick v. Gainer, 1998 U.S. Dist. LEXIS 6109, 1998 WL 214703, at *5 (N.D. Ill. Apr. 23, 1998)*.

**5. Municipal Liability**

Plaintiff also alleges violations on the part of the City of Camden. Municipalities may not be held liable under *§ 1983* based on a respondeat superior theory of liability. *Natale v. Camden County Correctional Facility, 318 F.3d 575, 583-84 (3d Cir. 2003)* (citing *Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 692 (1978))*. To the extent that Plaintiff is proceeding against the City of Camden merely because it is the employer of any of the individual defendants, he fails to state a claim under *§ 1983*.

However, Plaintiff also asserts claims against the City of Camden for "maintaining policies, practices or customs exhibiting deliberate indifference to the constitutional rights of persons in Camden, including **[*25]** Hispanic individuals, which caused the violation of Hector L. Huertas' rights." ¶ 157. Municipal customs for *§ 1983* purposes are those practices that "[a]lthough not authorized by written law,... [are] so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Monell, 436 U.S. at 691* (quoting *Adickes v. S.H. Kress & Co., 398 U.S.144, 167-68, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*.

Plaintiff further asserts claims against the City of Camden based on negligent supervision and training of police officers and City employees. Municipal liability for negligent supervision will only be found where a constitutional violation results from "deliberate indifference to the constitutional rights of its inhabitants." *Groman v. Township of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995)* (quoting *City of Canton, Ohio v. Harris, 489 U.S. 378, 392, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989))*. Plaintiffs must show: (1) the existence of a custom or practice that creates an unreasonable risk of

a constitutional violation; (2) that the supervisor was aware of the risk; (3) that the supervisor was indifferent to the risk; and (4) the supervisor's inaction was a direct cause of the plaintiff's injury. *Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)* (interpreting City of Canton).

Pursuant to *Alston, 363 F.3d at 233-34*, the Court finds that Plaintiff has adequately stated a claim that Camden failed to adequately train their employees to properly investigate the complaints of Hispanics.

**D. *42 U.S.C. § 1985(2)* and *(3)***

Plaintiff also brings claims under **[*26]** *§ 1985(2)* and *§ 1985(3)* for each of the events described above. There are two different categories of prohibited acts that arise under *§ 1985(2)*: (1) intimidating or interfering with witnesses in federal court; and (2) obstructing justice in state courts in order to deny any citizen the equal protection of the laws. *Nadig v. Nagel, 272 F. Supp. 2d 509, 513 (E.D. Pa. 2003)*; *Kush v. Rutledge, 460 U.S. 719, 723, 725, 103 S. Ct. 1483, 75 L. Ed. 2d 413 (1983)*. Plaintiff does not allege that any of the defendants intimidated or interfered with witnesses in federal court. In order to demonstrate that defendants obstructed justice in state court, "a Plaintiff must first point to some state proceeding." *Breslin v. Brainard, 2002 U.S. Dist. LEXIS 21845, 2002 WL 31513425, at *9 (E.D. Pa. Nov. 1, 2002)*. Plaintiff does not allege facts pointing to a state proceeding. Because Plaintiff fails to allege facts that satisfy either category of prohibited acts under *§ 1985(2)*, his claim under *§ 1985(2)* must be dismissed.

*Section 1985(3)* protects persons from deprivations of rights committed by either private or state actors as part of a conspiracy. *Brown, 250 F.3d at 805*.[14] *Section 1985(3)*, like *§ 1983*, does not create any substantive

_____

[14] "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." *42 U.S.C. § 1985(3)*.

2004 U.S. Dist. LEXIS 34053, *26

rights, but rather serves as a vehicle for vindicating federal rights and privileges that have been elsewhere defined. Id. (citing *Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 376, 99 S. Ct. 2345, 60 L. Ed. 2d 957 (1979)*). To succeed in an action under *§ 1985(3)*, a Plaintiff must show "(1) a conspiracy; (2) motivated by a racial or class-based discriminatory animus, designed to deprive, directly or indirectly, **[*27]** any person or class of persons of equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *White v. Williams, 179 F. Supp. 2d 405, 421 (D.N.J. 2002)* (citing *Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997))*.

The Supreme Court has recognized only two rights protected by *§ 1985(3)*: the right to be free from involuntary servitude and the right to interstate travel. See *Brown, 250 F.3d at 805* (citing *Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 278, 113 S. Ct. 753, 122 L. Ed. 2d 34 (1993))*; see also *Dixon v. Boscov's, Inc., 2002 U.S. Dist. LEXIS 13815, 2002 WL 1740583, at *2 (E.D. Pa. July 17, 2002)*. Plaintiff has not alleged impairments of either right. Even assuming that *§ 1985(3)* were not limited to these two rights, in support of his allegation of conspiracy, Plaintiff asserts solely that the Asian American 7-Eleven employees took sides with the defendant Sewell because he is African American "which is a civil rights violation because Hector L. Huertas is a Hispanic minority." ¶ 60a. The Court finds that this is precisely the type of bald assertion that it need not credit. Plaintiff's claim under *§ 1985(3)* must therefore be dismissed.

### E. *42 U.S.C. § 12132*; *42 U.S.C. 2000d*; *42 U.S.C. § 3789(d)*

In his Amended Complaint, Plaintiff alleges violations of Title II of the Americans with Disabilities Act (ADA), codified at *42 U.S.C. § 12132*.[15] To demonstrate a violation of Title II, a plaintiff must prove that "(1) he is a 'qualified individual with a disability;' **[*28]** (2) he is being excluded from participation in or being denied the benefits of some 'services, programs, or activities,' by

reason of his disability; and (3) the entity which provides the service, program or activity is a public entity." *Soto v. City of Newark, 72 F. Supp. 2d 489, 492 (D.N.J. 1999)*. Plaintiff's Amended Complaint does not mention a program, service, or activity from which he is being excluded or denied benefits. Plaintiff therefore fails to state a claim under *§ 12132*. Plaintiff also alleges violations of *42 U.S.C. § 2000d*,[16] which prohibits intentional discrimination or exclusion from programs or activities receiving federal financial assistance. *Cureton v. Nat'l Collegiate Athletic Ass'n., 198 F.3d 107, 113 (3d Cir. 1999)* (citations omitted). Plaintiff's Amended Complaint identifies no programs or activities receiving federal financial assistance from which he has been excluded or under which plaintiff was allegedly the victim of discrimination. Plaintiff's claims under *42 U.S.C. § 2000d* (as well as his claim under *section 601* of Title VI) are therefore dismissed.

Plaintiff's final federal claim is for violations of the antidiscrimination provision of the Omnibus Crime Control and Safe Streets Act of 1968, *42 U.S.C. § 3789d(c)*.[17] Plaintiff's Amended Complaint fails to identify a "program or activity" under which he was subjected to discrimination or denied employment, nor **[*29]** does it allege facts showing a nexus between the expenditure of federal funds and any alleged discrimination, and thus fails to state a claim under this section. See *U.S. v. City of Philadelphia, 644 F.3d 187, 205-206 (3d Cir. 1980)*.

### F. Supplemental Jurisdiction

Plaintiff also asserts state law claims of libel, slander, assault, battery, intentional infliction of emotional

---

[15] Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *42 U.S.C. § 12132*.

---

[16] In Counts VI and VII of the Amended Complaint, Plaintiff also asserts claims under "*§ 601*" as a separate violation. Plaintiff is presumably referring to *§ 601* of Title VI, which is codified as *42 U.S.C. § 2000d*, which provides that "[n]o person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

[17] "No person in any State shall on the ground of race, color, national origin, or sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under or denied employment in connection with any programs or activity funded in whole or in part with funds made available under this chapter." *42 U.S.C. § 3789d(c)(1)*.

2004 U.S. Dist. LEXIS 34053, *29

distress, malicious prosecution, malicious use of process, and abuse of process. This Court may exercise supplemental jurisdiction over state law claims that are "so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *28 U.S.C. § 1367(a)*.

## 1. Intentional Infliction of Emotional Distress

Under New Jersey law, in order to establish an intentional infliction of emotional distress claim, a plaintiff must show that (1) that the defendant intended to cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the actions proximately caused emotional distress; and (4) that plaintiff's emotional distress was severe. *Witherspoon v. Rent-A-Center, Inc., 173 F. Supp.2d 239, 242 (D.N.J. 2001)* (citing *Buckley v. Trenton Sav. Fund Soc., 111 N.J. 355, 544 A.2d 857 (1988))*. "To establish extreme and outrageous conduct, a plaintiff must show conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to **[*30]** be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. Plaintiff does not plead facts to demonstrate an action on the part of any of the Defendants that rises to the required level of outrageous and extreme behavior, and his claims for intentional infliction of emotional distress must be dismissed as to all Defendants.

## 2. Assault and Battery

A person can be found guilty of assault under New Jersey law if he or she (1) attempts to purposely, knowingly or recklessly cause bodily injury to another; or (2) negligently cause bodily injury to another with a deadly weapon; or (3) attempts by physical menace to put another in fear of imminent serious bodily injury. *N.J.S.A. 2C:12-1* (2004). Any non-consensual touching is a battery. *Perna v. Pirozzi, 92 N.J. 446, 461, 457 A.2d 431 (1983)*. Plaintiff does not plead any facts indicating that any Defendant attempted to cause bodily injury to him, or put him in fear of imminent serious bodily injury. He also does not plead facts demonstrating non-consensual touching, except with respect to Defendant Sewell. Plaintiff's claims for assault and battery are therefore dismissed as to all Defendants except for Defendant Sewell.

## 3. Malicious Prosecution, Malicious Use of Process, Abuse of Process

In **[*31]** order to establish a claim for malicious prosecution, plaintiff must prove (1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff. *Helmy v. City of Jersey City, 178 N.J. 183, 190, 836 A.2d 802 (2003)*. Because Plaintiff has not pled facts indicating that a criminal action was instituted by any defendant, his claim for malicious prosecution must be dismissed.

Plaintiffs bringing an action for malicious use of process are required to prove that a defendant brought an action without probable cause, that it was actuated by malice, has been terminated favorably to the plaintiff, and that plaintiff suffered a special grievance. *Tedards v. Auty, 232 N.J.Super. 541, 549, 557 A.2d 1030 (App. Div. 1989)*. Plaintiff presumably brings this claim based on the belief that he was improperly served with a Summons for violation of the Municipal Ordinance. However, he does not plead facts demonstrating that the matter was terminated in his favor. Plaintiff's claim for malicious use of process must therefore be dismissed as to all defendants.

In order to state a claim for abuse of process, a plaintiff must show "(1) an ulterior motive and (2) some further **[*32]** act after an issuance of process representing the perversion of the legitimate use of process." *Mosley v. Delaware River Port Auth., 2000 U.S. Dist. LEXIS 22402, 2000 WL 1534743, at *9 (D.N.J. Aug. 7, 2000)* (citing *SBK Catalogue P'ship v Orion Pictures, 723 F. Supp. 1053, 1067 (D.N.J. 1989))*. "Process is not abused unless 'after its issuance the defendant reveals an ulterior purpose he had in securing it by committing 'further acts' whereby he demonstrably uses the process as a means to coerce or oppress the plaintiff.'" Id. (citing *Ruberton v. Gabage, 280 N.J. Super. 125, 130, 654 A.2d 1002 (App. Div. 1995)*. The Court finds that Plaintiff does not allege further acts used to coerce or oppress him, and therefore does not state a claim for abuse of process.

## 4. Libel and Slander

To state a claim for defamation under New Jersey law, the plaintiff must allege: (1) that the defendant made a defamatory statement of fact; (2) concerning the

2004 U.S. Dist. LEXIS 34053, *32

plaintiff; (3) which was false; (4) which was communicated to persons other than the plaintiff; and (5) fault. *Taj Mahal Travel, Inc. v. Delta Airlines, Inc., 164 F.3d 186, 189 (3d Cir. 1998)* (citing *Feggans v. Billington, 291 N.J.Super. 382, 677 A.2d 771 (App. Div. 1996))*.

Plaintiff fails to state a cause of action for libel since he does not allege any printed defamation. Id. (citing restatement (Second) of Torts § 568 (1976)). As to his allegations of slander, most of the statements that Plaintiff alleges are defamatory are those made to the Plaintiff himself. Because these statements were not communicated to persons other than the Plaintiff, they do not state a claim **[*33]** for defamation.

The only statements not made to Plaintiff were those that Plaintiff alleges that the 7-Eleven employees made to the police officers. The 7-Eleven employees were entitled to a qualified privilege for any statements made to the police officers who responded to Plaintiff's 911 calls. *Dairy Stores, Inc. v. Sentinel Pub. Co., Inc., 104 N.J. 125, 137, 516 A.2d 220 (1986)*. Such a privilege can only be overcome on a showing of actual malice. *Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 565-66, 569 A.2d 793 (1990)*. Actual malice exists only when a defendant has knowledge that the statement he is making is false, or when he entertains serious doubts as to its truth. *Pitts v. Newark Bd. of Educ., 337 N.J. Super. 331, 339, 766 A.2d 1206 (App. Div. 2001)*. Plaintiff has not pled any facts to support actual malice on the part of the 7-Eleven employees. Plaintiff's claims for defamation must therefore be dismissed as to all defendants.

### III. CONCLUSION

The Motion to Dismiss of Defendant 7-Eleven and all 7-Eleven employees shall be granted as to all claims. Plaintiff may proceed with his *§ 1983* claim based on violations of equal protection under the *Fourteenth Amendment* only against the City of Camden, the Defendant Police Officers, and Mr. Munoz. The City Defendants' Motion to Dismiss is hereby granted as to Defendants Melvin Primas, Gwendolyn Faison, and Morton Bonaparte, as Plaintiff makes no allegations as to actions taken in their individual capacity, **[*34]** and the City of Camden remains as a defendant with respect to allegations made against them in their official capacity. The City Defendants' Motion to Dismiss is also hereby granted as to Mr. Flax and Diane Hood, because Plaintiff fails to state a claim for which relief can be

granted as to these Defendants.

/s/ Freda L. Wolfson

Honorable Freda L. Wolfson

United States District Judge

Dated: June 30, 2004

---

**End of Document**

# Appendix Unpublished Opinion No.4

## McDonald v. Cook County Officers' Electoral Bd.



**User Name:** Joe Grady
**Date and Time:** Tuesday, April 2, 2024 3:01:00PM EDT
**Job Number:** 220978441

## Document (1)

1. _McDonald v. Cook Cty. Officers' Electoral Bd., 2018 U.S. Dist. LEXIS 42503_

   **Client/Matter:** 20659.24026

   **Search Terms:** McDonald v. Cook Cty. Officers' Electoral Bd., 2018 U.S. Dist. LEXIS 42503, *11-12, 2018 WL 1334931 (N.D. Ill. 2018)

   **Search Type:** Natural Language - Expanded Results

   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

**A** Neutral

As of: April 2, 2024 7:01 PM Z

## *McDonald v. Cook Cty. Officers' Electoral Bd.*

United States District Court for the Northern District of Illinois, Eastern Division

March 15, 2018, Decided; March 15, 2018, Filed

No. 18 C 1277

**Reporter**

2018 U.S. Dist. LEXIS 42503 *; 2018 WL 1334931

JAN KOWALSKI McDONALD, Plaintiff, v. COOK COUNTY OFFICERS' ELECTORAL BOARD, DAVID ORR in his official capacity as Cook County Clerk and Chairman, KIMBERLY FOXX, in her official capacity as Cook County State's Attorney and Member, and DOROTHY BROWN, in her official capacity as Clerk of the Circuit Court of Cook County and Member, Defendants.

**Subsequent History:** Later proceeding at *McDonald v. Cook Cty. Officers Electoral Bd., 2018 U.S. App. LEXIS 36783 (7th Cir. Ill., Apr. 4, 2018)*

Appeal dismissed by, As moot *McDonald v. Cook Cty. Officers Electoral Bd., 2019 U.S. App. LEXIS 11 (7th Cir. Ill., Jan. 2, 2019)*

**Prior History:** *McDonald v. Cook Cty. Officers Electoral Bd., 2018 IL App (1st) 180406, 2018 Ill. App. LEXIS 104 (Mar. 7, 2018)*

## Core Terms

candidates, signatures, ballot, signature requirement, election, voters, Rights, county office, proceedings, voting, nominating petition, statewide office, cases, discriminatory, subdivision, regulation, altered, asserts, parties, merits, valid signature, challenging, judicata, courts, color

**Counsel:** **[*1]** For Jan Kowalski McDonald, Plaintiff: Frank B. Avila, LEAD ATTORNEY, Avila Law Group, Chicago, IL.

For Cook County Officers' Electoral Board, David Orr, in his official capacity as Cook County Clerk and Chairman, Kimberly Foxx, in her official capacity as Cook County State's Attorney and Member, Dorothy Brown, in her official capacity as Clerk of the Circuit Courty of Cook County and Member, Defendants: Megan Kelly McGrath, LEAD ATTORNEY, Cook County State's Attorney Office, Chicago, IL.

**Judges:** John J. Tharp, Jr., United States District Judge.

**Opinion by:** John J. Tharp, Jr.

## Opinion

### MEMORANDUM OPINION AND ORDER

Candidates for the office of Cook County Clerk must submit nominating petitions signed by at least 8,236 qualified voters to appear on the ballot for the March 20, 2018 Democratic Party primary election. In this case, Plaintiff Jan Kowalski McDonald submitted a nominating petition that contained only 7,916 valid signatures. Nonetheless, she argues that, under *Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 99 S. Ct. 983, 59 L. Ed. 2d 230 (1979)*, the state may require her to obtain, at most, 5,000 signatures to appear on the ballot—the number required of candidates for statewide office. Because the primary election is less than a week away,[1] she seeks a

―――――――――――――――

[1] In fact, early voting has already begun. In suburban Cook County, ballot applications to vote by mail were available on December 20, 2017 and early voting sites opened on March 5. *See Ways to Vote*, Cook County Clerk's Office, https://www.cookcountyclerk.com/agency/ways-vote . In Chicago, early voting in conjunction with voter registration was available as early as February 21. *See Early Voting*, Chicago Board of Election Commissioners, https://chicagoelections.com/en/early-voting.html . Although the Court set the timing of the TRO hearing so that it could issue a ruling before the primary date, neither McDonald nor the defendants raised any issue concerning the effect of a TRO altering the ballot after voting has already begun. Because the Court is denying the plaintiff's motion, it is not necessary to grapple with that issue, but it might be a significant one. Some as yet unknown number of voters have

2018 U.S. Dist. LEXIS 42503, *1

temporary restraining order enjoining the **[*2]** Cook County Officers' Electoral Board (the "Board") and its members from enforcing any signature requirement greater than 5,000 for the Cook County Clerk race and to include her name on the upcoming Democratic Party primary ballot. The Court concludes that McDonald has not demonstrated a likelihood of success on the merits and therefore denies the motion.

## BACKGROUND

The Illinois Election Code provides that candidates for any Cook County office, including the Office of Cook County Clerk, must submit a petition for nomination containing "at least the number of signatures equal to 0.5% of the qualified electors of [their] party who cast votes at the last preceding election in Cook County." 10 ILCS 5/7-10(k)(1). For the upcoming primary election, the parties agree that this requirement means that McDonald, as well as other countywide candidates, had to obtain 8,236 qualified signatures. A separate provision of the Illinois Election Code establishes that candidates for statewide office are required to submit petitions containing a minimum of 5,000 qualified signatures. 10 ILCS 5/7-10(a).

McDonald alleges that she timely filed a nominating petition that contained 22,057 signatures. After an examination **[*3]** of McDonald's petition, the Cook County Clerk's office determined that she obtained 8,684 valid signatures (more than 400 above the requirement). However, an objection was raised regarding the propriety of McDonald's signature collection process.[2] Following an evidentiary hearing, a

hearing officer assigned to her case determined that McDonald had deliberately altered a number of addresses on her petition sheets. The Board met later that day to consider the hearing officer's findings and voted unanimously to remove McDonald from the ballot. Specifically, the Board adopted the hearing officer's recommendation to invalidate over 700 altered signatures, which caused McDonald to fall below the required signature threshold. McDonald filed a petition for judicial review challenging the Board's decision; however, a Cook County circuit court upheld the decision on March 12, 2018. The circuit court's decision is currently pending appeal.[3] The result of the litigation to date is that McDonald stands 320 signatures short of qualifying for the ballot as a Democratic candidate for Cook County Clerk, but exceeds the 5,000 signature requirement that would have qualified her for inclusion on the party's **[*4]** primary ballot had she run for a statewide office.

McDonald claims that her exclusion from the ballot pursuant to 10 ILCS 5/7-10 violates the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Voting Rights Act. She seeks a temporary restraining order enjoining defendants from enforcing any signature requirement greater than 5,000 for the office of Cook County Clerk and to include her name on the March 20, 2018 Democratic ballot without qualification.[4] McDonald's motion has been fully briefed and argued at a hearing

---

[1] already cast their ballots having been told that McDonald and several other candidates whose names appear on the ballot are no longer eligible and that votes cast for them will not be counted; were McDonald to be restored to the ballot, it is no stretch to imagine that some early voters would claim that they were precluded from voting for the candidate of their choice. The Court takes no position on this issue presently, but it may warrant consideration by election authorities in setting deadlines for ballot access, ballot challenges, and early voting schedules.

[2] The objection was filed by a private party, Reginald Lamont Featherstone, Sr. Illinois law permits any legal voter to file objections to nomination petitions with the state Board of Elections or local election officials where the nomination petition was filed. 10 ILCS 5/10-8. The Seventh Circuit has upheld this private objection process against constitutional challenge, agreeing that "§ 10-8 imposes no greater burden on

candidates than the signature requirements we upheld in Nader v. Keith, 385 F.3d 729, 733 (7th Cir. 2004)." Gould v. Schneider, 448 F. App'x 615, 617-19 (7th Cir. 2011). In the same case, the court of appeals also agreed that "§ 10-8 does not violate the Voting Rights Act because it neither prevents anyone from voting nor keeps a potential candidate off the ballot because of race or color." Id.

[3] The history of the objection proceeding and McDonald's petition for judicial review is drawn from McDonald v. Cook County Officers Electoral Board, 2018 IL App (1st) 180406, ¶¶ 3-8, and the parties representations during the motion hearing held on March 13, 2018.

[4] The defendants represented during a prior hearing that, because they have already been printed, McDonald's name will appear on the March 20, 2018 ballot regardless of the outcome of this motion. However, absent the entry of a temporary restraining order, notices will be (and have been; see supra note 1) provided with each ballot indicating that any vote cast for McDonald will not be counted. This procedure also applies to other candidates who were disqualified after the ballots had already been printed.

on March 13, 2018. For the reasons stated below, the motion is denied.

## DISCUSSION

At the outset, the Court must address two arguments raised by the defendants asserting that that the Court should not address the merits of McDonald's motion. They first argue in their response brief that the Court must abstain from adjudicating this suit under the doctrine of *Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971)*. The *Younger* doctrine is an "exception to the general rule that federal courts must hear and decide cases within their jurisdiction" and "reflects a concern that federal interference with certain types of important state proceedings is unwise and unnecessary in a system of dual sovereigns." *Mulholland v. Marion Cnty. Election Bd., 746 F.3d 811, 815 (7th Cir. 2014)*. The doctrine applies in only three specific situations: where federal **[*5]** jurisdiction would intrude on (1) ongoing state criminal proceedings, (2) civil enforcement proceedings akin to criminal prosecutions, and (3) civil proceedings "that implicate a State's interest in enforcing the orders and judgements of its courts." *Id.* (quoting *Sprint Communs., Inc. v. Jacobs, 571 U.S. 69, 134 S. Ct. 584, 588, 187 L. Ed. 2d 505 (2013))*. Outside of these "exceptional" circumstances, "*Younger* abstention is not appropriate even when there is a risk of litigating the same dispute in parallel and redundant state and federal proceedings." *Id. at 816* (citations omitted).

The defendants rely on the third class of proceedings and argue that McDonald's state lawsuit implicates an important state interest of determining who may appear on an election ballot. This argument is unavailing for two reasons. As an initial matter, McDonald's petition for judicial review of the Board's decision plays no role in the *Younger* analysis. The focus instead must be on the Board's review of McDonald's petition. *See id.* ("In our review of *Younger*, Mulholland's state suit plays no role. . . . We focus instead on the proceedings before the Board.") (citing *Sprint, 134 S. Ct. at 591-92*; *New Orleans Public Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 369, 109 S. Ct. 2506, 105 L. Ed. 2d 298 (1989))*. Which brings the Court to its second point: the Seventh Circuit has made clear that the "critical consideration" in determining whether **[*6]** *Younger* applies is how closely the state proceeding "resembles a criminal prosecution." *Mulholland, 746 F.3d at 816*. Without some likeness to a criminal tribunal, the doctrine would apply to "virtually all parallel

state and federal proceedings, at least where a party could identify a plausibly important interest." *Id.* (quoting *Sprint, 134 S. Ct. at 593*). Here, the defendants have not and cannot show that the Board's review of McDonald's petition implicates the state's interests in investigating, enforcing, and sanctioning violations of its laws. *See id. at 817*. The Board's review was initiated not by the state but by a private party who filed an objection to McDonald's petition, *see McDonald, 2018 IL App (1st) 180406, ¶ 3*, and the defendants do not argue that the proceeding presents the possibility of any criminal penalty. Thus, *Younger* does not apply. *See Nader v. Keith, 385 F.3d 729, 731-32 (7th Cir. 2004)* (branding similar *Younger* argument "frivolous").

The defendants next argue that this suit should be dismissed as *res judicata*. At the motion hearing, the defendants informed this Court that the circuit court determined on March 12, 2018 (the day before the motion hearing here), that McDonald was properly removed from the ballot. In raising this issue, the defendants contend that because McDonald could have raised in state court **[*7]** the constitutional arguments she asserts in this Court, the circuit court's recent decision bars her claims here. The court disagrees with the defendants on this point as well. Under the doctrine of *res judicata* (more commonly known as claim preclusion), a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties on the same cause of action. *Hudson v. City of Chicago, 228 Ill. 2d 462, 467, 889 N.E.2d 210, 213, 321 Ill. Dec. 306 (2008)*.[5] The doctrine "bars not only what was actually decided in the first action but also whatever could have been decided." *Id.* "Three requirements must be satisfied for *res judicata* to apply: (1) a final judgment on the merits has been rendered by a court or competent jurisdiction; (2) an identity of cause of action exists, and (3) the parties of their privies are identical in both actions." *Id.*

McDonald argues that she could not have presented her constitutional claims in the state proceeding. That seems doubtful—*see, e.g., Crowley v. Bd. of Educ. of City of Chi., 2014 IL App (1st) 130727, ¶ 35, 380 Ill. Dec. 559, 8 N.E.3d 1101* ("Any issue that is not raised before the administrative agency, even constitutional

---

[5] Because "[a] state court judgment is entitled to the same preclusive effect in federal court as that judgment would have in state court," *First Weber Grp., Inc. v. Horsfall, 738 F.3d 767, 772 (7th Cir. 2013)* (citation omitted), Illinois law governs the preclusive effect of the circuit court's judgment.

2018 U.S. Dist. LEXIS 42503, *7

issues that the agency lacks the authority to decide, will be forfeited by the party failing to raise the issue.") (citations omitted)—but the Court need not resolve that question [*8] to reject the application of *res judicata* because there is not yet a final judgment in the state proceeding. The Illinois Supreme Court has held that an Illinois judgment is not final, and thus not entitled to preclusive effect, until appellate review has been exhausted. *Ballweg v. City of Springfield, 114 Ill. 2d 107, 113, 499 N.E.2d 1373, 1375, 102 Ill. Dec. 360 (1986)* (requiring exhaustion of appellate review for purposes of collateral estoppel); *Relph v. Board of Educ., 84 Ill. 2d 436, 442-43, 420 N.E.2d 147, 149-50, 50 Ill. Dec. 830 (1981)* ("Since the judgments in these cases were still subject to the appellate process, they were not to be given res judicata effect"). The circuit court's decision here was rendered only a few days ago and, according to McDonald, was appealed immediately thereafter. Therefore, because McDonald has not exhausted the appellate process in the state court proceeding, she is not precluded from asserting her constitutional claims in this Court.

Having determined that this suit can move forward, the Court turns to the merits of the motion.[6] McDonald's principal argument is that the signature requirement for Cook County office seekers, found in *10 ILCS 5/7-10*, is unconstitutional under the Supreme Court's holding in *Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 99 S. Ct. 983, 59 L. Ed. 2d 230 (1979)*. That case involved a challenge to the Illinois Election Code in the context of a special general election for the Mayor of Chicago. At the time, the [*9] statute required new political parties and independent candidates for statewide office to obtain 25,000 signatures to appear on the ballot. *Id. at 175*. New parties and independent candidates for office in political subdivisions of the state, by contrast, required signatures of at least 5% of the number of voters who

_____

[6] To establish a right to the "extraordinary remedy" of preliminary injunctive relief, McDonald must show, among other requirements, that she is reasonably likely to succeed on the merits of her claims. *Whitaker ex. rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034, 1044 (7th Cir. 2017)*; *Long v. Bd. of Educ., Dist. 128, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001)* (noting that standard for issuing temporary restraining order is identical to standard for preliminary injunction). In view of the Court's determination that McDonald has failed to demonstrate that she has a reasonable likelihood of success on the merits of her claims, the Court need not consider whether she has satisfied the remaining requirements for preliminary injunctive relief.

voted in the previous election for offices within that political subdivision. *Id. at 175-76*. The mechanism produced the "incongruous result" that to gain access to the ballot, a new party or independent candidate in the City of Chicago or Cook County needed substantially more signatures—nearly 36,000 for the election at issue in the case—than a similarly-situated party or candidate for statewide office. *Id. at 176-77*. The Court found that although states have "a legitimate interest in regulating the number of candidates on the ballot," the discrepancy in signature requirements violated the *Equal Protection Clause* because the state had advanced "no reason, much less a compelling one" for imposing a higher burden on candidates for Chicago and Cook County offices than it did for candidates of state offices. *Id. at 184-87*.

McDonald contends that in light of *Socialist Workers Party*, a ballot access [*10] law is "facially" unconstitutional under the *Equal Protection Clause* when it has the possibility of yielding, as is the case here, a numerically greater signature requirement for candidates seeking a county or municipal office than for candidates seeking statewide office. There are two fundamental flaws in McDonald's argument. The first is that McDonald misconstrues the concept of a facial challenge. A facial challenge "asserts that a statute is invalid on its face **as written** and authoritatively construed, when measured against the applicable substantive constitutional doctrine, **without reference** to the facts or circumstances of particular applications." *Ezell v. City of Chicago, 651 F.3d 684, 698 (7th Cir. 2011)* (citation omitted) (emphasis added). But that is not what McDonald is doing here. Rather, she asserts that Illinois' ballot access law is unconstitutional, as applied in the specific context of her case, because two "anomalies" that occurred during the last general election in 2016—the candidate for Recorder of Deeds was unopposed, thereby giving her an unusually large number of votes, and it was a Presidential election year—have driven the countywide signature requirement above the 5,000 signature level for the statewide candidates. As a result of the [*11] abnormally high signature requirement, McDonald continues, she (and other female and minority candidates in Cook County) have been prevented from gaining access to the Democratic primary ballot in the upcoming election.

The import of McDonald's as-applied challenge (as opposed to facial challenge) is that, to succeed under an equal protection theory, she must show that the Illinois Election Code was motivated by discriminatory

intent or purpose. That is because when dealing with a facially-neutral statute, as is the case here, the plaintiff must do more than present evidence of a disparate impact on women or minorities to establish an equal protection violation. *Washington v. Davis, 426 U.S. 229, 239, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976)* ("a purpose to discriminate must be present"); *see e.g., Harlan v. Scholz, 866 F.3d 754, 761 (7th Cir. 2017)* (vacating preliminary injunction barring election-day registration and voting, in part, because the equal protection claim failed where plaintiff "offer[ed] no evidence of discriminatory intent, as opposed to evidence of some differences in treatment"); *Alston v. Madison, 853 F.3d 901, 907 (7th Cir. 2017)* ("But even if [plaintiff] can show a discriminatory effect, his equal-protection claim fails because he cannot show a discriminatory purpose."); *Bond v. Atkinson, 728 F.3d 690, 692-93 (7th Cir. 2013)* (discussing how disparate impact alone does not violate equal protection **[\*12]** in context of claim that state elected to provide greater protective services for men than women). But all McDonald has put forward here is evidence of disparate impact—specifically, that several female and/or minority challengers (as opposed to party-back candidates) for countywide office were unable to obtain enough valid signatures to get on the ballot, while three white male challengers succeeded. McDonald's contention ignores that there are several candidates presently on the ballot who are female, a minority, or both, including Toni Preckwinkle, Karen Yarbrough, Maria Pappas, and Joseph Berrios. In view of the fact that most of the candidates on the ballot for the major county offices are, in fact, minorities and/or women, McDonald fails to show even discriminatory effect on the basis of race or gender, much less discriminatory intent.

Moreover, the seeming incongruity of requiring more signatures for county office than for statewide office is, as McDonald herself points out, the product of anomalies that in combination produced a signature requirement in excess of the flat figure required for state offices. According to McDonald, in typical years, the signature requirement for **[\*13]** county offices is *lower* than for state offices. In ascribing the higher signature requirement for this election as anomalous—that is, a result that deviates from the expected norm—McDonald effectively concedes that the signature requirement is *not* the product of an intentional scheme to disadvantage any particular class of voter or candidate. This conclusion is further buttressed by the fact that Cook County's signature requirement is no different than that of any other county in the state (the same formula is used to compute the signature requirement for other

counties as well, *see 10 ILCS 5/7-10(c)-(d)*), and McDonald has not presented any evidence as to whether the anomaly she has experienced with respect to the Cook County signature requirement has occurred in any other counties. McDonald, in short, has failed to provide any basis to infer that the higher signature requirement that prevails in Cook County for the 2018 primary election is the product of an intention to disenfranchise women and minorities.

The other flaw in McDonald's equal protection argument is that the Seventh Circuit does not read *Socialist Workers Party* as broadly as she does. *See, e.g., Bowe v. Bd. of Election Comm'rs of City of Chi., 614 F.2d 1147 (1980)*; *Gjersten v. Bd. of Election Comm'rs for City of Chi., 791 F.2d 472 (7th Cir. 1986)*; *Stone v. Bd. of Election Comm'rs for City of Chi., 750 F.3d 678 (7th Cir. 2014)*. Indeed, in *Bowe*, the court expressly **[\*14]** rejected the argument, reiterated by McDonald in this case, that *Socialist Workers Party* "stands for the broad proposition that a state may never impose a higher signature requirement for an office of a smaller subdivision than the requirement imposed for any office of a larger subdivision." *614 F.2d at 1151*. It found instead that courts must take an "intensely practical and fact-oriented approach to deciding" ballot access issues, as the Supreme Court had done in prior election cases. *Id. at 1152*. Viewing *Socialist Workers Party* in this light, the appellate court dissolved an injunction barring the application of provisions in the Illinois Election Code imposing a 10% minimum signature requirement on candidates for the office of Ward Committee in Chicago—which, depending on the ward, meant between 834 and 2,280 signatures—while candidates for State Central Committeeman required a fixed minimum of only 100 signatures to qualify for the ballot. *Id. at 1150, 1153*. The Court found that the injunction was not warranted absent a more fully-developed factual record "as to the circumstances, background and operation of the statue in question." *Id. at 1152-53*.

Since *Bowe*, the Seventh Circuit has continued to eschew the broad reading that McDonald **[\*15]** champions. In *Gjersten,* the court echoed that *Socialist Workers Party* does not stand for the "broad proposition that a state may never impose a higher signature requirement of an office of a smaller subdivision than the requirement imposed for any office of a larger subdivision." *791 F.2d at 477* (quoting *Bowe, 614 F.2d at 1151*). And more recently, in *Stone*, the court reiterated that "the absolute or relative number of signatures required" is not the "[w]hat is ultimately important" in ballot access cases. *750 F.3d at 682*. As

Judge Bucklo recently observed in a virtually identical suit brought by other candidates challenging the higher signature requirement for county offices in the upcoming 2018 primary, "[i]n the face of these [and other] decisions, plaintiffs must come forward with something more than dogged reliance on an expansive reading of *Socialist Workers Party* to show that the signature requirement the Illinois Election Code imposes on them amounts to an unreasonable burden on their fundamental rights." *Acevado v. Cook Cnty. Officers Electoral Bd., No. 18 C 293, 286 F. Supp. 3d 929, 2018 U.S. Dist. LEXIS 11269, 2018 WL 572509, at *4 (N.D. Ill. Jan. 24, 2018)*.

Rather than applying a statistical litmus-paper test that McDonald urges under the *Equal Protection Clause*, the more appropriate lens with which to analyze the signature requirement is the approach set out in *Anderson v. Celebrezze, 460 U.S. 780, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983)* and *Burdick v. Takushi, 504 U.S. 428, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992)*. *See, e.g., Harlan, 866 F. 3d at 759* (the *Anderson-Burdick* **[*16]** test is used to "address[] the constitutional rules that apply to state election regulations"); *Navarro v. Neal, 716 F.3d 425, 430 (7th Cir. 2013)* (stating that "[t]o assess the constitutionality of ballot access laws, we engage in a two-step inquiry" established under *Anderson-Burdick*. Under that line of cases, courts must determine to what extent fundamental individual rights under the *First Amendment* are burdened by a state's election laws, and then determine if the interests put forward by the state as justification for that burden are sufficient.[7] *Anderson, 460 U.S. at 789*. Although this is a two-step process, "much of the action takes place at the first stage." *Stone, 750 F.3d at 681*. That is because "[i]f the burden on the plaintiffs' constitutional rights is 'severe,' a state's regulation must be narrowly drawn to advance a compelling state interest." *Id. at 681* (quoting *Burdick, 504 U.S. at 434*). Conversely, if the burden is "'reasonable' and 'nondiscriminatory,'" then "the

government's legitimate regulatory interests will generally carry the day." *Id.* (again quoting *Burdick*). Moreover, in determining whether a ballot access law places a severe burden on candidates, the ultimate question is whether a "reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." **[*17]** *Id.* (citing *Bowe, 614 F.2d at 1152*).

To be sure, McDonald contends that a reasonably diligent candidate could not be expected to meet the 8,236 signature requirement within the 90-day circulation period provided under state law. What she lacks, though, is evidence. She relies almost exclusively on her own assessment of voters' attitudes and dispositions, which reflect nothing more than crude stereotypes. For example, she states that she had difficultly circulating her petition among Hispanic communities because voters in those communities were fearful that signing a petition could lead to the retention of information for deportation purposes. The Court will not indulge the implicit premise of this argument—that all, or mostly all, of the population in Hispanic communities are unlawful immigrants, and McDonald provides absolutely no basis to assess how widespread the fear she describes may be or what concrete effect it had on her ability to obtain signatures. Her gross overgeneralizations are not limited to minority communities; elsewhere she states that she was unable to obtain many signatures in Winnetka because most voters in that area are Republican, without providing any data **[*18]** to support that claim (contra, see *Harlan, 866 F.3d at 760*: "there is no necessary correlation between affluence, county size, and a tendency to vote Democratic") and without explaining why, if a Republican stronghold is not fertile ground for a Democrat to obtain nomination petition signatures, she invested resources in canvassing that area. McDonald's motion similarly calumnizes women voters as so timid that they are unwilling to engage a petition circulator for "fear of stalking"; men, apparently, are immune from concerns about personal safety. "Older voters," she says, are so concerned with identity theft that they are unwilling to provide even their name and address. These unsubstantiated and trite generalizations are not evidence and McDonald's declaration does not make them so; she is not in a position to testify about why large swaths of Cook County voters did not sign her petition or would be reluctant to sign her or anyone else's petition in this particular election.

What McDonald may credibly testify about, based on personal knowledge, are her own specific efforts to

---

[7] The *Anderson-Burdick* methodology reflects a shift in the analysis of ballot access issues away from the *Equal Protection Clause to the First Amendment*. *See Norman v. Reed, 502 U.S. 279, 289 n.8, 112 S. Ct. 698, 116 L. Ed. 2d 711 (1992)* ("As in [*Anderson*], we base our conclusion directly on the *First* and *Fourteenth Amendments* and do not engage in a separate *Equal Protection Clause* analysis. We rely, however, on the analysis in a number of our prior election cases resting on the *Equal Protection Clause of the Fourteenth Amendment*.") (internal quotation marks omitted).

2018 U.S. Dist. LEXIS 42503, *18

obtain signatures. And what is relevant about McDonald's efforts is how many signatures she obtained and how close she was to being **[*19]** placed on the ballot. McDonald's initial petition contained over 22,000 signatures—close to three times the amount she needed. Moreover, her petition survived an initial examination by the Cook County Clerk's Office; she had 8,684 valid signatures after that review. It was only after the Board found that some of the addresses of the voters who signed her petitions had been altered after the fact that McDonald was removed from the ballot. Thus, the record indicates that but for the alteration issue, McDonald would have obtained the necessary number of signatures. In any event, even after altered signatures are excluded, she was very close to making the cut; she needed only 320 additional signatures. That, in it of itself, cuts against McDonald's argument that no reasonably diligent candidate could meet the requirement.

The Court notes as well, and McDonald acknowledges, that at least eight candidates running for the offices of Cook County Clerk, President, Sheriff, Treasurer, and Assessor, were able to garner 8,236 valid signatures during the 90-day period. *See Stone, 750 F.3d at 683* ("[T]he fact that "nine candidates satisfied 65 ILCS 20/21-28(b) is powerful evidence that the burden of gathering 12,500 signatures in ninety **[*20]** days is not severe."). McDonald's response is that each of those candidates were either backed by the Cook County Democratic Party—and thus, were able to collect signatures more easily through the party apparatus and by using a slate—or were wealthy candidates who could afford to pay enough circulators to meet the requirement. But here again, McDonald lacks evidentiary support; there is simply no evidence in the record regarding the resources available to her or any of the other candidates running for Cook County office in this election, whether backed by the Democratic Party or otherwise. McDonald must do more than speculate about the ease in which other candidates were able to obtain signatures to show that the requirement at issue amounts to a greater burden on her and other candidates' constitutional rights. It is not self-evident, for example, why, as a "grass roots" candidate, McDonald could not herself run on a slate and thereby spread the burden of obtaining signatures among others; 10 ILCS § 5/7-10 expressly permits petitions to "contain the names of 2 or more candidates of the same political party for the same or different offices." If McDonald was unable to find even one other candidate **[*21]** to associate with on her nominating petition, that difficulty is not created by the statute, but by McDonald's own limitations as a

candidate.

Finally, as the defendants point out, numerous cases have upheld minimum signature requirements substantially more robust than the 0.5% requirement that applies to McDonald. *See, e.g., Burdick, 504 U.S. at 435 & n.3* (suggesting that requirement to obtain signatures from 1% of state's voters was within constitutional limits); *Norman v. Reed, 502 U.S. 279, 282 n.2, 295, 112 S. Ct. 698, 116 L. Ed. 2d 711 (1992)* (upholding Illinois election provision requiring suburban district commissioner candidates to obtain lesser of 5% of vote or 25,000 signatures); *Jenness v. Fortson, 403 U.S. 431, 438, 91 S. Ct. 1970, 29 L. Ed. 2d 554 (1971)* (finding that requirement for independent candidate to obtain signatures from 5% of eligible voters was constitutional); *Libertarian Party of Ill. v. Rednour, 108 F.3d 768, 775-76 (7th Cir. 1997)* (upholding Illinois election law requiring new political parties to satisfy 5% petition requirement to run candidates in congressional races); *see also Stone, 750 F.3d at 683* (observing that percentages ranging from 1% to 5% of eligible voting base have been found to be constitutional). While these cases do not establish a bright-line rule for constitutionality, they nonetheless "reflect the range of restrictions courts have considered to be reasonable." *Acevado, 2018 U.S. Dist. LEXIS 11269, 2018 WL 572509, at * 4.* And particularly close to home, the Seventh Circuit **[*22]** has held that reasonably diligent mayoral candidates could gather 12,500 signatures in Chicago over a 90-day period. *Stone, 750 F.3d at 684-85.* If that requirement is not unduly burdensome—and the Seventh Circuit held that it was not—then it is difficult to see how the need to collect 34% fewer signatures during the same time period across Cook County (as opposed to just the City of Chicago) is constitutionally infirm. Thus, the Court finds at this juncture that the state's ballot access rules for Cook County candidates in this election likely impose only reasonable, nondiscriminatory restrictions on candidates' constitutional rights.

From this point, the Court must conclude that McDonald likely cannot establish a constitutional violation. There is little question that the 8,236 signature requirement "serve[s] the important, interrelated goals of preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of elections." *Id. at 685* (citing *Navarro, 716 F.3d at 429; Anderson, 460 U.S. at 788 n.9*). Although McDonald contends there is little danger of voter confusion or ballot congestion in this case—indeed, Karen Yarbrough will run unopposed for Cook County Clerk if McDonald

2018 U.S. Dist. LEXIS 42503, *22

is not on the ballot—the state need not make **[\*23]** a "particularized showing" to establish these interests. *Id. at 685* (quoting *Munro v. Socialist Workers Party, 479 U.S. 189,194-95, 107 S. Ct. 533, 93 L. Ed. 2d 499 (1986))*. Even a "speculative concern that altering the challenged signature requirement will lead to large number of frivolous candidates . . . and, consequently, voter confusion is sufficient." *Id.* (quoting *Navarro, 716 F.3d at 432*). The Court therefore finds that the State's interests are sufficient, based on the record available to the Court, to justify the 8,236 signature requirement for Cook County Democratic Party candidates.

Finally, McDonald's invocation of the *Voting Rights Act* does nothing to save her claim. Apart from the fact that her argument is essentially undeveloped and can be disregarded on that basis alone,[8] it falls short in any event given McDonald's failure to show that the signature requirements of *§ 7-10(d)* impose any burden on the basis of race or color. In the context of a challenge to ballot eligibility regulations, to state a cause of action under the Voting Rights Act McDonald must show that the regulation in question prevents ballot access because of race or color. *Gould, 448 F. App'x at 617* (affirming dismissal of Voting Rights Act claim challenging law that allows individuals to object to validity of nominating petitions under *§ 10-8*). To establish a violation **[\*24]** of the Voting Rights Act, it must be "shown that the political processes leading to nomination or election in the State or political subdivision are *not equally open* to participation by a

_____

[8] "Perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Baugh v. Cuprum S.A. de C.V., 845 F.3d 838, 848 (7th Cir. 2017)* (quoting *United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir. 1991))* (alterations omitted). Although McDonald devotes two and half pages of her brief to the Voting Rights Act, she fails to identify a single Voting Rights Act case that supports her contention that a facially neutral ballot access regulation violates the Act. Instead, most of her "argument" consists of a recitation of factors developed in the context of racial gerrymandering cases. *See Frank v. Walker, 768 F.3d 744, 752 (7th Cir. 2014)*. And rather than offering real evidence of the effect of *§ 7-10(d)* on people of race and color, McDonald blithely contends that the history of official discrimination in Illinois, racial polarization in voting patterns, and the socioeconomic disparities affecting Illinois minority voters is "well documented" and thus, she is likely to succeed on the merits. Given, as McDonald concedes, that Voting Rights Act claims "can be fact intensive," the Court needs more than bare generalizations to grant the temporary restraining order she seeks.

class of citizens . . . in that its members have *less opportunity* than other members of the electorate to participate in the political process." *Frank, 768 F.3d at 753*. *Section 7-10(d)* does nothing to foreclose the opportunity to participate in the nominating process, or to run for office, on the basis of race or color. If, as McDonald asserts, "minority voters will have more difficulty overcoming the barriers to effective candidate endorsement," that does not mean that minority voters have, by virtue of the ballot signature requirement, less opportunity to participate in the voting process, but only that they are less likely to *use* that opportunity." *Id. at 753*. By McDonald's reasoning, *any* voting requirement would likely be invalid under the Act to the extent one could claim that other barriers, having nothing to do with the voting regulation, magnify the burden on voters of minority race or color. As the Seventh Circuit stated in *Frank*, the Voting Rights Act "forbids discrimination by 'race or color' but does not require states to overcome **[\*25]** societal effects of private discrimination that affect the income or wealth of potential voters." *Id.* The Act is better understood "as an equal-treatment requirement . . . than as an equal-outcome command." *Id. at 754*.

* * *

Because McDonald is unable to demonstrate a reasonable likelihood of success on the merits of her claims—that is, she is not reasonably likely to establish either that Cook County's signature requirement for nominating petitions is unconstitutional or violates the Voting Rights Act—she is not entitled to a temporary restraining order. Accordingly, the Court denies McDonald's motion for temporary restraining order.

Date: March 15, 2018

/s/ John J. Tharp, Jr.

John J. Tharp, Jr. **[\*26]**

United States District Judge

_____

**End of Document**

# Appendix Unpublished Opinion No.5

Smith v. Radian Settlement Services



**User Name:** Joe Grady
**Date and Time:** Tuesday, April 2, 2024 3:00:00PM EDT
**Job Number:** 220978273

## Document (1)

1. *Smith v. Radian Settlement Servs., 2024 U.S. Dist. LEXIS 27943*
   **Client/Matter:** 20659.24026
   **Smith v. Radian Settlement Servs., 2024 U.S. Dist. LEXIS 27943, *9, 2024 WL 666178 (M.D. Pa February 16, 2024):**
   **Search Type:** nat
   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

ⓘ Cited
As of: April 2, 2024 7:00 PM Z

## *Smith v. Radian Settlement Servs.*

United States District Court for the Middle District of Pennsylvania

February 16, 2024, Decided; February 16, 2024, Filed

No. 4:23-CV-01652

**Reporter**
2024 U.S. Dist. LEXIS 27943 *; 2024 WL 666178

EDWARD SMITH and CAROL SMITH, Individually and on behalf of those similarly situated, Plaintiffs, v. RADIAN SETTLEMENT SERVICES, INC., and SHAWN P. MURPHY, Defendants.

## Core Terms

private right of action, notary, mortgage, notary public

**Counsel:** **[*1]** For Edward Smith, Individually and on behalf of those similarly situated, Carol Smith, Individually and on behalf of those similarly situated, Plaintiffs: D. Aaron Rihn, LEAD ATTORNEY, Robert Peirce & Associates, P.C., Pittsburgh, PA; Jonathan F. Andres, LEAD ATTORNEY, PRO HAC VICE, Jonathan F. Andres P.C., St. Louis, MO.

For Radian Settlement Services, Inc., Shawn P. Murphy, Defendants: Erin L Fischer, Ballard Spahr LLP, Antitrust and Competition, Ste 51st Floor, Philadelphia, PA; John Chesley Burruss, Ballard Spahr LLP, Ste 51st Floor, Philadelphia, PA; Matthew A White, Timothy D. Katsiff, Ballard Spahr LLP, Philadelphia, PA.

**Judges:** Matthew W. Brann, Chief United States District Judge.

**Opinion by:** Matthew W. Brann

## Opinion

**MEMORANDUM OPINION**

**I. BACKGROUND**[1]

Plaintiffs Edward and Carol Smith refinanced a mortgage secured by residential real estate in Pennsylvania in September 2022.[2] The Smiths were provided with a Closing Disclosure that itemized the closing costs of the loan.[3] Among those costs were "Services Borrower Did Not Shop For," which included a $225 notary fee charged by Defendant Radian Settlement Services, Inc.[4] The only notarial service performed by Radian's notary public at the closing of a residential **[*2]** real estate mortgage, including the Smiths, is the acknowledgment of the mortgagee's signature on a mortgage and signature affidavit.[5] The Smiths, required to use the services of a notary public to close their mortgage, are among thousands of Radian customers who have been charged a fee in excess of the maximum fee authorized by Pennsylvania law.[6]

The Smiths initiated this lawsuit on behalf of themselves and other individuals similarly situated against Radian and its CEO, Shawn Murphy, with the filing of a Class Action Complaint on October 4, 2023.[7] In their Complaint, the Smiths bring claims under the *Pennsylvania Revised Uniform Law on Notarial Acts* (Count I), for unjust enrichment (Count II), and for violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (Count III). Radian filed a motion to dismiss or, in the alternative, strike the class allegations which is fully briefed and ripe for

---

[1] The Court accepts as true the well-pleaded allegations of the Complaint. *See infra* Section II.

[2] Compl., Doc. 1, ¶ 18.

[3] *Id.*

[4] *Id.*

[5] *Id.* ¶¶ 20-21.

[6] *Id.* ¶¶ 14-15, 34, 43.

[7] The Court refers to Defendants Radian and Murphy collectively as Radian.

2024 U.S. Dist. LEXIS 27943, *2

disposition.[8]

## II. LAW

*Federal Rule of Civil Procedure 12(b)(6)* authorizes dismissal for "failure to state a claim upon which relief can be granted." The United States Court of Appeals for the Third Circuit has instructed that, under the standard established by the Supreme Court of the United States in *Bell Atlantic Corp. v. Twombly* [9] and *Ashcroft v. Iqbal* [*3] ,[10] a court reviewing the sufficiency of a pleading must take three steps: (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they give rise to an entitlement to relief."[11]

## III. ANALYSIS

### A. Uniform Law on Notarial Acts

The viability of the Smith's Count I claim turns on whether Pennsylvania's Revised Uniform Law on Notarial Acts ("RULNA") provides for a private right of action. The Court finds that it does not.

Enacted in 2013, RULNA replaced the now-repealed Pennsylvania Notary Public Law.[12] Neither version of the statute expressly provided for a private right of action.[13] Whether either version of the statute implies a private right of action appears to be a matter of first impression. The Smiths assert that the Court should follow the lead of the Idaho Supreme Court's opinion in *616 Inc. v. Mae Properties, LLC*, which affirmed a grant of summary judgment of claims brought under Idaho's version of the uniform notarial act.[14] Pennsylvania law provides that [*4] "uniform statutes" such as RULNA "shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them."[15] Accordingly, courts interpreting Pennsylvania uniform statutes afford great deference decisions from sister states regarding such statutes.[16] However, *616 Inc.* is of limited utility here, as it does not appear that the parties argued, nor did that court consider whether the notarial act did in fact provide for a private right of action.[17]

The Pennsylvania Supreme Court has adopted a three-prong test to determine whether a statute creates an implied private cause of action: "(1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; and (3) whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff."[18]

The Court begins with the second factor, legislative intent, as it "has been recognized as the 'central inquiry' of the analysis."[19] Pennsylvania law identifies several factors to be considered [*5] in ascertaining intent, such as "the occasion and necessity for the statute," "the mischief to be remedied," "the object to be attained," "the former law, if any, including other statues upon the

---

[8] Mot. to Dismiss, Doc. 14; Br. Supp. MTD, Doc. 18; Opp., Doc. 24; Reply, Doc. 25.

[9] *550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.

[10] *556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*.

[11] *Connelly v. Lane Constr. Corp., 809 F.3d 780, 787 (3d Cir. 2016)* (internal quotations and citations omitted).

[12] *57 Pa. C.S. § 301, et seq.*

[13] *See Becker v. Chicago Title Ins. Co., No. CIV.A. 03-2292, 2004 U.S. Dist. LEXIS 1988, 2004 WL 228672, at *10 (E.D. Pa. Feb. 4, 2004)* (observing that there is no private right of action under the Pennsylvania Notary Public Law).

[14] *616 Inc. v. Mae Properties, LLC, 524 P.3d 889 (Idaho 2023)*.

[15] *1 Pa. C.S. § 1927*.

[16] *Continental Ins. Co. v. Schneider, Inc., 582 Pa. 591, 873 A.2d 1286, 1293-94 (Pa. 2005)* (construing Pennsylvania UCC law in accordance with the decisions of courts of several sister states).

[17] *See generally 524 P.3d 889*. The Minnesota Court of Appeals also declined to address the issue after it was raised for the first time on appeal. *Michaels v. First USA Title, LLC, 844 N.W.2d 528, 533 (Minn. App. 2014)*.

[18] *Schappell v. Motorists Mut. Ins. Co., 594 Pa. 94, 934 A.2d 1184, 1189 (Pa. 2007)* (citing *Estate of Witthoeft v. Kiskaddon, 557 Pa. 340, 733 A.2d 623, 626 (Pa. 1999)*).

[19] *Witthoeft, 733 A.2d at 626*; *accord 1 Pa. C.S. § 1921(a)*.

same or similar subjects," and "the contemporaneous legislative history."[20] The Smith's have not provided, nor has the Court found any indication that the Pennsylvania General Assembly intended to create a private right of action.

The Smiths direct the Court to the statements of Representative Glenn R. Grell, a sponsor of the House Bill that would become RULNA.[21] Grell stated that the then-proposed legislation would improve upon the Pennsylvania Notary Public Law in several respects, none of which include providing for a private right of action.[22] The Smith's cite no authority in support of their logical leap that Representative Grell's statement that RULNA would "help prevent fraudulent notarization practices" implies a private right of action.[23] Whether a statute aims to prevent fraud is a matter distinct from whether it provides a right of action for victims of such fraud to recover damages. The Smith's argument to the contrary proves too much, as it would suggest that all criminal statutes, [*6] which are plainly intended to prevent criminal activity—including fraud—imply a private right of action for victims of criminal activity.[24]

The Court also notes that, as the General Assembly intended for RULNA to improve upon a then-existing law, it makes it more likely that, had the legislature intended for a private right of action to be among those improvements, it would have expressly done so. The Court is again unmoved by the Smith's contrary argument that a private right of action should be implied because the statute does not expressly foreclose such a possibility. If legislative silence were sufficient to find an implied private right of action, there would be no need for a three-pronged balancing test; courts would simply look to whether the statute explicitly precluded private rights of action. Instead, courts are reluctant to find private rights of action where they are not expressly provided for by the statute.[25]

Further, RULNA provides that it "does not prevent a person from seeking and obtaining *other* criminal or civil remedies provided by law."[26] The Smith's tortured reading of this language aside, the text of RULNA clearly and unambiguously provides that the **[*7]** law should not be interpreted to foreclose alternative remedies just as the Smiths have done *in this suit*.

Nor are the Smiths of the class for whose especial benefit the statute was enacted. As discussed above, the Smith's contention that the RULNA was enacted for the special benefit of anyone harmed by the statute would create private rights of action in every criminal statute. When determining whether a statute was enacted for the benefit of a class of people, courts consider whether there exists a "foreseeable and identifiable class."[27] RULNA does no such thing. Instead, it focuses entirely on the regulated entities, and empowers only the Pennsylvania Department of State with the authority to enforce the statute.[28]

Accordingly, the Court will dismiss Count I with prejudice.

## B. Voluntary Payment Doctrine

"Under the voluntary payment defense, 'one who has voluntarily paid money with full knowledge, or means of knowledge of all the facts, without any fraud having been practiced upon him . . . cannot recover it back by reason of the payment having been made under a mistake or error as to the applicable rules of law.'"[29] Though "[t]he voluntary payment doctrine is not properly considered at **[*8]** the motion to dismiss stage when the

---

[20] *1 Pa. C.S. § 1921(c)*.

[21] Grell Mem., Doc. 24-1.

[22] *Id*.

[23] *Cf*. Doc. 24 at 8.

[24] *D'Errico v. DeFazio, 2000 PA Super 354, 763 A.2d 424 (Pa. Super. 2000)*.

[25] *E.g.*, *Wagner v. Anzon, Inc., 453 Pa. Super. 619, 684 A.2d 570, 575 (Pa. Super. 1996)*; *accord Russell v. Chesapeake Appalachia, L.L.C., No. 4:14-CV-00148, 2014 U.S. Dist. LEXIS*

---

*163401, 2014 WL 6634892, at *3 (M.D. Pa. Nov. 21, 2014)*.

[26] *57 Pa. C.S. § 323(c)* (emphasis added).

[27] *Witthoeft, 733 A.2d at 627*.

[28] *See Albert v. Erie Ins. Exch., 2013 PA Super 59, 65 A.3d 923, 931 (Pa. Super. 2013)* (no private cause of action where enforcement authority was vested in Pennsylvania Department of Insurance); *Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 117 (2d Cir. 2007)* (observing that, under Supreme Court precedent, federal statutes are not enacted for the especial benefit of a certain class where the focus of the statute is on the entities to be regulated).

[29] *Liss & Marion, P.C. v. Recordex Acq. Corp., 603 Pa. 198, 983 A.2d 652, 661 (Pa. 2009)* (quoting *In re Kennedy's Estate, 321 Pa. 225, 183 A. 798, 802 (1936)*).

2024 U.S. Dist. LEXIS 27943, *8

factual record is insufficient to determine its viability,"[30] "[t]he court may dismiss claims based on an affirmative defense if the affirmative defense is obvious from the face of the complaint."[31] This is such a case.

The Closing Disclosure clearly stated that Radian would charge $225 for notary fees and the Complaint alleges that the notary services performed by Radian were "typical" of the notary services provided in connection with the execution of a residential mortgage.[32] There is no allegation that Radian misrepresented the service to be provided.[33] The Smiths try to avoid the applicability of the voluntary payment doctrine by suggesting that Radian misrepresented the legality of its fees. However, no such misrepresentation is alleged. Rather, the Smiths *assumed* that the fee was in accordance with the law. Money paid voluntarily, although under a mistake or ignorance of the law cannot be recovered.[34]

The Court similarly rejects the Smiths' argument that they only made the payment under duress, as they were required to use the services of a notary public in connection with the settlement of their mortgage.[35] While the notarial services may have **[*9]** been required to settle the Smiths' mortgage, absent from the Complaint is any allegation that the Smiths were required to use *Radian's* services.[36]

---

[30] *McLean v. Big Lots Inc., 542 F. Supp. 3d 343, 354 (W.D. Pa. 2021)* (quoting **Gallo v. PHH Mortg. Corp., 916 F.Supp.2d 537, 553 (D.N.J. 2012)**).

[31] *Id.* (citing *Peele v. McLaughlin, 641 F. App'x 111, 112 (3d Cir. 2016)* (per curiam)).

[32] Compl. ¶¶ 20-21.

[33] *Cf. Liss & Marion, 983 A.2d at 661* (rejecting voluntary payment defense where defendant misrepresented the product in invoices); *Gotham Distrib. Corp. v. United Parcel Serv. Co., Inc., No. 14-CV-6165, 2016 U.S. Dist. LEXIS 98501, 2016 WL 4039642, at *3-4 (E.D. Pa. July 28, 2016)* (same).

[34] *Acme Markets, Inc. v. Valley View Shopping Ctr., Inc., 342 Pa. Super. 567, 493 A.2d 736, 737 (Pa. Super. 1985)*.

[35] Doc. 24 at 31 (citing Compl. ¶¶ 25, 27).

[36] The Court notes that borrowers are entitled to shop for certain services in connection with the settlement of a residential mortgage. *Loan Estimate Explainer*, CFPB, https://www.consumerfinance.gov/owning-a-home/loan-estimate/ (last accessed Feb. 8, 2024). The Court may take judicial notice of information contained on the website of a

Accordingly, the Court will dismiss Counts II and III without prejudice.[37] The Smiths may attempt to amend their Complaint to show that the payment of Radian's notary fee was not voluntary. However, they are advised not to attempt to stave off dismissal by simply creatively re-stating facts already alleged. If there are no new facts to be alleged, or existing facts that may be alleged more completely, amendment is discouraged.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted.

An appropriate Order follows.

BY THE COURT:

*/s/ Matthew W. Brann*

Matthew W. Brann

Chief United States District Judge

---

## ORDER

In accordance with the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that:

  1. Defendants Radian Settlement Services, Inc.'s and Shawn P. Murphy's Motion to Dismiss (Doc. 14) is **GRANTED**.

  2. Count I of the Complaint is **DISMISSED WITH PREJUDICE**.

  3. Counts II and III of the Complaint are

---

governmental agency. *Landair Transp., Inc. v. Del's Truck & Auto Repair, No. 1:17-CV-0723, 2018 U.S. Dist. LEXIS 26519, 2018 WL 950208 at *2 n.1 (M.D. Pa. Feb. 20, 2018)* (citing *Abulkhair v. Comm'r of Soc. Sec., 450 Fed. App'x. 117, 119 n.3 (3d Cir. 2011)*; *accord Morgan v. Pa., No. 4:23-CV-00872, 2023 U.S. Dist. LEXIS 177374, 2023 WL 6461245 at *3 (M.D. Pa. Oct. 2, 2023)* (Brann, J.) (citing *In re Google Inc., 806 F.3d 125, 133 n.12 (3d Cir. 2015)*. *See also Vanderklok v. United States, 868 F.3d 189, 205 n.16 (3d Cir. 2017)*).

[37] Though the Smiths appear to suggest that only Count II could be subject to dismissal under the voluntary payment doctrine, claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law are also subject to the doctrine. *Cf. McLean, 542 F. Supp. 3d at 354* (considering voluntary payment doctrine as defense to UTPCPL claim).

**DISMISSED WITHOUT PREJUDICE**.

4. Plaintiffs Edward and Carol Smith may file an Amended Complaint **[*10]** by March 1, 2024.

BY THE COURT:

*/s/ Matthew W. Brann*

Matthew W. Brann

Chief United States District Judge

---

**End of Document**

Joe Grady

# Appendix Unpublished Opinion No.6

Landair Transp., Inc. v. Del's Truck & Auto Repair



**User Name:** Joe Grady
**Date and Time:** Tuesday, April 2, 2024 2:59:00PM EDT
**Job Number:** 220978124

## Document (1)

1. *Landair Transp., Inc. v. Del's Truck & Auto Repair, 2018 U.S. Dist. LEXIS 26519*

   **Client/Matter:** 20659.24026

   **Search Terms:** Landair Transp., Inc. v. Del's Truck & Auto Repair, No. 1:17-CV-0723, 2018 U.S. Dist. LEXIS 26519, 2018 WL 950208 at *2 n.1 (M.D. Pa. Feb. 20, 2018)

   **Search Type:** Natural Language - Expanded Results

   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | US Cases | -None- |

ⓘ Cited
As of: April 2, 2024 6:59 PM Z

## *Landair Transp., Inc. v. Del's Truck & Auto Repair*

United States District Court for the Middle District of Pennsylvania

February 20, 2018, Decided; February 20, 2018, Filed

Civil No. 1:17-CV-0723

**Reporter**
2018 U.S. Dist. LEXIS 26519 *; 2018 WL 950208

LANDAIR TRANSPORT, INC., Plaintiff, v. DEL'S TRUCK AND AUTO REPAIR, Defendant.

## Core Terms

punitive damages, unjust enrichment, fraud claim, gist, economic duress, allegations, Counts, economic loss doctrine, tractor trailer, lack of subject matter jurisdiction, subject matter jurisdiction, place of business, diversity, asserts, towing

**Counsel:** **[*1]** For Landair Transport, Inc., Plaintiff: Gary N. Stewart, LEAD ATTORNEY, Rawle & Henderson LLP, Harrisburg, PA; Inder Deep Paul, Payne Shoemaker Building, Harrisburg, PA.

For Del's Truck and Auto Repair, Defendant: Danielle M Donivan, LEAD ATTORNEY, PRO HAC VICE, Evey Black Attorneys LLC, Hollidaysburg, PA.

**Judges:** SYLVIA H. RAMBO, United States District Judge.

**Opinion by:** SYLVIA H. RAMBO

## Opinion

### MEMORANDUM

In this diversity action, Plaintiff asserts claims for breach of contract, fraud, and unjust enrichment, and seeks punitive damages against Defendant for allegedly excessive charges related to Defendant's towing and repair of a tractor trailer owned by Plaintiff. Presently before the court is Defendant's motion to dismiss pursuant to *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)* for, respectively, lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. For the reasons stated herein, Defendant's motion will be granted in part and denied in part.

## I. Background

### A. Facts

Plaintiff Landair Transport, Inc. ("Plaintiff") is a Tennessee corporation that ships and transports goods and cargo in interstate commerce as a common motor carrier. (Doc. 1, ¶¶ 1, 7.) On July 19, 2016, one of Plaintiff's tractor trailers was involved **[*2]** in a motor vehicle accident within the Middle District of Pennsylvania. (*Id.* at ¶ 5.) Plaintiff called Defendant Del's Truck and Repair ("Defendant"), a business incorporated in Pennsylvania that offers towing, accident cleanup and recovery, and automotive repair services, to assist with Plaintiff's damaged tractor trailer. (*Id.* at ¶¶ 2, 8-9.) In response, Defendant towed Plaintiff's tractor trailer to Defendant's place of business in Chambersburg, Pennsylvania, and subsequently sent Plaintiff an invoice in the amount of $89,210.00. (*Id.* at ¶¶ 10-11.)

On August 18, 2016, Plaintiff agreed to pay Defendant the sum of $87,419.75 as costs related to the accident, including towing, disposal of cargo, and storage of Plaintiff's tractor trailer. (*Id.* at ¶ 13.) According to the complaint, Plaintiff believed Defendant's charges were excessive and only agreed to pay because Defendant was in possession of Plaintiff's equipment and cargo. (*Id.* at ¶ 14.) On February 7, 2017, Plaintiff reached out to Defendant in an effort to amicably resolve the disputed charges, but to no avail. (*Id.* at ¶ 12.)

### B. Procedural History

Plaintiff initiated this action by filing a complaint on April 24, 2017. (Doc. 1.) **[*3]** Defendant waived formal service and responded to the complaint with motions to

2018 U.S. Dist. LEXIS 26519, *3

dismiss for failure to state a claim (Doc. 10) and lack of subject matter jurisdiction (Doc. 11). The motion has been briefed (Docs. 12 & 15) and is ripe for disposition.

## II. Legal Standards

Defendant seeks dismissal of the complaint pursuant to both *Rule 12(b)(1)* for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim upon which relief can be granted. Under *Rule 12(b)(1)*, the court must dismiss any action over which it "lack[s] subject-matter jurisdiction." *Fed. R. Civ. P. 12(b)(1)*. "Challenges to subject matter jurisdiction under *Rule 12(b)(1)* may be 'facial' or 'factual.'" *Lee v. Reynolds, Civ. No. 13-cv-2604, 2014 U.S. Dist. LEXIS 71836, 2014 WL 2195403, *1 (M.D. Pa. May 27, 2014)* (quoting *Turicentro v. Am. Airlines, 303 F.3d 293, 300 n.4 (3d Cir. 2002))*. "Where subject matter jurisdiction 'in fact' is challenged, the trial court's very power to hear the case is at issue, and the court is therefore 'free to weigh the evidence and satisfy itself as to the power to hear the case,'" *id.* (quoting *Mortensen v. First Fed. Sav. & Loan Assoc., 549 F.2d 884, 891 (3d Cir. 1977))*, and need not accord a plaintiff's allegations with any presumption of truth, *Turicentro, 303 F.3d at 300 n.4*.

A motion to dismiss pursuant to *Rule 12(b)(6)*, on the other hand, tests the sufficiency of the complaint against the pleading requirements of *Rule 8(a)*, which requires that a complaint set forth "a short and plain statement of the **[\*4]** claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. For a complaint to survive dismissal it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (citing *Bell Atl. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. Thus, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *United States v. Pennsylvania, 110 F. Supp. 3d 544, 548 (M.D. Pa. 2015)* (quoting *Fleisher v. Standard Ins. Co., 679 F.3d 116, 120 (3d Cir. 2012))*; *see also Fed. R. Civ. P. 12(b)(6)*.

## III. Discussion

Defendant raises the following bases that support dismissal of the complaint: 1) the court lacks subject matter jurisdiction; 2) Plaintiff's fraud claim contained in Count I was not plead with sufficient particularity; 3) Counts I and II are barred by the gist of the action and economic duress doctrines; 4) Plaintiff's claim for economic duress fails because Plaintiff had time to consult with legal counsel before entering into the contract; 5) Plaintiff's claim for unjust enrichment is barred by the existence of a written or express contract; and 6) Plaintiff's pleading of punitive damages as a separate claim fails as a matter of law, and Plaintiff has failed to plead sufficient facts **[\*5]** to support any award of punitive damages in relation to Plaintiff's other claims. (*See* Doc. 12.) The court will address each argument in turn.

## A. Lack of Subject Matter Jurisdiction

Defendant's first argument is that the entire complaint should be dismissed pursuant to *Federal Rule of Civil Procedure 12(b)(1)* for lack of subject matter jurisdiction. In the complaint, Plaintiff asserts that the court's subject matter jurisdiction over this matter is based upon diversity of citizenship pursuant to *28 U.S.C. § 1332*. (Doc. 1, ¶ 3.) For diversity jurisdiction to exist, the amount in controversy must exceed $75,000 and the plaintiff and defendant must be citizens of different states. *28 U.S.C. § 1332(a)* & *(a)(1)*. Where corporations are parties, they are deemed to be a citizen of every state in which they are incorporated and where they have their principal place of business. *Id.* at (c)(1).

As to the amount in controversy requirement, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 395 (3d Cir. 2016)* (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288-89, 58 S. Ct. 586, 82 L. Ed. 845 (1938))*; *see also Angus v. Shiley, Inc., 989 F.2d 142, 145 (3d Cir. 1993)* ("The general federal rule is to decide the amount in controversy from the complaint itself."). Here, Plaintiff **[\*6]** claims that the sum it felt improperly compelled to agree to pay to Defendant was $87,419.75, an amount Plaintiff disputes in its entirety. (*See* Doc. 1, ¶¶ 13-14; Doc. 15, p. 5 of 15.) Accordingly, the court finds that the amount in controversy requirement has been met.

Defendant also argues that Plaintiff has failed to allege citizenship in a different state from Defendant because

Defendant is an entity incorporated in Pennsylvania and Plaintiff is both incorporated in Pennsylvania and maintains a physical location there. After a quick review of both the allegations contained in the complaint as well as the Pennsylvania Department of State's website, it is clear that the court must reject both claims by Defendant, especially at this stage of the litigation. The complaint asserts that Plaintiff both maintains its principal place of business - and is incorporated - in Tennessee. (Doc. 1, ¶ 1.) In addition, the Pennsylvania Department of State lists Plaintiff as a foreign corporation with the state of incorporation as Tennessee. *See* Pa. Dep't of State, Business Entity Search,

https://www.corporations.pa.gov/search/corpsearch (search "Landair Transport, Inc." then click on hyperlink for **[\*7]** Entity Number 2635360) (last visited Feb. 13, 2018).[1]

After years of confusion and different tests being applied in different circuits, The United States Supreme Court clarified in 2010 that a corporation's principal place of business is "where a corporation's officers direct, control, and coordinate the corporation's activities[,]" or, in other words, its "nerve center" or "main headquarters." *Hertz Corp. v. Friend, 559 U.S. 77, 92-93, 130 S. Ct. 1181, 175 L. Ed. 2d 1029 (2010)*. Although a Pennsylvania location is listed on the Pennsylvania Department of State's website, the address listed for the corporate officers is in Tennessee. *See id.* The court has no reason to look any further, and, accepting the allegations in the complaint as true, finds that Plaintiff has sufficiently pleaded facts to support that its principal place of business is in Tennessee and that the court can exercise diversity jurisdiction over this matter.

**B. Failure to Plead Fraud with Particularity**

Next, Defendant argues that Plaintiff's fraud claim should be dismissed because Plaintiff has failed to meet

---

[1] A district court may take judicial notice only from sources not reasonably subject to dispute. *Fed. R. Evid. 201(b)*. Because the website in question here is owned and operated by the Pennsylvania Department of State, rather than by a private entity, the court finds that the facts contained on the site are authentic and that the source is not reasonably subject to dispute. *See Abulkhair v. Comm'r of Soc. Sec., 450 F. App'x 117, 119 n.3 (3d Cir. 2011)* (taking judicial notice of facts contained on official government website for the Social Security Administration).

the particularity standard contained in *Federal Rule of Civil Procedure 9(b)*. Unlike the general notice pleading standard of *Rule 8*, in order to support a fraud claim, "a party must state with particularity the circumstances constituting **[\*8]** fraud[,]" but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Fed. R. Civ. P. 9(b)*.

Fraud is a common law claim, and as a federal court sitting in diversity, the court must apply the substantive law of the forum state. *Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)* ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). "In order to prove fraud in Pennsylvania, a claimant must prove six elements: (1) a misrepresentation; (2) material to the transaction; (3) made falsely; (4) with the intent of misleading another to rely on it; (5) justifiable reliance resulted; and (6) injury was proximately caused by the reliance." *Bral Corp. v. Johnstown Am. Corp., 919 F. Supp. 2d 599, 617-18 (W.D. Pa. 2013)* (citations omitted).

Here, Plaintiff alleges in the complaint that Defendant knowingly and falsely represented specific costs associated with the towing and storage of Plaintiff's tractor trailer, which satisfies elements one through three of a fraud cause of action. (Doc. 1, ¶¶ 17-19.) Plaintiff further alleges that Defendant did so in order to procure from Plaintiff more money than what Defendant was entitled to and that Plaintiff suffered injury in the form of excessive costs paid to Defendant for its **[\*9]** services. (*Id.* at ¶¶ 20-22.) The court is satisfied at this early pleading stage that Defendant's representations to Plaintiff about what services were done and at what cost were material to Plaintiff. The court also finds, again only for purposes of this motion to dismiss, that Plaintiff justifiably relied on those representations because Defendant's statements about the services rendered was the only information Plaintiff had available to it until it secured the return of its equipment. Accordingly, the court finds that Plaintiff has met the more exacting pleading standard of *Rule 9(b)* and Count I will not be dismissed on this basis.

**C. Gist of the Action and Economic Loss Doctrines**

As alternative bases for dismissing Plaintiff's fraud claim contained in Count I, as well as its economic duress claim in Count II, Defendant relies on the gist of the action and economic loss doctrines. The court will

examine each doctrine in relation to both Counts I and II.

Under Pennsylvania law, "[t]he gist of the action doctrine precludes tort claims where the true gravamen, or gist, of the claim sounds in contract." *Dommel Properties LLC v. Jonestown Bank & Trust Co., 626 F. App'x 361, 364 (3d Cir. 2015)* (citing *Bruno v. Erie Ins. Co., 630 Pa. 79, 106 A.3d 48, 68 (Pa. 2014))*. The central question is whether the duty allegedly breached by one of the parties **[*10]** arose solely out of a contract or whether there was a "violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract." *Id. at 365* (quoting *Bruno, 106 A.3d at 68*).

In the present case, Defendant performed the services and sent Plaintiff an invoice before any contract was entered into. In addition, Plaintiff alleges in Count I that Defendant committed fraud by knowingly making false representations about the necessary services and their related costs. If Plaintiff is ultimately successful in its fraud claim, the fraud would have happened in the inducement of the contract, making the contract voidable. "Pennsylvania state and federal courts have reached different conclusions about whether the gist of the action doctrine applies to fraudulent inducement claims." *Downs v. Andrews, 639 F. App'x 816, 820 (3d Cir. 2016)*. In *Downs*, the Third Circuit Court of Appeals was not compelled to decide whether the gist of the action doctrine barred all fraud in the inducement claims because the claim in that case involved a failure to perform ongoing obligations under the contract. *Id.* Here, the court is presented with the flip side of that coin: all services were performed before entering into the contract, **[*11]** which really amounted to Plaintiff merely agreeing to pay a certain amount for those services already rendered. The duty Plaintiff asserts has been breached is not contractual, but rather the societal duty imposed by the law of torts for individuals not to commit fraud. Thus, the court finds that the gist of the action doctrine does not bar Plaintiff's fraud claim and it will not be dismissed on that basis.[2]

Turning to the economic loss doctrine, Defendant contends that both Counts I and II - tort claims sounding in fraud and economic duress - should be barred because the economic loss doctrine "prohibits plaintiffs

from recovering in tort economic losses to which their entitlement flows only from contract." *Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995)*. Defendant fails to mention, however, that the economic loss doctrine applies only in limited circumstances, such as the products liability context, and is based on the reasoning that "[w]hen a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong." *Id.* (quoting *East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871, 106 S. Ct. 2295, 90 L. Ed. 2d 865 (1986))*. In other words, the purchaser of a defective product that did not also cause personal injury to the purchaser can seek redress **[*12]** through product warranties rather than via tort law. *Id. at 619*.

Even if the economic loss doctrine were applicable here, however, the court would reject it at this stage of the litigation for the same reasons it is refusing to apply the gist of the action doctrine. The economic loss doctrine seeks to encourage parties with contractual rights to enforce those rights rather than pursuing tort claims for the same loss. Here, Plaintiff is asserting that Defendant's alleged fraud and placing Plaintiff under economic duress by refusing to release its equipment until Plaintiff paid the full $87,419.75 should void the contract. Again, there are no ongoing performance obligations or warranties Plaintiff could seek to enforce in that scenario. Thus, the court will not dismiss Counts I or II based on the economic loss doctrine.

**D. Economic Duress**

Defendant next argues that Plaintiff's economic duress claim should be dismissed because Plaintiff had time to freely consult with legal counsel before entering into the contract. *See Degenhardt v. Dillon Co., 543 Pa. 146, 669 A.2d 946, 950 (Pa. 1996)* (finding that duress does not exist in the absence of bodily threats or actual bodily harm where the contracting party was free to consult with counsel); *see also Nayak v. McNees Wallace & Nurick LLC, Civ. No. 15-cv-0933, 2016 U.S. Dist. LEXIS 125059, 2016 WL 7015711, *9 (M.D. Pa. Sept. 13, 2016)* **[*13]** (quoting *Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 893 (3d Cir. 1975))* ("[U]nder Pennsylvania law where the contracting party is free to come and go and to consult with counsel, there can be no duress in the absence of threats of actual bodily harm.").

Here, Plaintiff has not alleged any unlawful threats, and

---

[2] Defendant makes no separate argument based on the gist of the action doctrine related to Plaintiff's economic duress claim in Count II. Accordingly, the court will not dismiss Count II for the same reasons discussed regarding Count I.

2018 U.S. Dist. LEXIS 26519, *13

has only stated that it was under economic pressure to retrieve its equipment. Unfortunately for Plaintiff, however, Pennsylvania law is well settled that "mere financial pressure is insufficient," *Hull v. Welex Inc., Civ. No. 02-cv-7735, 2002 U.S. Dist. LEXIS 24772, 2002 WL 31887043, *2 (E.D. Pa. Dec. 30, 2002)*, and "there must be more than a mere threat which might possibly result in injury at some future time," *McDonald v. Whitewater Challengers, Inc., 2015 PA Super 104, 116 A.3d 99, 114-15 (Pa. Super. Ct. 2015)* (citation omitted). Accordingly, the court finds that Plaintiff has not sufficiently pleaded facts to support a claim of economic duress, and Count II will be dismissed.

## E. Unjust Enrichment

As to Count III, Plaintiff's claim for unjust enrichment, Defendant argues that dismissal is appropriate because the parties have a written agreement and an unjust enrichment claim cannot be maintained where an express or written contract exists. *See Lackner v. Glosser, 2006 PA Super 14, 892 A.2d 21, 34 (Pa. 2006)* (citing *Mitchell v. Moore, 1999 PA Super 77, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999))*. While this is typically true, more discussion is required due to Plaintiff's surviving fraud claim.

In order for **[*14]** Plaintiff to state a claim for unjust enrichment under Pennsylvania law, it "must allege that (1) [it] conferred a benefit on the defendant, (2) the defendant knew of the benefit and accepted or retained it, and (3) it would be inequitable to allow the defendant to keep the benefit without paying for it." *Whitaker v. Herr Foods, Inc., 198 F. Supp. 3d 476, 492 (E.D. Pa. 2016)* (citing *Mitchell, 729 A.2d at 1203-04*). Plaintiff may advance its unjust enrichment claim "under a theory based on unlawful or improper conduct established by an underlying claim, such as fraud, in which case the unjust enrichment claim is a companion to the underlying claim." *Id.* (citations omitted). However, allowing the unjust enrichment claim to proceed along with the underlying fraud claim would only be proper in the absence of an express contract. As stated above when discussing Plaintiff's fraud claim, it is possible that Plaintiff may be able to void the written contract in this matter based on Defendant's alleged fraudulent misrepresentations. Accordingly, the court finds that it would be premature at this stage of the litigation to foreclose Plaintiff from pursuing its unjust enrichment claim along with its fraud claim, and Count III will not be dismissed. It is clear, however, that should Plaintiff's **[*15]** fraud claim fail, so too must its claim for unjust enrichment.

## F. Punitive Damages

Lastly, Defendant has moved to dismiss Plaintiff's request for punitive damages because: 1) Plaintiff pled the request as a separate cause of action, which is improper under Pennsylvania law; and 2) even if Plaintiff had properly plead the request, Plaintiff has failed to plead any facts upon which an award of punitive damages could be based. The court agrees with both arguments.

As an initial matter, it is clear that punitive damages may not be pursued as a separate cause of action under Pennsylvania law, *see, e.g., Murray v. Gencorp, Inc., 979 F. Supp. 1045, 1050 (E.D. Pa. 1997)*, and accordingly Count IV will be dismissed. In addition, the only facts Plaintiff has averred in support of a properly-pled request for punitive damages are that Defendant "acted in bad faith" and its conduct was "wanton and egregious, with reckless indifference and conscious disregard to the rights of Plaintiff." (Doc. 1, ¶¶ 36-37.) In actuality these are not facts, but rather boilerplate and conclusory allegations that are routinely rejected as insufficient to support an award of punitive damages. *See Salvio v. Amgen Inc., Civ. No. 11-cv-0553, 2012 U.S. Dist. LEXIS 19009, 2012 WL 517446, *8 (W.D. Pa. Feb. 15, 2012)* (finding "boilerplate allegation" of defendants' **[*16]** "malice, fraud and reckless disregard for others" failed to support a request for punitive damages). Accordingly, any request for punitive damages will be stricken from the complaint.

## IV. Conclusion

For the reasons stated herein, the court finds that it has subject matter jurisdiction over this action and that Plaintiff has stated a claim upon which relief can be granted with regard to its fraud claim contained in Count I and unjust enrichment claim contained in Count III. However, Plaintiff has failed to state plausible claims for relief in Counts II and IV, and those counts will be dismissed. Finally, Plaintiff has failed to plead sufficient facts to support a request for punitive damages and any such request shall be stricken.

An appropriate order will issue.

/s/ Sylvia H. Rambo

SYLVIA H. RAMBO

United States District Judge

Dated: February 20, 2018

## ORDER

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED** that Defendant's motion to dismiss (Doc. 10) is **DENIED** as to Counts I and III, and **GRANTED** as to Counts II and IV. **IT IS FURTHER ORDERED** that any request for punitive damages is **STRICKEN**.

/s/ Sylvia H. Rambo

SYLVIA H. RAMBO

United States District Judge

Dated: February **[*17]** 20, 2018

---

**End of Document**

Joe Grady

# Appendix Unpublished Opinion No.7

## Morgan v. Pennsylvania



**User Name:** Joe Grady
**Date and Time:** Tuesday, April 2, 2024 2:58:00PM EDT
**Job Number:** 220977994

## Document (1)

1. _Morgan v. Pennsylvania, 2023 U.S. Dist. LEXIS 177374_
   **Client/Matter:** 20659.24026
   **Search Terms:** Morgan v. Pa., No. 4:23-CV-00872, 2023 U.S. Dist. LEXIS 177374, 2023 WL 6461245 at *3 (M.D. Pa. Oct. 2, 2023) (Brann, J.)
   **Search Type:** Natural Language - Expanded Results
   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

🛈 Cited
As of: April 2, 2024 6:58 PM Z

# *Morgan v. Pennsylvania*

United States District Court for the Middle District of Pennsylvania

October 2, 2023, Decided; October 2, 2023, Filed

No. 4:23-CV-00872

**Reporter**

2023 U.S. Dist. LEXIS 177374 *; 2023 WL 6461245

DALE MORGAN, Plaintiff, v. COMMONWEALTH OF PENNSYLVANIA, et al., Defendants.

## Core Terms

arrest, motion to dismiss, probable cause, training, false arrest, allegations, municipal, traffic, custom, false imprisonment, amended complaint, judicial notice, imprisonment, investigate, pleadings, local law enforcement agency, malicious prosecution claim, leave to amend, identification, corroborate, counterfeit, supervision, employees, website, attach, brings, courts, rented, rights

**Counsel:  [*1]** For Dale Morgan, Plaintiff: Camille O. Russell, Russell Law Group, Westbury, NY.

For Commonwealth of Pennsylvania, Pennsylvania State Police, Michael D Brown, Defendants: Alexander Thomas Korn, PA Department of Banking and Securities, Harrisburg, PA.

For Centre County, PA, Defendant: David Lee Schwalm, Matthew R Clayberger, LEAD ATTORNEYS, PRO HAC VICE, Thomas, Thomas & Hafer, LLP, Camp Hill, PA.

**Judges:** Matthew W. ***Brann***, Chief United States District Judge.

**Opinion by:** Matthew W. ***Brann***

## Opinion

**MEMORANDUM OPINION**

**I. BACKGROUND**

In August 2021, Plaintiff Dale Morgan filed a three-count complaint against several Defendants: the Commonwealth of Pennsylvania (the "Commonwealth"); Pennsylvania State Police ("PSP"); Centre County, Pennsylvania ("Centre County"); several unspecified officers employed by these Pennsylvania law enforcement agencies; and Officer Michael D. Brown, who is employed by PSP.[1] Morgan filed his most recent amended complaint in November 2022.[2] This is a civil rights case brought pursuant to *42 U.S.C. § 1983*.[3]

In June 2023, Centre County filed a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)* for failure to state a claim;[4] Morgan filed a brief in opposition to Centre County's motion,[5] and Centre County filed a Reply Brief.[6] Separately, Defendants **[*2]** the Commonwealth, PSP, and Brown filed a motion to dismiss;[7] Morgan has filed a brief in opposition to Defendant Brown's motion.[8]

---

[1] Complaint, Doc. 1.

[2] Amended Complaint, Doc. 28.

[3] This case was originally assigned to the Honorable Eric R. Komitee in the Eastern District of New York in August 2021. Doc. 2. Following a motion to change venue by all defendants, the case was transferred to the Middle District of Pennsylvania in May 2023. Motion to Change Venue by all Defendants, September 15, 2022; Memorandum and Order, *Morgan v. Commonwealth of Pa. et al., 21-cv-4581, 2023 U.S. Dist. LEXIS 91030 (E.D.N.Y. May 24, 2023)* (Komitee, ***J***.), Doc. 41.

[4] Defendant Centre County's Motion to Dismiss, Doc. 46; Brief in Support of Defendant Centre County's Motion to Dismiss, Doc. 47.

[5] Plaintiff's Response to Defendant Centre County's Motion to Dismiss, Doc. 60; Plaintiff's Brief in Opposition to Defendant Centre County's Motion to Dismiss, Doc. 61.

[6] Reply Brief in Support of Defendant Centre County's Motion to Dismiss, Doc. 62.

[7] Renewed Motion to Dismiss of Commonwealth, PSP and Brown, Doc. 55.

[8] Plaintiff's Brief in Opposition to Defendant Michael Brown's

The motions are now ripe for disposition. The motion to dismiss all claims against the Commonwealth and PSP is granted with prejudice. The motions to dismiss all claims against Brown, and Morgan's *Monell* claims against Centre County, are granted with leave to amend.

## II. DISCUSSION

### A. Motion to Dismiss Standard

Under *Federal Rule of Civil Procedure 12(b)(6)*, courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[9] and *Ashcroft v. Iqbal*,[10] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[11] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled **[*3]** to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[12]

### B. Materials Outside of Morgan's Complaint

Morgan attaches five documents in his papers against Centre County and asks the Court to take judicial notice. In its Reply, Centre County argues that this is an impermissible attempt to amend the pleadings.[13] The Commonwealth, PSP, and Brown also attach Brown's

___

Motion to Dismiss, Doc. 63.

[9] *550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.

[10] *556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*.

[11] *Id. at 678* (quoting *Twombly, 550 U.S. at 570*).

[12] *Connelly v. Lane Construction Corp., 809 F.3d 780, 787 (3d Cir. 2016)* (internal quotations and citations omitted).

[13] Doc. 62 at 2.

affidavit of probable cause ("Brown's Affidavit") and the warrant for Morgan's arrest (the "Arrest Warrant").[14]

When deciding a motion to dismiss, a Court generally considers only the allegations in the complaint, exhibits attached thereto, and facts of public record.[15] Normally, to consider anything beyond those sources, a motion to dismiss must be converted to a motion for summary judgment.[16] But consideration of materials outside the complaint is not completely barred on a *Rule 12(b)(6)* motion. A Court may consider any documents that are integral or explicitly relied upon in the complaint.[17] "However, before materials outside the record may become the basis for a dismissal, several conditions must be met."[18] "For example, even **[*4]** if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."[19] It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document.[20]

First, the Court takes judicial notice of Brown's Affidavit and the Arrest Warrant, labeled as Exhibits A and B in Defendants the Commonwealth, PSP, and Brown's brief, and Exhibit Three in Morgan's brief.[21] Several courts in this Circuit have considered such documents to be public records,[22] and they are also "directly

___

[14] Docs. 55-1, 55-2.

[15] *Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)*.

[16] See *Fed. R. Civ. P. 12(d)*.

[17] *Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014)*.

[18] *Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006)*.

[19] *Id.; see also Kaempe v. Myers, 367 F.3d 958, 965, 361 U.S. App. D.C. 335 (D.C. Cir. 2004)*; *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001)*.

[20] *Faulkner, 463 F.3d at 134*.

[21] Doc. 56 at 2 n.6. Doc. 61 at 10. Plaintiff erroneously labels the Affidavit of Probable Cause as "Exhibit two" in his Brief, but it is attached as Exhibit Three to the Brief. Accordingly, the Affidavit will be referred to as Exhibit Three when referring to Plaintiff's materials.

[22] *Johnson v. City of Reading, No. 21-4860, 2023 U.S. Dist. LEXIS 19110, at *3 n.1 (E.D. Pa. Feb. 6, 2023)*; *Williams v. Hammer, No. 21-312, 2022 U.S. Dist. LEXIS 76287, at *2 n.3 (E.D. Pa. Apr. 26, 2022)*.

2023 U.S. Dist. LEXIS 177374, *4

challenged" by, "integral to," and "explicitly relied upon" in Morgan's false arrest, false imprisonment, and malicious prosecution claims,[23] and are therefore properly considered.

The Court also takes judicial notice of Exhibit Four, attached to Morgan's brief, as a public record.[24] Exhibit Four is a document released by Centre County, titled "Community Facilities and Services-Public Safety Handbook."[25] While taking judicial notice of webpages belonging to private companies at the motion to dismiss stage is generally inappropriate,[26] the Third Circuit has followed the prevailing wisdom that **[*5]** documents available on government websites are public records.[27] This Court has previously taken judicial notice of municipal websites in this precise context—to establish the relationship between a County and local law enforcement agencies when ruling on a motion to dismiss a *Monell* claim.[28]

However, the Court cannot take notice of Exhibit Five, which contains content from the Centre County Public Safety Training Center's ("the Center") website.[29] The Center is actually managed and operated by the Central Pennsylvania Institute of Science and Technology,

_____

[23] *See In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 368 n.9 (3d Cir. 1993); In re Burlington Coat Factory Sec. Litig. 114 F.3d 1410, 1426 (3d Cir. 1997).*

[24] *See Williams v. Long, 585 F.Supp. 2d 679, 688 n.4 (D. Md. 2008)* (explaining that Electronically Stored Information is included within "other publications" under *Federal Rule of Evidence 902(5),* and therefore self-authenticating)

[25] Doc. 61-4.

[26] *Schmidt v. Skolas, 770 F.3d 241, 249-250 (3d Cir. 2014).*

[27] *In re Google Inc., 806 F.3d 125, 133 n.12 (3d Cir. 2015). See also Vanderklok v. United States, 868 F.3d 189, 205 n.16 (3d Cir. 2017)* (taking judicial notice of administrative scheme based on government websites "made publicly available by governmental entities").

[28] *Rodriguez-Melendez v. Dauphin Cnty Drug Task Force, No. 1:14-CV-00012, 2014 U.S. Dist. LEXIS 179391, at *6 (M.D. Pa. Dec. 2, 2014)* (Mehalchick, M.J.), *report and recommendation adopted, 2015 U.S. Dist. LEXIS 343 (M.D. Pa. Jan. 5, 2015). See also Mincy v. Wetzel, No. 1:20-CV-717, 2021 U.S. Dist. LEXIS 212854 at *9 n.1 (M.D. Pa. Nov. 3, 2021)* (taking judicial notice of Department of Corrections' website as matter of public record).

[29] Doc. 61-5.

meaning that the website is not government-maintained.[30] In any event, the Center's activities would be of no help to Morgan's *Monell* claim.[31]

Finally, the Court will not take judicial notice of Exhibits One and Two. Exhibit One is the LinkedIn page of Officer Ralph Ralston, a Centre County Detective; Exhibit Two is Centre County's Facebook page.[32] "Not every website is a 'source[] whose accuracy cannot reasonably be questioned,' and it is generally inappropriate for a court to rely on internet research when considering a motion to dismiss."[33] Courts have therefore rightly refused to take **[*6]** judicial notice of unverified non-public internet information, including online networking profiles.[34]

## C. Facts

In an investigation centering on identity theft, Morgan was mistakenly arrested because the true culprit stole his identity. On January 4, 2019, a Volkswagen rental car traveling on the Interstate-80 was stopped by the PSP for a traffic violation.[35] The driver, Horace Henry, provided a counterfeit New York Driver's License.[36] This license displayed Henry's photograph, but Morgan's identifying information.[37] Based on Henry's counterfeit license, the officers misidentified Henry as Morgan in their incident report.[38]

_____

[30] *See* https://ccpstc.cpi.edu/about/.

[31] The Center's policy is set by nine representatives, only one of which is from Centre County, and it merely offers optional training services to municipal forces; nothing indicates that this training relates to the proper procedures involved in applying for a warrant. *Id.*

[32] Doc. 61-1, 61-2.

[33] *Havens v. James, 76 F.4th 103, 109 n.4 (2d Cir. 2023).*

[34] *Schmidt v. Skolas, 770 F.3d 241, 249-250 (3d Cir. 2014). See, e.g., Richcourt Allweather Fund, Inc. v. Midanek, No. 13-4810, 2014 U.S. Dist. LEXIS 54679, at *16-17 (D.N.J. Apr. 17, 2014)* (refusing to take judicial notice of a LinkedIn profile).

[35] Amended Complaint, Doc. 28 ¶12; Doc. 55-1 at 6.

[36] Doc. 28 ¶14.

[37] *Id.*

[38] Doc. 55-1 at 6.

2023 U.S. Dist. LEXIS 177374, *6

Also in early 2019, the Department of Homeland Security-HIS, PSP, and Centre County local law enforcement agencies began investigating an identity theft ring, which used stolen identities to create fraudulent Sprint accounts.[39] Officer Brown's affidavit states that after these accounts requested delivery of smart phones, the co-conspirators would show counterfeit identification to receive deliveries from trucks outside of their identity theft victims' residences.[40] Officers observed co-conspirator Sherica Chambers parked at one of these residences during such a delivery. [*7] [41] Officers subsequently learned of the make, model, and license plate of a Volkswagen rental car rented by Chambers at John F. Kennedy Airport in New York City;[42] the car was observed in the area during many of the deliveries, being driven by Chambers and co-conspirator Andrew Herdsman.[43] This was the same car that Henry was driving at the time of the traffic stop in early January, rented in Chambers' name.[44]

Officers subsequently arrested Herdsman on January 24, 2019.[45] Herdsman was interviewed by three officers, one of whom was Officer Brown.[46] During the interview, Herdsman identified another co-conspirator by an alias, "Metro,"[47] whose real name was Horace Henry.[48] Brown's affidavit states that, when Herdsman was shown a photograph of Chambers, Herdsman identified her "without hesitation."[49] The affidavit reveals no inquiries into whether Morgan was "Metro," and Morgan alleges no attempt was made.[50] This was despite several discrepancies which Herdsman, who had interacted with Henry face-to-face, may have

perceived from Morgan's picture: Henry is approximately 5'3" tall, while Morgan is 6'1"; Henry is a black man with a fair-skinned complexion, while Morgan is a black man with a darker complexion; [*8] and Henry weighs approximately 150 pounds, while Morgan weighs approximately 220 pounds.[51]

After interviewing Herdsman, Brown applied for a warrant for Morgan's arrest. Morgan alleges that Brown did so "blindly and summarily," without any additional investigation or corroboration of Morgan's identity, and based solely on the information obtained from Henry's fraudulent identification during his traffic stop.[52] A Centre County magisterial district judge signed Brown's warrant on February 1, 2019,[53] and the Centre County District Attorney's Office brought charges against Morgan "on or about" the same day.[54]

In March 2019, Detective Michael Langellotti, employed by the New York City Police Department, received the warrant for Morgan's arrest.[55] Langellotti also received unspecified instructions from Brown and others from Centre County.[56] Langellotti then issued a complaint against Morgan as a fugitive from justice, went to Morgan's home in the early morning, and arrested him.[57] Defendants also sent interstate communications to the Queens County District Attorney's Office, who brought suit on their behalf.[58] Morgan is a resident of Kings County, New York, and has never entered Pennsylvania; [*9] this was his first and only arrest.[59] As a result of the warrant, Morgan was denied bail and held in detention for nine days.[60]

On March 26, 2019, Officer Brown wrote an email to the Queens County District Attorney's Office, stating that

---

[39] Doc. 28 ¶10.

[40] Doc. 55-1 at 5.

[41] *Id.* at 6.

[42] Doc. 55-1 at 5.

[43] Doc. 28 ¶11; Doc. 55-1 at 5-6, 8.

[44] Doc. 55-1 at 5-7.

[45] Doc. 28 ¶16.

[46] *Id.* ¶17.

[47] *Id.* ¶18.

[48] Doc. 55-1 at 6; Doc. 28 ¶¶12-13.

[49] Doc. 55-1 at 5.

[50] Doc. 26 ¶¶19, 29.

[51] *Id.* ¶15.

[52] *Id.* ¶¶19-20, 28, 30, 35.

[53] *Id.* ¶21.

[54] *Id.* ¶65.

[55] *Id.* ¶22.

[56] *Id.* ¶¶22, 24, 36.

[57] *Id.* ¶22.

[58] *Id.* ¶37.

[59] *Id.* ¶¶6, 25.

[60] *Id.* ¶34.

2023 U.S. Dist. LEXIS 177374, *9

subsequent investigation "has led to the withdraw[al] of all charges against Mr. Dale Morgan," and all charges against him were eventually dismissed.[61] Despite Defendants' determination that Morgan was innocent, Centre County employees insisted that Morgan appear in Pennsylvania to address his false charges before they were dismissed.[62]

Morgan has now filed a three-count complaint under *42 U.S.C. § 1983*. He first brings a claim against all Defendants, alleging false arrest and false imprisonment in violation of the *Fourth* and *Fifth Amendments*.[63] Second, Morgan brings a *Monell* claim against the Commonwealth, PSP, and Centre County, alleging that inadequate training, policies, practices, customs and usages caused Morgan's false arrest and imprisonment.[64] Third, Morgan brings a claim against all Defendants for malicious prosecution.[65]

**D. Pennsylvania and PSP's Motion to Dismiss**

In his amended complaint, Morgan brings three claims against the Commonwealth and PSP.[66] However, **[*10]** in his most recent briefing, Plaintiff concedes that this Court should dismiss these claims,[67] and for good reason. The *Eleventh Amendment* provides the states with complete immunity from suit by citizens of any state,[68] and such immunity extends to suit against agencies of those states, including law enforcement agencies such as PSP.[69] However, as the Supreme Court of the United States explained in *Monell v. Department of Social Services*, the *Eleventh Amendment's* shield does not reach municipalities, such as Centre County.[70] Nor does it reach an officer sued in his individual capacity, such as Brown.[71] Accordingly, the *Eleventh Amendment* bars suit against the Commonwealth and PSP, and Morgan's claims against those Defendants are dismissed with prejudice.

**E. Centre County's Motion to Dismiss**

Morgan also argues that Centre County should be liable for the actions of the Commonwealth, PSP and its officers, and local law enforcement agencies including the Spring Township Police. The Court does not reach the merits of these claims because nothing in Morgan's amended complaint or the attachments plausibly alleges that Centre County had any role in these bodies' actions. Morgan also argues that Centre County should be liable for the actions of the Centre **[*11]** County District Attorney's Office. However, counties can only be liable for a prosecutor's policymaking, administrative, or investigatory acts. Morgan's complaint does not plausibly allege that any policy, administrative, or investigatory decision by the Centre County District Attorney's Office caused him constitutional injury. Therefore, all claims against Centre County are dismissed, with leave to amend.

Respondeat superior liability is unavailable against municipal bodies under *§ 1983*.[72] The violations must result from the execution of a policy or custom which fairly reflects that body's official policy.[73] A *§ 1983* plaintiff cannot survive dismissal through "conclusory allegations against defendants as a group."[74] An adequate allegation cannot, where multiple defendants

---

[61] *Id.* ¶38.

[62] *Id.* ¶40.

[63] *Id.* at 8-9.

[64] *Id.* at 9-12.

[65] *Id.* at 12-16.

[66] *Id.*

[67] Doc. 63 at 16; Doc. 56 at 5-6.

[68] *U.S. Const., amend. XI* ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . . "); *Hans v. Louisiana, 134 U.S. 1, 10 S. Ct. 504, 33 L. Ed. 842 (1980)*.

[69] *Will v. Michigan Dep't of State Police, 491 U.S. 58, 70, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)*.

[70] *436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*.

[71] *Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)*. Money damages are permissible so long as the damages are attributable to the officer himself and are not paid from the state treasury. *Scheuer v. Rhodes, 416 U.S. 232, 238, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*.

[72] *Monell v. New York City Dep't of Social Servs, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*.

[73] *Id.*

[74] *Galicki v. New Jersey, No. 14-169, 2015 U.S. Dist. LEXIS 84365, at *2 (D.N.J. June 29, 2015)*.

2023 U.S. Dist. LEXIS 177374, *11

"occupy different positions and presumably have distinct roles in the alleged conduct," engage in "impermissibly vague group pleading;" it must instead specify "which defendants engaged in what wrongful conduct."[75]

Morgan's complaint contains only references to "Centre County employees" alongside a litany of other Defendants, without any explanation of each actor's role in the alleged conduct.[76] Morgan's statement that "[a]t all material **[*12]** times each of the defendants was the agent of each other defendant" is not much better.[77] Morgan's description of local law enforcement agencies is likewise shaky at best, with only one paragraph actually naming the relevant Spring Township Police Department officer and his role in the initial investigation.[78] These allegations communicate nothing about the relationship among the defendants, and fail to explain Centre County's specific involvement in the decisions of the Commonwealth, PSP or Brown which led to Morgan's arrest, imprisonment and prosecution.

Morgan also contends that "Defendant Centre County authorizes and empowers . . . its local law enforcement agencies including police personnel working for the Spring Township Police Department."[79] However, as Centre County highlights, Pennsylvania counties often have no role in supervising or controlling municipal law enforcement agencies.[80] Morgan's attachment does not prove otherwise. Exhibit Four, a description of safety-related community facilities and services in Centre County, states that "[t]he provision and coordination of public safety in Centre County requires constant monitoring by County and municipal officials," and then **[*13]** provides a description of the various departments within the County, including its local police agencies.[81] That "county *and* municipal officials" provide and coordinate for public safety does not

explain what Centre County's role is in training local police agencies and is perfectly consistent with the idea that it does not oversee or empower them.

The final basis for Centre County's liability is through the activities of the Centre County District Attorney's Office. Prosecutors have a "dual or hybrid status" as both state and county-level actors.[82] When a prosecutor engages in conduct in furtherance of a criminal prosecution, he acts as a state actor, and is absolutely immune.[83] Therefore, no liability can be had based on Morgan's prosecution.

When a prosecutor acts in a policymaking capacity to make administrative and investigatory decisions on a local level, he acts as a county actor.[84] A municipality and its departments are treated as a single entity for purposes of *§ 1983* liability.[85] A *§ 1983* claim against a municipality must show (1) an underlying constitutional violation (2) caused by the municipality's execution of a municipal policy or custom.[86] The plaintiff must also plausibly allege **[*14]** that the identified policy, custom, or training or supervision deficiency caused the constitutional violation.[87]

For liability based on failure to train or supervise, that failure must amount to a "deliberate indifference" to the rights of persons with whom employees will come into contact.[88] Deliberate indifference usually requires showing a "pattern of similar constitutional violations by employees."[89] In rare circumstances, liability may be

---

[75] *Falat v. Cnty of Hunterdon, No. 12-6804, 2013 U.S. Dist. LEXIS 37398, at *3 (D.N.J. Mar. 19, 2013)*.

[76] Doc. 28 ¶¶35, 36, 46, 53.

[77] *Id.* ¶63.

[78] *Id.* ¶17.

[79] *Id.* ¶10.

[80] Doc. 47 at 9. *See, e.g., Pena v. City of Lancaster, No. 21-CV-590, 2022 U.S. Dist. LEXIS 1680, at *7 (E.D. Pa. Jan. 5, 2022)*.

[81] Doc. 61-4 at 2.

---

[82] *Coleman v. Kaye, 87 F.3d 1491, 1499 (3d Cir. 1996)*.

[83] *Imbler v. Pachtman, 424 U.S. 409, 430-41, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976)*.

[84] *Carter v. City of Phila., 181 F.3d 339, 352-53 (3d Cir. 1999)*.

[85] *Jackson v. City of Erie Police Dep't, 570 F.App'x 112, 114 (3d Cir. 1997); Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 n.4 (3d Cir. 1997)*.

[86] *Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003)*.

[87] *Canton v. City of Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)*.

[88] *Id. at 388*.

[89] *Connick v. Thompson, 563 U.S. 51, 62, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011); see also Forrest v. Parry, 930 F.3d*

demonstrated if "the need for more or different training" was so "plainly obvious" that no pattern of abuse is required.[90] "Liability cannot rest only on a showing that the employees 'could have been better trained or that additional training was available that would have reduced the overall risk of continued injury."[91] The court must weigh the "likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle the situation will violate citizens' rights."[92]

Morgan's allegation that the Centre County District Attorney's Office provided inadequate training and supervision on the process of applying for warrants is not clearly in his complaint. It is, instead, **[*15]** noted in his his brief in opposition to Centre County's Motion to Dismiss.[93] This is an impermissible attempt to amend pleadings. Be that as it may, Morgan remains unclear as to what specific training or supervision is lacking here, aside from training on "probable cause" in warrants.[94]

Probable cause is a notoriously complex and fact-specific concept; training on probable cause could span training on most of police work. Courts finding *Monell* liability have generally done so based on more concrete failures.[95] And while Morgan states that a similar incident of wrongful arrest due to inadequate investigation occurred once before, to an individual named Vladimir Esguerra,[96] Morgan provides no details about the Esguerra incident. The Court has no way to determine if this matter was similar, or even if it had anything to do with the Centre County District Attorney's Office.

---

*Monell* liability may also attach based on a custom or usage when a "persistent and widespread" practice of government officials is so "permanent and well-settled as to constitute a custom or usage with the force of law."[97] But again, excising impermissibly vague pleadings,[98] Morgan does not allege any specific **[*16]** custom of the District Attorney's Office, and fails to set out the specific details of the District Attorney's Office's practice or customs, other than securing warrants "without adequate investigations" and "without sufficient information."[99] There is no heightened pleading standard for a *Monell* claim, but more is needed; a plaintiff must "identify a custom or policy, and specify what exactly that custom or policy was."[100]

Finally, the amended complaint alleges that Centre County Prosecutors had some role in the investigation, but Morgan does not state what that role is. Moreover, the allegation that the District Attorney's Office "did not make the requisite preliminary inquiries . . . to determine the true perpetrator of the alleged offenses"[101] it is too vague from the face of the complaint to support liability on this basis. Morgan must more clearly allege what role prosecutors had in the investigation, what specific inquiries they did not make, and how this resulted in a specific constitutional injury.

### F. Brown's Motion to Dismiss

Morgan brings three *§ 1983* causes of action against Officer Brown, presented in two counts: false arrest and false imprisonment, and malicious prosecution.[102] **[*17]** Brown contends that the false arrest or imprisonment claims fail because he was not "personally involved" in

---

[93, 106 (3d Cir. 2019)](citing *Carter v. City of Phila., 181 F.3d at 357*).

[90] *Canton, 489 U.S. at 390*.

[91] *Thomas v. Cumberland Cnty, 749 F.3d 217, 226 (3d Cir. 2014)*.

[92] *Bd. of Cnty Comm'rs v. Brown, 520 U.S. 397, 409, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)*.

[93] *Compare* Doc. 28 at ¶¶47-48 *with* Doc. 61 at 12-13.

[94] Doc. 28 at ¶¶54, 56.

[95] *See, e.g.*, *Berg v. Cnty of Allegheny, 219 F.3d 261, 276-77 (3d Cir. 2000)*; *Carter v. City of Phila, 181 F.3d 339, 352-53 (3d Cir. 1999)* (citing *Walker v. City of New York, 974 F.2d 293 (2d Cir. 1992)*).

[96] Doc. 28 ¶51.

---

[97] *Monell v. New York City Dep't of Social Servs, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*; *Brown v. Muhlenberg Twp.*, 269, F.3d 205, 215 (3d Cir. 2001).

[98] *See* Doc. 28 at ¶¶47-48, 55.

[99] *Id.*

[100] *Small v. Lower Paxton Twp., No. 1:22-cv-01146, 2023 U.S. Dist. LEXIS 124829, at *29 (M.D. Pa. July 19, 2023)* (quoting *McTernan v. City of New York, 564 F.3d 636, 658 (3d Cir. 2009)*).

[101] *See* Doc. 28 ¶38, 52.

[102] *Id.* at 8-9, 12-16.

2023 U.S. Dist. LEXIS 177374, *17

Morgan's arrest and imprisonment.[103] The Court rejects Defendant's argument.[104] However, assuming Brown's affidavit of probable cause to be truthful, Morgan has no false arrest, false imprisonment, or malicious prosecution claim against Brown based on Brown's affidavit of probable cause or the execution of his arrest warrant, as both were approved by a neutral magistrate. Nor does Brown's alleged failure to investigate support these claims based on Morgan's pleaded theories of liability. For the reasons stated below, Brown's motion to dismiss all counts is granted, with leave to amend.

Morgan's claims against Brown ultimately reduce to probable cause, and all fail to reach that issue due to the strength of Brown's qualified immunity defense.[105] A false arrest claim requires "(1) that there was an arrest; and (2) that the arrest was made without probable cause."[106] False imprisonment claims generally overlap with false arrest claims, requiring (1) that a plaintiff was detained and (2) that the detention was unlawful.[107] Morgan adequately alleges that he was arrested and imprisoned,[108] so the dispute lies in probable cause existed. **[*18]**

"To prevail on a malicious prosecution claim, a plaintiff must demonstrate that: '(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in [the] plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted

---

[103] Doc. 56 at 6-8.

[104] See *Berg v. Cnty of Allegheny, 219 F.3d 261, 272* ("*§ 1983* liability for an unlawful arrest can extend beyond the arresting officer to other officials whose intentional actions set forth the arresting officer in motion"); *Wilson v. Russo, 212 F.3d 781, 786-87 (3d Cir. 2000)* (filing affidavit of probable cause with false statement or omission can support false arrest claim); *Diaz v. Carstaphen, No. 22-cv-7465, 2023 U.S. Dist. LEXIS 126688, at *11-12 (D.N.J. July 24, 2023)* (personal involvement for supervisory authority over arrest).

[105] Courts have discretion to determine whether to tackle qualified immunity before the underlying claim. *Ashcroft v. al-Kidd, 563 U.S. 731, 735, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)*.

[106] *Harvard v. Cesnalis, 973 F.3d 190, 199 (3d Cir. 2020)* (quoting *James v. City of Wilkes-Barre, 700 F.3d 675, 680 (3d Cir. 2012)*).

[107] *Wallace v. Kato, 549 U.S. 384, 389, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007)*.

[108] Doc. 28 ¶¶22, 24.

maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.'"[109] Morgan has adequately alleged many of these elements as well and, therefore, again the only dispute is whether there existed probable cause.

Assuming the truthfulness of Brown's affidavit, Morgan's false arrest and malicious prosecution claims would have to clear an astoundingly high bar to evade a qualified immunity defense. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional rights, and (2) that the right was 'clearly established' at the time of the challenged conduct."[110] "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the **[*19]** contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing is right."[111]

Where an alleged constitutional violation involves an arrest pursuant to a warrant, "the fact that a neutral magistrate has issued the warrant is the clearest indication that the officers acted in an objectively reasonable manner"[112] and the magistrate is given "great deference."[113] The arrest is valid unless "it is obvious that no reasonably competent officer would have concluded that a warrant should issue."[114] The warrant must be "so lacking in indicia of probable cause" that "it is apparent from a 'simple glance' at the face of the warrant itself, not a defect that would 'become apparent only upon a close parsing of the

---

[109] *Harvard, 973 F.3d at 206* (quoting *Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003)*).

[110] *Ashcroft v. al-Kidd, 563 U.S. 731, 735, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)*.

[111] *Id. at 741* (quoting *Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)*) (cleaned up).

[112] *Messerschmidt v. Millender, 565 U.S. 535, 546-57, 132 S. Ct. 1235, 182 L. Ed. 2d 47 (2012)*.

[113] *United States v. Leon, 468 U.S. 897, 913-14, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984)*.

[114] *Malley v. Briggs, 475 U.S. 335, 342, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)*.

Joe Grady

2023 U.S. Dist. LEXIS 177374, *19

warrant application.'"[115] "The threshold for establishing this exception is a high one"[116] because "an officer cannot be expected to question the magistrate's probable-cause determination."[117] The same is true for prosecutions initiated by the affidavit of probable cause; indeed, the claim is "twice disadvantaged" as it has also been approved by a prosecutor.[118]

As it has developed, there may have been a lack of probable cause to arrest Morgan, but it cannot **[*20]** be said that its deficiency is apparent absent a close parsing of the warrant application. Successful plaintiffs in this Circuit generally demonstrate such deficiencies through "bare bones" or "skeletal" affidavits containing, at most, a few general sentences.[119] Here, Officer Brown filed a detailed, four-page affidavit outlining the activities of an identity fraud ring. He outlined the results of surveillance and Andrew Herdsman's interview, which were used to connect Sherica Chambers to the identity fraud scheme, and then correctly tied Chambers' rental car to "Metro" by confirming that the car was still being rented in Chambers' name at the time of Henry's traffic violation.

Despite Morgan's protests to the contrary, his complaint does not allege that Brown could verify Morgan's identity through any readily available information, other than the traffic report itself. Morgan does not allege that an image of Metro was available to Brown,[120] and Brown was not present at the initial traffic stop. If a picture of Henry, the man who was actually Metro, was available in the traffic incident report or elsewhere, that fact is not

---

[115] *Armstrong v. Asselin, 734 F.3d 984, 992 (9th Cir. 2013)* (citing *Messerschmidt, 565 U.S. at 556*).

[116] *Messerschmidt, 565 U.S. at 547*.

[117] *United States v. Leon, 468 U.S. 897, 922-923, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984)*.

[118] *Fiore v. City of Bethlehem, 510 F.App'x 215, 220 (3d Cir. 2013)*; *Handy v. Palmiero, No. 17-3107, 2019 U.S. Dist. LEXIS 142639, at *18 (E.D.a. Aug. 22, 2019)*.

[119] *Fiore, 510 F.App'x at 221 (3d Cir. 2013)*; *United States v. Pavulak, 700 F.3d 651, 664 (3d Cir. 2012)* (collecting examples of "bare bones" affidavits); *Kolhaas v. N.J., Civ. No. 16-1564, 2017 U.S. Dist. LEXIS 175134, at *14-15 (D.N.J. Oct. 23, 2017)*.

[120] *See Rothermel v. Dauphin Cnty., No. 1:16-CV-1669, 2020 U.S. Dist. LEXIS 51951, at *18 n.6 (M.D. Pa. Mar. 26, 2020)*.

alleged in the complaint. Nor is showing Morgan's picture to Herdsman **[*21]** a readily available method of corroborating his identity, as the word of an informant is far from an "objective" determination.[121]

Although Morgan is correct that a reasonable officer should expect the ringleader of an identity fraud conspiracy to present fraudulent identification, only a "close parsing" of the application reveals these deficiencies. It is well-settled under qualified immunity that it is reasonable to rely on "what proves to be the flawed conclusions of a fellow officer."[122] Here, the traffic officers mistakenly concluded that Henry's counterfeit identity was authentic, and Brown relied on their traffic report to connect Morgan to the driver. Moreover, Brown did corroborate that the Volkswagen was being rented by Chambers at the time of the traffic stop, and knew that that the Volkswagen had been rented from the John F. Kennedy Airport. Additionally, Brown knew that the identity theft ring would use fraudulent identification to obtain packages from Pennsylvania residents, making it reasonable to believe that Morgan would not carry counterfeit identification from the residents of other states. This makes Morgan's Queens, New York address a corroborating rather than **[*22]** a detracting factor in Brown's affidavit.

Brown certainly could have—and should have—taken more steps to corroborate whether Morgan was Metro. But an officer is not required to exhaust every potential avenue of investigation before seeking to obtain a warrant, and any failure to "ferret out mistakes made by others"[123] is not obvious without a close parsing of the circumstances surrounding the affidavit.

This does not mean that plaintiffs are always remediless when false arrest, false imprisonment, and malicious prosecution occur pursuant to a facially valid warrant. All three causes of action are available where officers (1) "knowingly and deliberately, or with a reckless disregard for the truth, made false statements and omissions that create a falsehood in applying for a warrant;" and (2) "such statements or omissions are material, or

---

[121] Cf. **Kelly v. Jones I, 148 F. Supp. 3d 395, 403 (E.D. Pa. 2015)**.

[122] *Mills v. Golden Nugget Atl. City, LLC, No. 19-19610, 2021 U.S. Dist. LEXIS 156166, at *23 (D.N.J. Aug. 18, 2021)* (quoting *Rogers v. Powell, 120 F.3d 446, 454-55 (3d Cir. 1997)*).

[123] *See Rothermel, 2020 U.S. Dist. LEXIS 51951, at *26*.

necessary, to the finding of probable cause."[124]

But Morgan equivocates as to the theory underlying his false arrest, false imprisonment, and malicious prosecution claims against Brown, and it is unclear whether alleging that Brown "blindly and summarily" applied for the Arrest Warrant is meant to allege a falsehood or omission.[125] As Morgan never **[*23]** explicitly contests the completeness or sincerity of Brown's affidavit, the Court will construe his pleadings in this way; the true gravamen of Morgan's complaint is geared toward the thoroughness of Brown's underlying investigation[126] and whether probable cause existed. Any such claim must fail, as it cannot be said that no reasonable officer would believe a warrant should issue here. Consequently, the allegations do not establish that Morgan's constitutional rights were violated, let alone that those rights were clearly established.

Morgan also states that his imprisonment was prolonged due to a failure to investigate his identity.[127] While there is no clearly established "failure to investigate" cause of action under § 1983,[128] some courts have held that a plaintiff who was lawfully arrested may bring a false imprisonment claim where the failure to investigate unconstitutionally prolongs his imprisonment.[129] But the boundaries of this theory of liability are uncertain,[130] and the Court does not opine on its viability. It is not clear from Morgan's amended complaint or briefings that he intended to plead this theory of liability, so the Court will not address it here.

## III. [*24]  CONCLUSION

Defendants' motions to dismiss pursuant to Rule 12(b)(6) are granted. Plaintiff is granted leave to amend his claims against Centre County and Officer Brown. Leave to amend any claims against the Commonwealth of Pennsylvania or Pennsylvania State Police is denied, as any attempted amendment would be futile due to the existence of the Eleventh Amendment.

As such, Plaintiff will be given fourteen days from today's date to file an amended complaint. If no amended complaint is filed, the action will be subject to dismissal with prejudice.

An appropriate Order follows.

BY THE COURT:

/s/ Matthew W. *Brann*

Matthew W. *Brann*

Chief United States District Judge

## ORDER

In accordance with the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that:

    1. Defendants' motions to dismiss (Docs. 46, 55) are **GRANTED**;
    2. All claims against the Commonwealth of Pennsylvania and Pennsylvania State Police are dismissed with prejudice; and

    3. Claims against Michael D. Brown and Centre

---

[124] Wilson v. Russo, 212 F.3d 781, 786-87 (3d Cir. 2000) (citing Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997)); see also Goodwin v. Conway, 836 F.3d 321, 327-28 (3d Cir. 2016); Dempsey v. Bucknell Univ., 834 F.3d 457, 469 (3d Cir. 2016); Geness v. Cox, 902 F.3d 344, 356-57 (3d Cir. 2018).

[125] Doc. 28 ¶20.

[126] Id. ¶¶19-20, 30, 35, 49, 50, 52, 67, 68.

[127] Doc. 28 ¶¶34, 76.

[128] See Baker v. McCollan, 443 U.S. 137, 145-46, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979); White v. Andrusiak, No. 14-7045, 2015 U.S. Dist. LEXIS 110076, at *2-3 (E.D. Pa. Aug. 19, 2015); Wright v. City of Phila., 229 F.Supp.3d 322, 332 n.3 (E.D. Pa. 2017); Harvard v. Cesnalis, 973 F.3d 190, 207 (3d Cir. 2020); Geness v. Cox, 902 F.3d 344, 354 n.5 (3d Cir. 2018).

[129] See Kelly v. Jones I, 148 F. Supp. 3d 395, 402 (E.D. Pa. 2015). Likewise, malicious prosecution claims may be available "where an officer's involvement does not end with the issuance of a warrant or the act of arrest." Kelly v. Jones II, 148 F. Supp. 3d 395 (E.D. Pa. 2015) (citing Johnson v. Knorr, 477 F.3d 75 (3d Cir. 2007)); see also Thomas v. City of

---

Phila., 290 F.Supp. 3d 371, 379 (E.D. Pa. 2018).

[130] Baker v. McCollan initially indicated that this cause of action may be unavailable. 443 U.S. 137, 140-41, 145-46, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). Subsequent decisions have held otherwise. See, e.g., Kelly I, 148 F. Supp. at 402; Kelly II, 148 F. Supp. at 395; Rodriguez v. Roth, 516 F.Supp. 410, 412 (E.D. Pa. 1981); Cannon v. Macon Cnty, 1 F.3d 1558 (11th Cir. 1993); Patton v. Przybylski, 822 F.2d 697 (7th Cir. 1987).

2023 U.S. Dist. LEXIS 177374, *24

County, Pennsylvania, are dismissed without prejudice, and with leave granted to file an amended complaint no later than twenty-one (21) days from the date of this Order. If no amended complaint is filed by that date, the action will be subject to dismissal **[*25]** with prejudice.

BY THE COURT:

*/s/ Matthew W. **_Brann_***

Matthew W. **_Brann_**

Chief United States District Judge

---

**End of Document**

Joe Grady