**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALEIDA AQUINO & BRENDALIS LOPEZ, | |
| Plaintiffs, | CIVIL ACTION NO. 3:24-CV-00206 |
| v. | (MEHALCHICK, J.) |
| HAZLETON AREA SCHOOL DISTRICT, | |
| Defendant. | |

## MEMORANDUM

This action arises under Section 2 of the Voters Rights Act of 1965 ("VRA") and the Fourteenth Amendment of the U.S. Constitution. (Doc. 1). Plaintiffs Aleida Aquino and Brendalis Lopez ("Plaintiffs") filed the operative complaint on February 5, 2024. (Doc. 1). Presently before the Court is a motion to dismiss filed by Defendant Hazleton Area School District ("HASD"). (Doc. 21). For the following reasons, the motion to dismiss will be **DENIED**. (Doc. 21).

## I.    BACKGROUND AND PROCEDURAL HISTORY

The following factual summary is taken from the complaint. (Doc. 1). Plaintiffs are Hispanic registered voters in the HASD. (Doc. 1, ¶ 1). The HASD is governed by the Hazleton Area School Board ("HASB"), a body of nine individuals elected on staggered terms through an at-large election system. (Doc. 1, ¶¶ 14-15). Plaintiffs allege that this at-large election system dilutes the voting strength of Hispanic voters and deprives them of the equal opportunity to participate in the electoral process in violation of the VRA and the Fourteenth Amendment. (Doc. 1, ¶ 19).

The HASD's current at-large election scheme has been in place since 1989. (Doc. 1, ¶ 18). From 2010 to 2022, the Hispanic population has grown from 17.9% to 39.6%. (Doc. 1, ¶ 9). As of the date of the complaint's filing, the City of Hazleton and West Hazleton Borough, both municipalities contained within the HASD, had respective Hispanic populations of 62.2% and 66.5%. (Doc. 1, ¶ 10). A Hispanic individual has never been elected to the HASB. (Doc. 1, ¶ 26). Plaintiffs allege that despite the fact that the Hispanic population in the HASD is politically cohesive, the white population there votes sufficiently as a bloc to defeat Hispanic voters' preferred candidates. (Doc. 1, ¶¶ 21-22). Plaintiffs also allege that there "is a history of official discrimination against Hispanics in the HASD that affects the rights of Hispanic residents to register, vote, and participate in the democratic process," that the "Hispanic population of HASD continues to suffer the effects of discrimination in education, policing, and employment, including employment within the HASD, which hinders their ability to participate effectively in the political process," and that statistically, Hispanic individuals in the HASD are more likely to live under the poverty line. (Doc. 1, ¶¶ 28-31).

On April 4, 2024, the HASD filed the instant motion to dismiss and a brief in support. (Doc. 21; Doc. 22). On April 24, 2024, Plaintiffs filed a brief in opposition. (Doc. 26). On May 1, 2024, the Office of the United States Attorney General filed a Statement of Interest on behalf of the Government. (Doc. 27). On May 15, 2024, the HASD filed a reply brief. (Doc. 31). On July 11, 2024, the parties engaged in oral argument. (Doc. 35). Accordingly, the motion has been fully briefed and is ripe for discussion.

## II.    LEGAL STANDARD

### A.    MOTION TO DISMISS

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To assess the sufficiency of a complaint on a Rule 12(b)(6) motion, a court must first take note of the elements a plaintiff must plead to state a claim, then identify mere conclusions that are not entitled to the assumption of truth, and finally determine whether the complaint's factual allegations, taken as true, could plausibly satisfy the elements of the legal claim. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). In deciding a Rule 12(b)(6) motion, the court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

After recognizing the required elements that make up the legal claim, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plaintiff must provide some factual ground for relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, courts "need not credit a complaint's 'bald assertions' or 'legal conclusions'. . . " *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). Nor need a court assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

A court must then determine whether the well-pleaded factual allegations give rise to a plausible claim for relief. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted); *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). The court must accept as true all allegations in the complaint, and any reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). The plausibility determination is context-specific and does not impose a heightened pleading requirement. *Schuchardt*, 839 F.3d at 347.

B.    42 U.S.C. SECTION 1983

Section 1983 is the vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. *See* 42 U.S.C. § 1983. The statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

"Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors." *See Pappas v. City of*

*Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002)). To state a cause of action under Section 1983, a plaintiff must allege that: (1) the conduct complained of was committed by persons acting under color of state law; and (2) the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States. *See Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

## III.  DISCUSSION

The Fifteenth Amendment protects "the right of citizens to vote." U.S. CONST. amend. XIV, § 1. This right may not be "denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. CONST. amend. XIV, § 1. In 1964, Congress enacted the VRA to "banish the plight of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966). The VRA is intended to enforce the guarantees of the Fifteenth Amendment against "unremitting and insidious defiance of the Constitution" effectuated through continued voter discrimination. *Katzenbach*, 383 U.S. at 308.

Section 2 of the Voting Rights Act ("Section 2") guarantees that:

No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen in the United States to vote on account of race or color…

52 U.S.C. § 10301(a).

There are several ways in which a citizen's voting power may be diluted in violation of Section 2, including through racial gerrymandering, the enactment of electoral laws and practices that target and disadvantage minorities, and other attempts to weaken the voting strength of minority groups. *See Gingles*, 478 U.S. at 47 ("The essence of a [Section] 2 claim is that a

certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."). As long recognized by the Supreme Court, "at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'" *Jenkins v. Manning*, 116 F.3d 685, 689 (3d Cir. 1997) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47–48 (1986) (internal quotations omitted)). "The danger inherent in at-large voting systems is that the majority, based on its greater numbers, will be able to elect its chosen candidates and defeat the candidates preferred by the minority." *Jenkins*, 116 F.3d at 689.

Plaintiffs allege that the HASD's at-large voting scheme dilutes the voting strength of Hispanic voters and prevents their equal participation in the political process in violation of the VRA and the Fourteenth Amendment. (Doc. 1, ¶ 19). Plaintiffs note that even though Hispanics make up 39.6% of the population of the HASD, 62.2% of the City of Hazleton, and 66.5% of the Borough of West Hazleton, no Hispanic individual has ever been elected to the HASB. (Doc. 1, ¶¶ 9-10, 26). According to Plaintiffs, intentional discrimination in the HASD hinders the ability of Hispanic citizens to participate effectively in the political process. (Doc. 1, ¶ 29). HASD seeks to dismiss Plaintiffs' complaint, arguing that there is no private cause of action under Section 2 of the VRA, and that Plaintiffs have failed to state a claim under either Section 2 of the VRA, or the Fourteenth Amendment. (Doc. 22; Doc. 31). Plaintiffs refute each of these grounds for dismissal. (Doc. 26).

A. Private Cause of Action under the VRA

The HASD argues that Section 2 of the VRA does not imply a private cause of action. (Doc. 22, at 10). In response, Plaintiffs submit that longstanding precedent supports that

Section 2 is privately enforceable; that the VRA's text, structure, and history require recognition of a private right of action; and that Section 2 is otherwise enforceable under 42 U.S.C. § 1983. (Doc. 26, at 2). In a Statement of Interest filed by the Government, the Attorney General agrees with Plaintiffs, asserting that Section 2 creates privately enforceable personal rights and contains an implied private right of action. (Doc. 27, at 8). For the following reasons, this Court concludes that there is a private cause of action under Section 2 of the VRA and will deny the HASD's motion to dismiss on this basis.

**1. The Voting Rights Act**

The Court first turns to the language of the VRA to determine whether there is support for an implied right of action to enforce Section 2. As discussed, *supra*, the VRA, which guarantees that the right to vote not be denied on account of race or color, is intended to enforce the guarantees of the Fifteenth Amendment against "unremitting and insidious defiance of the Constitution" effectuated through continued voter discrimination. *Katzenbach*, 383 U.S. at 308; 52 U.S.C. § 10301(a). However, the text of Section 2 of the VRA does not contain an explicit private right of action. 52 U.S.C. § 10301. Even where a statute explicitly creates rights, a plaintiff suing under an implied right of action may do so where the statute manifests an intent to create not just a private right but also a private remedy. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002); *see also Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)). In this context, this remedy is logically intended to redress infringement of an individual's private right to vote, which is protected under the Fifteenth Amendment and subsequently by the VRA. *See* 52 U.S.C. § 10302(a); *see also* 52 U.S.C. § 1030l(a), (e); *see also* 52 U.S.C. § 10308(f).

Historically, the great majority of Section 2 litigation is brought by private litigants, reflecting Congress' intent to create a private remedy for Section 2 violations.[1] As stated by the Government, "the right- or duty-creating language of [a] statute has generally been the most accurate indicator of the propriety of implication of a cause of action." (Doc. 27, at 11); *see Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979); *see also Sandoval*, 532 U.S. at 288 (characterizing the "rights creating" component of the private-right-of-action analysis as "critical"). The Government goes on to persuasively argue that "Congress's intent to provide a private remedy to enforce Section 2 can be understood from several provisions of the VRA," including Section 12(f), Section 3, and Section 14(e). (Doc. 27, at 11-13); *see* 52 U.S.C. § 10302(a); *see also* 52 U.S.C. § 10308(f); 52 U.S.C. § 10310(e). These provisions provide the following: federal courts subject-matter jurisdiction over suits brought by "a person asserting rights under the provisions of [the VRA]" 52 U.S.C. § 10308(f); a remedy in actions brought by "the Attorney General or *an aggrieved person* . . . under any statute to enforce the voting guarantees of the Fourteenth or Fifteenth Amendment," 52 U.S.C. § 10302(a), (c) (emphases

---

[1] "Since 1982, more than 400 Section 2 cases have been litigated in federal court." *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204, 1220 n. 8 (8th Cir. 2023) (citing Ellen D. Katz, Brian Remlinger, Andrew Dziedzic, Brooke Simone & Jordan Schuler, *To Participate and Elect: Section 2 of the Voting Rights Act at 40*, Univ. Mich. L. Sch. Voting Rights Initiative (2022), https://voting.law.umich.edu (listing 439 electronically-reported cases with judicial decisions between 1982 and 2021 addressing a substantive Section 2 claim)). "Over the past forty years, there have been at least 182 successful Section 2 cases; of those 182 cases, only 15 were brought solely by the Attorney General." *Arkansas State Conference of the NAACP*, 86 F.4th at 1220 n. 8 (citing Katz, *supra*, at https://voting.law.umich.edu/wp-content/uploads/2022/02/VRI_Codebook.pdf (defining successful cases as those where "the ultimate outcome of the lawsuit was that a plaintiff achieved success on the merits by proving a violation of the VRA," or where "a positive real-world outcome could be determined from the opinions reviewed, e.g. a consent decree or a positive settlement")).

added); and the right of a "prevailing party, other than the United States, to seek attorney's fees" "[i]n any action or proceeding to enforce the voting guarantees of the Fourteenth or Fifteenth Amendment." 52 U.S.C. § 10310(e). This Court agrees that the language of the VRA creates a strong presumption that Congress intended Section 2 to be privately enforceable. (Doc. 27, at 11).

### 2. Supreme Court and Lower Court Precedent

Further, "[s]ince the passage of the Voting Rights Act, federal courts across the country, including. . .the Supreme Court. . .have considered numerous Section Two cases brought by private plaintiffs." *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1031 (N.D. Ala. 2022) (per curiam) (three-judge court). Indeed, the Supreme Court has repeatedly suggested that plaintiffs may bring a private cause of action under Section 2 and has itself adjudicated Section 2 claims brought by private citizens. *See Allen v. Milligan*, 599 U.S. 1, 17 (2023); *see also Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006); *see also Voinovich v. Quilter*, 507 U.S. 146 (1993); *see also Houston Laws' Ass 'n v. Att'y Gen.*, 501 U.S. 419 (1991); *see also Chisom v. Roemer*, 501 U.S. 380 (1991); *see also Thornburg v. Gingles*, 478 U.S. 30 (1986). For example, in a case involving a private action brought under Section 10 of the VRA, *Morse v. Republican Party of Virginia*, Justice Stevens wrote, in a plurality opinion, that "[i]t would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language." 517 U.S. at 232. In Justice Breyer's concurring opinion in *Morse*, he concluded, "I believe Congress intended to establish a private right of action to

9

enforce § 10, no less than it did to enforce §§ 2 and 5."[2] *Morse*, 517 U.S. at 240. As recently as 2023, the Supreme Court has considered a private cause of action under Section 2. *See Allen*, 599 U.S. at 17. Accordingly, while the Supreme Court has not addressed an express challenge to private enforcement of rights under Section 2, Supreme Court precedent fails to support the HASD's conclusion that there is no implied private cause of action under Section 2.[3]

The Third Circuit also has a history of hearing private actions brought under Section 2. *See Jenkins v. Manning*, 116 F.3d 685 (3d Cir. 1997); *see also Page v. Bartels*, 248 F.3d 175 (3d Cir. 2001). While the Third Circuit has not opined on the existence of a private right of action under Section 2, it has heard a case factually analogous to this matter without questioning the plaintiffs' ability to sue under Section 2.[4] *Jenkins*, 116 F.3d at 685. The Fifth, Sixth, and Eleventh Circuits have all specifically concluded that private plaintiffs have the right to sue under Section 2. *See Robinson v. Ardoin*, 86 F.4th 574, 587-88 (5th Cir. 2023); *see also Mixon v. Ohio*, 193 F.3d 389, 406 (6th Cir. 1999); *see also Alabama State Conf. of NAACP v. Alabama*, 949

---

[2] Relying on *Seminole Tribe of Fla. v. Florida,* Plaintiffs submit that these two opinions in *Morse* require the conclusion that "there is a private right of action under Section 2" and that such a conclusion is binding. (Doc. 26, at 11; quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").

[3] In the 2021 Supreme Court case *Brnovich v. Democratic National Committee*, Justice Gorsuch's concurrence called into question the creation of a private right of action under Section 2, writing that "[o]ur cases have assumed—without deciding—that the Voting Rights Act of 1965 furnishes an implied cause of action under § 2." 594 U.S. 647, 690 (2021). However, Justice Gorsuch did not further opine on this issue, concluding "[b]ecause no party argues that the plaintiffs lack a cause of action here, and because the existence (or not) of a cause of action does not go to a court's subject-matter jurisdiction, this Court need not and does not address that issue today." *Brnovich*, 594 U.S. at 690 (internal citation omitted).

[4] Notably, in *Jenkins v. Manning*, the parties did not raise or litigate this issue. 16 F.3d 685 (3d Cir. 1997).

F.3d 647, 652 (11th Cir. 2020), *cert. granted, op. vacated, and case dismissed as moot*, 141 S. Ct. 2618 (2021) ("We instead ask whether the statute's text makes clear that Congress intended to subject States to liability by private parties. The answer here is unmistakably yes."). The bulk of Circuit precedent thus weighs in favor of an implied private right of action in Section 2.

HASD asks this Court to follow the one Circuit that has recently decided this issue differently. (Doc. 22, at 10-11). In *Arkansas Con'f NAACP v. Arkansas Bd. Of Apportionment*, the Eighth Circuit concluded that "text and structure reveal" that there is no private right to bring suit under Section 2. 86 F.4th 1204, 1215 (8th Cir. 2023). The court explained that "[t]he Supreme Court has been increasingly reluctant to go down this road in recent years, often citing the general principle that 'private rights of action to enforce federal law must be created by Congress.'" 86 F.4th at 1209. The court further concluded that because the text of Section 2 includes an enforcement mechanism for the Attorney General, Congress would have included a similar private enforcement mechanism in the text of the statute if it had intended the VRA to be enforceable by private individuals.[5] *Arkansas State Conference of the NAACP,* 86 F.4th at 1215. However, as noted in Eighth Circuit Chief Judge Smith's dissent, "[i]t would be ambitious indeed for a [lower] court ... to deny a private right of action in the light of precedent and history." *Arkansas State Conference of the NAACP,* 86 F.4th at 1224 (quoting

---

[5] The HASD also urges this Court to consider whether, in precedent regarding Section 2, this issue has been passed *sub silentio* and thus in a manner not precedential. (Doc. 22, at 11). Given that the current factors for determining Plaintiffs' Section 2 claims have existed since 1986 with no adverse action by the legislature or the Supreme Court, this Court rejects this argument. (Doc. 26, at 14-15); *see Thornburg v. Gingles*, 478 U.S. 30 (1986).

*League of United Latin Am. Citizens v. Abbott*, No. EP-21-CV-00259-DCG-JES-JVB, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court)).

The Court notes that it is not bound by the Eighth Circuit case and is not persuaded by the reasoning of *Arkansas State Conference of the NAACP* decision. Instead, this Court will rely on the precedent of the Supreme Court and the majority of Circuits and lower courts.

In sum, this Court concludes that precedent as well as the VRA's text, structure, and history, require recognition of private plaintiffs' ability to enforce Section 2. (Doc. 22, at 13; Doc. 27, at 14). As aptly stated by the United States District Court for the District of Kansas:

> In the end, the Court concludes that it has a choice before it. Option one—adhere to the extensive history, binding precedent, and implied Congressional approval of Section 2's private right of action. Option two—conduct a searchingly thorough examination of Section 2's text, legislative history, and the [*Alexander v.*] *Sandoval* analysis in an attempt to predict the Supreme Court's future decisions. *The Court chooses the former*.
>
> *Coca v. City of Dodge City*, 669 F. Supp. 3d 1131, 1140 (D. Kan. 2023), *motion to certify appeal denied*, No. 22-1274-EFM, 2023 WL 3948472 (D. Kan. June 12, 2023) (emphasis added).

Like the District Court for the District of Kansas, this Court acknowledges that while the private right of action under Section 2 "has been called into question by two Supreme Court justices, the Supreme Court has yet to overrule itself on that precise issue." *Coca*, 669 F. Supp. 3d at 1140. Thus, "until the Supreme Court or [Third] Circuit provide otherwise, the Court holds that Section 2 contains an implied private right of action." *Coca*, 669 F. Supp. 3d at 1140. Without decisive precedent otherwise, this Court will "adhere to the extensive history, binding precedent, and implied Congressional approval of Section 2's private right of action" to find that Plaintiffs are entitled to bring their Section 2 claims. Not only is this conclusion

consistent with the stated aims of the VRA, but also with numerous other district courts' conclusions on this issue.[6] Accordingly, HASD's motion to dismiss is **DENIED** on this basis.[7]

B. <u>Failure to State a Claim Under Section 2 of the VRA</u>

The parties next dispute whether Plaintiffs have sufficiently pled their claim under Section 2 of the VRA. (Doc. 22, at 12). When analyzing claims brought under Section 2, courts look to three factors outlined by the Supreme Court in *Thornburg v. Gingles*. 478 U.S. 30 (1986). These factors are as follows:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district . . . Second, the minority group must be able to show that it is politically cohesive . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it -- in the absence of special

---

[6] *See Singleton v. Allen*, No. 2:21-CV-01291-AMM, 2024 WL 3384840, at *14 (N.D. Ala. July 11, 2024) ("Based on case precedent and the text of Section Two, we see a clear answer to the question whether Section Two creates a private right: it does."); *see also Mississippi State Conf. of Nat'l Ass'n for Advancement of Colored People v. State Bd. of Election Commissioner*s, No. 3:22-CV-734-DPJ-HSO-LHS, 2024 WL 3275965, at *11 (S.D. Miss. July 2, 2024) (denying a motion to dismiss on the premised on the argument that Section 2 does not provide for a private cause of action and stating "if a court now holds, after almost 60 years, that cases filed by private individuals were never properly brought, it should be the Supreme Court, which has the controlling word on so momentous a change."); *see also City of Hammond v. Lake Cnty. Jud. Nominating Comm'n*, No. 2:21CV160-PPS, 2024 WL 68279 (N.D. Ind. Jan. 4, 2024) (finding Section 2 creates a private cause of action and asserting that the court's "analysis is unaffected by the Eighth Circuit's Arkansas decision, both because it is not binding in this Circuit and because . . . I recognize the 'simple fact' that a majority of Supreme Court justices 'explicitly recognized a private right of action under Section 2 in *Morse*,' and the Court 'has yet to overrule itself on that precise issue.'").

[7] Plaintiffs also argue that Section 2 of the VRA is enforceable under Section 1983. (Doc. 26, at 15); *see Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) (Section 1983 "undoubtedly embraces" and "broadly encompasses" suits by private plaintiffs to enforce "federal statutory as well as constitutional law"). HASD did not move to dismiss Plaintiffs' Section 2 claim brought under Section 1983. Because this Court has concluded Plaintiffs are entitled to bring their claims under Section 2, the Court will not further opine on this issue.

circumstances, such as the minority candidate running unopposed . . . usually to defeat the minority's preferred candidate.

*Jenkins*, 116 F.3d at 690-691 (citing *Gingles*, 478 U.S. at 50-51).

The HASD does not contest that Plaintiffs have met their burden as to the first *Gingles* factor by alleging that the Hispanic community in the HASD is "sufficiently large and geographically compact to constitute a majority in a single member district." (Doc. 1, ¶ 20; Doc. 22); 478 U.S. at 50. The HASD argues that Plaintiffs have failed to sufficiently plead the second and third *Gingles* factors: political cohesion and that the white majority votes sufficiently as a bloc to defeat the Hispanic population's chosen candidate by only providing conclusory statements to support their allegations and failing to make a showing that the election results in the HASD were not the result of partisan politics. (Doc. 22, at 12-17); *Gingles*, 478 U.S at 50.[8] (Doc. 22, at 13-17). Specifically, the HASD contends that "[w]hile the Complaint contains voluminous statistics concerning alleged percentages of the school district's demographics, including a chart of the City of Hazleton's White/Latino adult population over time, the Complaint fails to allege with any credible specificity the second and third *Gingles* criteria, aside from literally reciting them in conclusory fashion." (Doc. 22, at 13; Doc. 31, at 6) (internal citations omitted). In response, Plaintiffs submit that "a fair reading of the [c]omplaint leaves no doubt that Plaintiffs have met their pleading burden." (Doc. 26, at 16). More precisely, regarding the second *Gingles* factor Plaintiffs contend:

> The Complaint alleges that the Hispanic population in the HASD has grown substantially over the past three decades, that Hispanics make up a majority of

---

[8] The HASD's argument that Plaintiffs have failed to address partisan politics in their complaint, which is an affirmative defense to a Section 2 claim, is barred by Federal Rule of Civil Procedure 8 which establishes that a "complaint need not anticipate or overcome affirmative defenses." *Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014); Fed. R. Civ. P. 8.

the voting age population in and around the City of Hazleton, that Hispanic-preferred candidates have been among the top vote-getters in Hispanic precincts, and that Hispanic candidates have been unsuccessful in primary and general elections for HASB despite the preference of Hispanic voters. These allegations, accepted as true, support a plausible inference that Hispanic voters in Hazleton tend to vote the same way and are politically cohesive.

(Doc. 26, at 16-17) (internal citation omitted).

In addressing the third *Gingles* factor, Plaintiffs likewise point to a number of factual averments in the complaint supporting their allegation that a white voting bloc exists in the HASD. (Doc. 26, at 17-18).

Application of the *Gingles* factors is "'particularly dependent on the facts of each case,' and requires 'an intensely local appraisal of the design and impact of the contested electoral mechanisms.'" *Gingles*, 478 U.S. at 79 (quoting *Rogers v. Lodge*, 458 U.S. 613, 621-22 (1982)). The *Gingles* analysis requires "searching practical evaluation of the past and present reality." *Gingles,* 478 U.S. at 75. "[B]ecause a violation of § 2 is such a fact-sensitive inquiry that frequently depends on consideration of statistics and other data relating to elections held pursuant to the challenged practice, standard, or procedure," a court may decline to make a determination on whether a voting system violates the VRA until it has a developed record before it. *Bradley v. Work*, 916 F. Supp. 1446, 1465 (S.D. Ind. 1996), *aff'd*, 154 F.3d 704 (7th Cir. 1998).

As to the second *Gingles* factor, political cohesiveness of the minority group, Plaintiffs allege that the Hispanic community in the HASD is politically cohesive. (Doc. 1, ¶ 21); *Gingles,* 478 U.S. at 50*; Jenkins*, 116 F.3d at 690-691. Plaintiffs also allege that there has been substantial growth in the Hispanic population over the past three decades, that Hispanics make up the majority of the voting age population in Hazleton, and that "Hispanic candidates … were among the top vote-getters in primarily Hispanic precincts in and around the City of

15

Hazleton." (Doc. 1, ¶¶ 8-12). "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim." *Gingles,* 478 U.S. at 56. This is because "[p]olitical cohesiveness must be evaluated 'primarily on the basis of the voting preferences expressed in actual elections.'" *Luna v. Cnty. of Kern,* No. 116CV00568DADJLT, 2016 WL 4679723, at *5 (E.D. Cal. Sept. 6, 2016) (quoting *Gomez v. City of Watsonville,* 863 F.2d 1407, 1415 (9th Cir. 1988)). However, the Court "may not assume from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls," and therefore have a strong preference to review "evidence of polarized voting." *Perry,* 548 U.S. at 433 (further citation, quotations, and brackets omitted); *Allen,* 599 U.S. at 22-23. This makes political cohesion difficult to show without an established record.

The Court finds Plaintiffs have met their burden as to the second *Gingles* factor. 478 U.S. at 56. Plaintiffs' specific allegation that the Hispanic community in the HASD is politically cohesive is likely insufficient as a conclusory recital of the necessary elements of this claim. However, Plaintiffs' supplemental allegations, including their allegation that "Hispanic candidates have been unsuccessful in primary and general elections for the HASB even though they were among the top vote-getters in primarily Hispanic precincts in and around the City of Hazleton," support a plausible inference that Hispanic voters in the HASD are politically cohesive. (Doc. 1, ¶¶ 12, 21; Doc. 31, at 5-6); *see Luna,* 2016 WL 4679723, at *5 (finding plaintiffs met their burden as to the second *Gingles* factor because "the complaint alleges that Latino voters in Kern County express a preference for Latino candidates"); *see also Coco,* F. Supp. 3d at 11443-44 (finding plaintiffs sufficiently alleged the second *Gingles* factor where "Plaintiffs factually allege that five Latino-preferred candidates have run for

office since 2000, reaping a majority vote in high-density Latino precincts while receiving low support in non-Latino precincts.").

To satisfy the third *Gingles* factor, Plaintiffs must allege that the white majority in the HASD votes sufficiently as a bloc to usually defeat Hispanic voters' preferred candidates. 478 U.S. at 50. Black's Law Dictionary defines bloc as a "group of persons or political units aligned with a common interest or purpose, even if only temporarily." *Bloc*, Black's Law Dictionary (11th ed. 2019). Plaintiffs explicitly allege "[t]he White population of the HASD votes sufficiently as a bloc to usually defeat the preferred candidates of Hispanic voters." (Doc. 1, ¶ 22). In support of this allegation, Plaintiffs also allege that "[d]espite the substantial Hispanic population in the HASD and the political cohesion among Hispanic voters, Hispanic candidates preferred by Hispanic voters have consistently lost in elections for seats on the HASB and other local elections," that "[v]oting in school board and other elections in the HASD is racially polarized," that "[a]ll current members of the HASB are White," "[n]o Hispanic has ever been elected to the HASB," and that "[n]o Hispanic candidate has ever been elected to a local or state position that represents all of HASD" or "to fill any federal office representing all of HASD." (Doc. 1, ¶¶ 12, 23-27). In reviewing the third *Gingles* factor, the Supreme Court has provided that "a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election." 478 U.S. at 57. Further, "in a district where elections are usually shown to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting." *Gingles*, 478 U.S. at 57.

The Court finds that Plaintiffs have satisfied their pleading burden as to the third *Gingles* factor. 478 U.S. at 57. Plaintiffs' allegation that no Hispanic individual has ever been elected to the HASB or to any local, state, or federal position representing the HASD despite the sizable Hispanic population in the area weighs in favor of the existence of a "pattern of racial bloc voting that extends of a period of time." *Gingles*, 478 U.S. at 57; *see also Luna,* 2016 WL 4679723, at *5-6 (finding an allegation that Hispanic candidates had not been elected outside of the district where they made up the majority was sufficient for plaintiffs to have successfully pled the third *Gingles* factor). Likewise, Plaintiffs' claim that "[v]oting in school board and other elections in the HASD is racially polarized" also supports a finding that there is racial bloc voting under the third *Gingles* factor, especially because Plaintiffs are entitled to a presumption of truth at this early stage of the litigation. (Doc. 1, ¶ 24); *see Alabama State Conf. of NAACP v. City of Pleasant Grove*, 372 F. Supp. 3d 1333, 1340 (N.D. Ala. 2019) (finding plaintiffs had adequately pleaded the *Gingles* factors by alleging that Black candidates repeatedly lost to White candidates in racially polarized elections.). While Plaintiffs will be expected to produce evidence in support of these allegations, given the liberal pleading standard afforded at a motion to dismiss stage, Plaintiffs' allegations suffice to establish the third *Gingles* factor. *See Hall v. Louisiana*, 974 F. Supp. 2d 978, 992 (M.D. La. 2013) (finding that an allegation that "White voters…vote sufficiently as a bloc to enable them…to defeat the Black voter's preferred candidates" was sufficient for pleading the third *Gingles* factor). Defendant's motion to dismiss Plaintiffs' Section 2 claim is therefore **DENIED**. (Doc. 1, ¶¶ 36-40; Doc. 21).

C. Failure to State a Claim under the Fourteenth Amendment

Finally, the HASD argues that Plaintiffs fail to sufficiently state a claim for a violation of the Fourteenth Amendment under Section 1983, and specifically, that Plaintiffs fail to "allege any racial classification of citizens or discriminatory intent, but instead only [allege] that the neutral 'at-large' elections deprive Plaintiffs of their right to equal protection." (Doc. 22, at 19). Further, the HASD claims that none of Plaintiffs' claims "rise to the discriminatory intent required for a violation of the Equal Protection Clause." (Doc. 22, at 20). In response, Plaintiffs argue that "[t]he Complaint alleges facts plausibly demonstrating that HASD purposefully maintains the at-large system to dilute the voting strength of Hispanics in violation of the equal protection guarantee." (Doc. 26, at 23). The U.S. Government's Statement of Interest does not address the issue of Plaintiffs' Fourteenth Amendment claims. (Doc. 27).

"In the voting rights context, the Equal Protection Clause requires at least that in popular elections of governing bodies, each vote should enjoy equal weight, and the state may not devise a system that destroys the one-man, one-vote principle." *Bradley v. Work*, 916 F. Supp. 1446, 1445 (S.D. Ind. 1996), *aff'd*, 154 F.3d 704 (7th Cir. 1998). This considered, "[a]t-large voting schemes and multimember districts tend to minimize the voting strength of minority groups by permitting the political majority to elect all representatives of the district." *Rogers v. Lodge*, 458 U.S. 613, 616 (1982). The Supreme Court has held that multi-member districts and at-large elections violate the Fourteenth Amendment if "'conceived or operated as purposeful devices to further racial discrimination' by minimizing, cancelling out, or diluting the voting strength of racial elements in the voting population." *Rogers*, 458 U.S. at 617 (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971)). "Cases charging that

multimember districts unconstitutionally dilute the voting strength of racial minorities are …

subject to the standard of proof generally applicable to Equal Protection Clause cases." *Rogers,*

*458 U.S. at 617*. Accordingly, "[p]roof of racially discriminatory intent or purpose is required

to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan*

*Housing Development Corp.*, 429 U.S. 252, 265 (1977).

"Determining whether invidious discriminatory purpose was a motivating factor

demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be

available." *Village of Arlington Heights*, 329 U.S. at 265; *see also Washington v. Davis,* 426 U.S.

229, 242 (1976). "Disproportionate impact is not irrelevant, but it is not the sole touchstone

of an invidious racial discrimination forbidden by the Constitution." *Washington*, 426 U.S. at

242 (1976). However, "[t]he impact of the official action whether it 'bears more heavily on

one race than another,' may provide an important starting point." *Village of Arlington Heights*,

329 U.S. at 266 (quoting *Washington*, 426 U.S. at 242). The Supreme Court has also laid out

other non-exhaustive factors that can indicate invidious discriminatory purpose, including the

historical background of the challenged decision, the sequence of events leading up to the

challenged decision, the legislative or administrative history of the challenged decision, the

impact of past discrimination on the ability of a minority group to participate effectively in

the political process, the impact of past discrimination in education specifically on the ability

of a minority group to participate effectively in the political process, discrimination in the

selection of grand jurors, the hiring of local government employees, and appointments to

boards and committees overseeing the local government, evidence of historical

discrimination, and discriminatory discrepancies in the provision of local services such as the

paving of roads. *Village of Arlington Heights,* 429 U.S. at 267-68; *see Rogers,* 458 U.S. at 624-25; *see also Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 143 (3d Cir. 1977).

The Court must determine whether the at-large voting system in the HASD is maintained with "invidious discriminatory purpose." *Village of Arlington Heights*, 329 U.S. at 265. Plaintiffs argue that "[t]he Complaint alleges facts plausibly demonstrating that HASD purposefully maintains the at-large system to dilute the voting strength of Hispanics." (Doc. 26, at 23). Plaintiffs claim that their "allegations of bloc voting along racial lines and the disproportionate impact of the at-large system on Hispanic individuals are sufficient to show that the at-large election scheme" is operated with a racially discriminatory purpose. (Doc. 1, ¶¶ 22, 44; Doc. 22, at 26); *see Rogers,* 458 U.S. at 623 (looking at evidence of bloc voting as supportive of plaintiffs' equal protection claim in the at-large election context). Plaintiffs submit that because the at-large election system has a foreseeable disparate impact on the Hispanic community, they have sufficiently established that the HASD's election scheme is "operated as a purposeful device to further race discrimination." (Doc. 26, at 25); *see Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 454 (1977) ("[A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact of a forbidden purpose."); *see also Village of Arlington Heights,* 429 U.S. at 266 ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."). To support this position, Plaintiffs also cite to allegations of larger patterns of discrimination in the HASD. (Doc. 1, ¶¶ 34, 30; Doc. 26, at 25-26). For example, Plaintiffs allege that:

> There has been a significant lack of responsiveness on the part of elected HASB officials to the particularized needs of the Hispanic Community in the HASD. This includes, but is not limited to, disregard for serious concerns related to disparate student discipline, student registration procedures founded on unfair

stereotypes, inadequate school staffing, lack of qualified translators, and lack of effective methods of communication with parents.

(Doc. 1, ¶ 34).

Plaintiffs also allege that "Hispanics in the HASD have been targeted by law enforcement, unfairly blamed for rising crime rates, denied language assistance by municipal officials, subjected to overtly discriminatory laws, and otherwise been subjected to harassment and discrimination on account of their race." (Doc. 1, ¶ 30).

Considering these allegations together with the entirety of the complaint, the Court finds that Plaintiffs have satisfied their burden as to their Fourteenth Amendment claim. "An invidious discriminatory purpose may often be inferred from the totality of the relevant facts," or in the context of a motion to dismiss, the alleged facts. *Richardson v. Pennsylvania Dep't of Health*, 561 F.2d 489, 492 (3d Cir. 1977) (concluding that, under the motion to dismiss standard, it is premature to dismiss a complaint where plaintiff could later prove facts under the intentional or purposeful discrimination test). Plaintiffs allege that Hispanic citizens in the HASD have been impacted by past and present discrimination in the education system, obstructed in their ability to participate effectively in the political process, subjected to historical discrimination in other local services, such as policing, and experienced discriminatory discrepancies in the provisions of local services. *Village of Arlington Heights,* 429 U.S. at 267-68. Plaintiffs also directly allege they are disproportionately impacted by the at-large voting scheme erected by the HASD, and that this scheme is "maintained for the purpose of denying minorities equal access to the political process." (Doc. 1, ¶¶ 43, 44). Together, these allegations support Plaintiffs' Fourteenth Amendment claim.

With a fully developed record, this Court will be better able to review the "evidentiary sources" laid out by the Supreme Court to determine whether the HASD maintains its at-large election system "as [a] purposeful device[] to further racial discrimination in violation of the Fourteenth Amendment." *Village of Arlington Heights,* 429 U.S. at 272; *Rogers,* 458 U.S. at 617. Accordingly, the HASD's motion to dismiss Plaintiffs' Fourteenth Amendment claim is **DENIED**. (Doc. 1, ¶¶ 41-45; Doc. 21).

IV.    CONCLUSION

Based on the foregoing, the HASD motion to dismiss is **DENIED** (Doc. 21).

An appropriate Order follows.

**Dated: October 28, 2024**                    *s/ Karoline Mehalchick*
                                               **KAROLINE MEHALCHICK**
                                               **United States District Judge**