**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BRENDALIS LOPEZ and EMMANUEL MARTINEZ<br><br>Plaintiffs,<br><br>v.<br><br>HAZLETON AREA SCHOOL DISTRICT,<br><br>Defendant. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>CIVIL ACTION NO.3:24-CV-00206 |

## SECOND AMENDED COMPLAINT

Plaintiffs Brendalis Lopez and Emmanuel Martinez, by and through their undersigned counsel, state the following as their Complaint against Defendant Hazleton Area School District ("HASD") under Section 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301, and the Fourteenth Amendment to the U.S. Constitution:

### Introduction

1. Section 2 of the Voting Rights Act states:

> (a) No voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed or applied by any State or any political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color…as provided in subsection (b).

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population. 52 U.S.C. § 10301.

2. This provision requires, as a baseline, that minority voters must have "the chance enjoyed by nonminority voters to secure the election of their preferred candidates." *Louisiana v. Callais,* 146 S. Ct. 1131, 1154, *judgment entered*, 146 S. Ct. 1111 (2026).[1]

3. The U.S. Supreme Court in *Callais* acknowledged the unique and distinctive nature of local, at-large jurisdictions as distinguished from single-member districts. *Callais*, 146 S. Ct. at 1146 (*citing White v. Regester*, 412 U.S. 755, 765 (1973); *Perkins v. Matthews*, 400 U.S. 379, 389 (1971); *Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969)("The Court . . . recognized that such districts can be employed to achieve discriminatory ends.")*; Allen v. Milligan*, 599 U.S. 1,

---

[1] Both *Callais* and *Allen v. Milligan*, 146 S. Ct. 1377, 1381(2026), involved challenges to congressional districts. It is not clear that these decisions apply equally to local political subdivisions with at-large redistricting schemes. To the extent those decisions apply here, the standard for liability under Section 2 is met as detailed herein. Plaintiffs reserve all arguments, including that these cases are inapplicable to the elections at issue here.

48 n.3 (2023) (J. Thomas dissenting) (*citing Johnson v. De Grandy*, 512 U. S. 997, 1012, (1994); *Growe v. Emison*, 507 U. S. 25, 40 (1993)) ("[T]he idea that such [at-large and multimember] plans might be especially problematic from a vote-dilution standpoint is hardly foreign to the Court's precedents.")

4. Even under the *Callais* decision, the at-large election system used by HASD still violates Section 2 of the VRA.

5. The framework for evaluating Section 2 claims established in *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986), continues to apply. *Callais*, 146 S. Ct. at 1157. Proof of discriminatory intent is not required. *Id.* at 1162. Rather, a party must "show that a districting scheme denies members of a racial group the same 'opportunity' as other voters to elect the candidates they prefer." *Id.* Use of at-large or multi-member districting schemes that prevent the election of minority candidates of choice is exactly the type of "circumstantial evidence" that proves a violation of Section 2(b). *Id.* at 1145-46.

6. At-large elections, while not per-se unconstitutional, pose "greater threats to minority voter participation." *Growe*, 507 U.S. at 40. Specifically, "[a]t-large voting schemes . . . tend to minimize the voting strength of minority groups by permitting the political majority to elect *all* representatives of the district." *Rogers v. Lodge*, 458 U.S. 613, 616 (1982). Use of such a system can give rise to an

inference of racial discrimination for purposes of establishing a violation of Section 2.

7. Plaintiffs Brendalis Lopez and Emmanuel Martinez, registered Hispanic voters residing in the HASD, bring this action challenging the at-large system for electing directors of the Hazleton Area School Board ("HASB"). As alleged herein, the at-large method of electing HASB directors denies Hispanics voters the same opportunity as non-Hispanic voters to elect their preferred candidates in violation of Section 2 of the VRA and the Fourteenth and Fifteenth Amendments. The relevant evidence supports a strong inference of racial discrimination. In the absence of judicial relief, Plaintiffs' voting strength will continue to be unlawfully diluted by virtue of the at-large election method. Accordingly, Plaintiffs seek a declaratory judgment that the current at-large system for electing HASB directors violates the VRA and the Fourteenth Amendment, a permanent injunction prohibiting HASD from conducting future elections for the HASB using the at-large method of election and requiring implementation of an alternate election system that complies with Section 2 of the VRA and the Fourteenth Amendment to the U.S. Constitution, and other appropriate relief.

**Parties**

8. Mr. Martinez is a citizen of the United States and a registered voter residing in Hazleton, Pennsylvania, which is within the HASD. Mr. Martinez is a

former student of the HASD, regularly votes in local elections, including school board elections, and fully intends to vote in future elections for school director.

9. Ms. Lopez is a citizen of the United States and a registered voter residing in Hazleton, Pennsylvania. Ms. Lopez is the parent of a student who attends school in the HASD, regularly votes in local elections, including school board elections, and fully intends to vote in future elections for school director.

10. HASD is a public school district organized and operating under Pennsylvania's Public School Code, 24 P.S. §§ 1-101 *et seq.*, which is comprised of Luzerne County and parts of Carbon and Schuylkill Counties. HASD has a business address at 1515 West 23rd Street, Hazle Township, Pennsylvania.

11. HASD is a political subdivision within the meaning of and subject to the requirements of the VRA.

**Jurisdiction and Venue**

12. This Court has jurisdiction over this dispute under 52 U.S.C. §§ 10301, 10310(e), 42 U.S.C. §§ 1983, 1988, and 28 U.S.C. §§ 2201-2202 pursuant to 28 U.S.C. §§ 1331, 1343.

13. Venue is proper in this Court under 28 U.S.C. § 1391(b) because HASD is located within this district and the events giving rise to the claims asserted herein, occurred in this district.

## Allegations

***Background***

14. In the 2024-2025 school year, The HASD consisted of 13,341 students—69.7% of whom were Hispanic (around 9,298 students), and 26.7% of whom were White (around 3,562 students).

15. The HASD is governed by the HASB, a nine-member elected board of school directors who serve staggered four-year terms.

16. HASB school directors are elected pursuant to an "at-large" system whereby directors are chosen in district-wide elections to fill at-large seats.

17. Under HASD's at-large system, all voters in the HASD vote for all the school board seats from among a group of board candidates, each of whom must run a district-wide campaign and, if elected, represents the entire district.

18. Pennsylvania law allows school districts to elect school directors at-large or from regions, or to elect some school directors at-large and some from regions. *See* 24 P.S. § 3-303.

19. Prior to 1988, the HASD was apportioned into nine single-member districts and school directors were elected by region. The system was changed to the current at-large election system beginning in 1989.

20. The Court acknowledged in *Callais* that an at-large voting system "could be a 'metho[d] to maintain white control of the political process.'" *Callais*, 146 S. Ct. at 1145 (quoting *Perkins v. Matthews*, 400 U. S. 379, 389 (1971)).

21. All current members of the HASB are White.

22. Several Hispanic candidates have run for HASB.

23. No Hispanic has ever been elected to the HASB.

24. No Hispanic candidate has ever been elected to a local or state position that represents all of HASD, nor has any Hispanic candidate been elected to fill any federal office representing all of HASD. Furthermore, only one Hispanic candidate out of several has been successful in elections for local municipal offices within the HASD.

***Gingles 1– Sufficiently Large and Geographically Compact***

25. The first *Gingles* precondition requires that a minority group be sufficiently large and geographically compact enough to constitute a majority in a single member district. *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986).

26. Plaintiffs easily meet the first *Gingles* precondition.

27. The first *Gingles* precondition, as updated by *Callais*, requires that the illustrative maps drawn must meet all "legitimate districting objectives, including traditional districting criteria and . . . specified political goals" noted by the jurisdiction for drawing and maintaining their map. *Callais*, 146 S. Ct. at 1159; *Allen*

*v. Milligan*, 146 S. Ct. at 1380. The creation of illustrative maps can also support "a strong inference that intentional discrimination occurred." *Callais*, 146 S. Ct. at 1156. Specifically, if a race neutral algorithm "yields numerous maps with districts in which the members of a minority group constitute a majority" and no reason is given for rejecting all those maps, "the inference of racial motivations is strong, and § 2 of the Fifteenth Amendment permits the imposition of liability." *Id*.

28. Such race neutral algorithms when applied to HASD "yield[] numerous maps with districts in which the members of a minority group constitute a majority." *Id.*

29. The Hispanic population within HASD is sufficiently large and geographically compact enough to constitute a majority in one or more districts in an illustrative map drawn without consideration of race.

30. According to the U.S. American Community Survey (ACS), as of 2024, the HASD had a population of 78,900, of whom 51.1% were White/Non-Hispanic, 44.2% were Hispanic, and 4.8% were Black, Asian, multi-racial, or other.

31. The Hispanic population in the HASD has grown substantially over the past two decades. Hispanics made up 14.6% of the HASD population in 2010, 25.2% in 2016, and 39.6% in 2022, compared to 44.2% in 2024.

32. The Hispanic population is concentrated in and around the City of Hazleton, which is fully contained within the HASD. This City is the largest

municipality in the HASD. The total Hispanic population in the City of Hazleton as of 2024 was 63.4%. West Hazleton Borough, which borders the City of Hazleton, was 72.2% Hispanic.

33. The Hispanic population is sufficiently large and fully concentrated within the City of Hazleton such that it can easily make up the majority of at least one of nine school board districts in an illustrative map using race neutral criteria.

34. As the chart below demonstrates, while the Hispanic citizen voting age population (CVAP) in the City of Hazleton has grown substantially over the past three decades and continues to grow, the White citizen voting age population has declined:

**City of Hazleton, 2010-2024**



35. This growth is so significant that, using race neutral criteria, it is virtually impossible to draw a single-member district electoral map for HASD without a Hispanic majority.

36. Mapping ensembles generated using race-neutral algorithms that control only for population and municipal splits yielded maps with at least one Hispanic majority population district in every one of 100,000 simulations.

37. Similarly, mapping ensembles generated using race- neutral algorithms controlling only for population and municipal splits yield maps that contain at least one Hispanic majority voting age population (VAP) district in 99.9% out of 100,000 simulated maps, at least two Hispanic majority VAP districts in 98.1% out of 100,000 simulated maps, and at least three Hispanic majority VAP districts in 57.6% out of 100,000 simulated maps.

***Gingles 2 and 3 – Racially Polarized Voting***

38. To meet the second and third *Gingles* preconditions, "the minority group must be able to show that it is politically cohesive," and that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed … usually to defeat the minority's preferred candidate." *Thornburg*, 478 U.S. at 51. This is the racially polarized voting analysis.

39. Plaintiffs readily meet the second and third *Gingles* preconditions.

40. The second and third *Gingles* preconditions, as updated by *Callais*, require that "plaintiffs must provide an analysis that controls for party affiliation." *Callais*, 146 S. Ct. at 1159. In other words, "[plaintiffs] must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation." *Id*. Plaintiffs can meet these conditions by demonstrating "intra-party racial bloc voting patterns," specifically that minority and non-minority voters within political parties vote differently. *Id*. This "helps to demonstrate that the minority plaintiffs have 'less opportunity' than their majority counterparts because of race, not just because of partisan affiliation." *Id*. (citation omitted); *see also Allen v. Milligan*, 146 S. Ct. at 1381.

41. Voting in Hazleton is racially polarized. Hispanic voters in HASD are politically cohesive and the non-Hispanic White majority regularly vote as a bloc to defeat the Hispanic candidate of choice.

42. Partisanship cannot account for this polarization in voting by Hispanic and non-Hispanic voters. Differences in voting between the two groups appear in general elections as well as within each of the Democrat and Republican primary elections. Intra-party primary results for the HASB reveal strong racially polarized voting, demonstrating that race, not partisan affiliation, is the cause of the difference in voting patterns. "This type of intra-party racial-bloc voting pattern helps to demonstrate that the minority plaintiffs have 'less opportunity' than their majority

counterparts because of race, not just because of partisan affiliation." *Callais*, 146 S. Ct. at 1159 (quoting 52 U.S.C § 10301(b)).

43. Hispanic candidates have been unsuccessful in primary and general elections for the HASB.

44. Election results for Spanish surname candidates prove Hispanic voter cohesion and white bloc-voting against Hispanic candidates of choice.

45. When Hispanic candidates have run in the Democratic primary, White voters have consistently voted against them, and often. White voters rated Spanish surname candidates near the bottom of the candidate list. In contrast, Hispanic voters within the Democratic party consistently rank Spanish-surname candidates high enough to elect them to the HASB.

46. Homogenous precinct analysis of the elections confirms the presence of racially polarized voting not caused by partisanship.

47. In the 2019 election for HASB, four Hispanic Spanish-surname candidates—Yesenia Rodgriguez, Ivelisse Eufracio, Taira Ferraras, and Marilyn Calderon—ran in the Democratic primary and all four were defeated.

48. The four Hispanic candidates were all ranked as the top four choices in the three voting precincts in Hazleton that have the highest Hispanic population.

49. By contrast, in the four precincts with the highest White population—Foster, Jeddo, Butler, and Black Creek—the same four Hispanic candidates were ranked at the bottom of the candidate list and defeated.

50. Following the 2019 election Hispanic, Spanish-surname candidates cross listed their partisan affiliation as both Democrats and Republicans and thus were able to run in both party primaries. These candidates have lost in both party primaries. Such cross-listing is common.[2] When elections allow for such cross-listing, partisan effect is neutralized.

51. In the 2021 HASB election, four Hispanic Spanish-surname candidates—Ivelisse Eufracio-Childs, Marily Calderon, Yesenia Rodriguez, and Amilcar Arroyo—ran for office in the Democratic primary, and all four were defeated. As demonstrated in the racially polarized dispersion plots[3] below, Hispanic candidates are greatly preferred in high-density Hispanic areas (in green), while they receive far less support in high-density white areas (in pink). The four Hispanic candidates were all ranked as the top four choices in the three voting precincts in Hazleton that have the highest Hispanic populations.

---

[2] For example, every candidate that ran in the 2025 primary for HASB cross-listed and thus competed in both the Democratic and Republican primary.

[3] Ananya Hariharan, et al., *Racially Polarized Voting Dispersion Plots: A Method to Measure and Visualize Racial Voting Patterns*, 17 J. OF METHODS & MEASUREMENTS IN THE SOC. SCI. (forthcoming 2026).

**Support for Eufracio Childs in 2021 Democratic Primary:**[4]




**Support for Eufracio Childs in 2021 Democratic Primary – Hazleton Zoom Detail**




4 Underlying map shading denotes area demographics, from 100% white (darkest pink) to 100% Hispanic (darkest green). Precinct boundaries are denoted with black lines. The density of black + symbols and red dots in a precinct indicates how strongly a candidate performed in that precinct relative to that precinct's vote share in the entire jurisdiction. Black + symbol indicates that a candidate drew a larger fraction of votes from that precinct than voters in the precinct cast in the election. Red dots indicate the opposite; a candidate drew a smaller fraction of their total votes from that precinct than voters in the precinct cast in the election overall.

**Support for Arroyo in 2021 Democratic Primary:**




**Support for Arroyo in 2021 Democratic Primary – Hazleton Zoom Detail**




52. In the four precincts with the highest White population—Sugarloaf, Jeddo, Butler, and Black Creek—the same four Hispanic candidates were ranked at the bottom of the candidate list and defeated.

**Support for Rodriguez 2021 Democratic Primary:**




**Support for Rodriguez in 2021 Democratic Primary – Hazleton Zoom Detail**




53. By contrast, White candidates gained overwhelming support in the areas with low Hispanic populations.

**Support for Shemansky 2021 Democratic Primary:**




**Support for Shemansky in 2021 Democratic Primary – Hazleton Zoom Detail**




54. Also, in 2021, two Hispanic candidates—Ivelisse Eufracio-Childs and Yesenia Rodriguez—cross-listed their candidacies and ran in the Republican primary. Both were the lowest ranked candidate out of the entire Republican field, finishing in 6th and 7th place out of seven total.

55. In the 2023 primary election, a Hispanic candidate, Taira Ferreras, ran in a three-person contest for Democratic primary to fill a 2-year term, and was defeated. This candidate was ranked first in four highest Hispanic populations precincts, specifically in Hazleton and West Hazleton, but lost in the four highest-density White precincts.

56. Also in 2023, three Hispanic candidates—Taira Ferreras, Daniel Jorge and Ivelisse Childs—ran for 4-year term school board positions. Similar to 2019 and 2021, they were ranked as leading candidates in the precincts with the highest Hispanic populations.

57. Out of the 12 candidates in the Democratic field, the two Spanish-surname Hispanics finished in the lowest tier with less than 1,000 total votes and were not selected by the majority White voters.

58. One Hispanic candidate, Ivelisse Childs, advanced in the Democratic primary. Ivelisse Childs ran both in 2019 and 2021 without success. However, in 2023, she did not use her Spanish surname of Eufracio as she had in her other campaigns.

59. In 2023, Ivelisse Childs ran on a ticket with her non-Hispanic White husband, Dr. Robert Childs, whose surname she adopted for the 2023 campaign.

60. Ivelisse Childs and Dr. Robert Childs also ran in the Republican primary. Dr. Robert Childs advanced in the Republican primary while Ivelisse

finished last in 10th position. Her lowest vote support came from the most heavily White populated precincts.

61. Bayesian Improved Surname Geocoding (BISG) also confirms the presence of racially polarized voting. Using BISG to identify Hispanic and White voters in the official voter file who voted in May 2021, the evidence shows clear evidence of Hispanic cohesion and White bloc-voting in a full ecological inference model[5] relying on all 39 precincts in the entire HASB.[6]

62. In the Democratic primary election, Hispanic voters preferred the four Hispanic candidates while White voters bloc-voted against the four Hispanic candidates in the primary.

---

[5] Under ecological Inference (EI) regression techniques, precinct-level vote choice data is merged with precinct-level racial demographics to accurately estimate candidate vote choice by race of voters. *See* GARY KING, A SOLUTION TO THE ECOLOGICAL INFERENCE PROBLEM RECONSTRUCTING INDIVIDUAL BEHAVIOR FROM AGGREGATE DATA (1997); Ori Rosen et al., *Bayesian and frequentist inference for ecological inference: the R x C case*, 55 STATISTICA NEERLANDICA, 134-46 (2001); Loren Collingwood et al., *eiCompare Comparing Ecological Inference Estimates across El and EI:R x C*, 8 R. J., 93 (2016).

[6] *See e.g., Clerveaux v. E. Ramapo Cent. Sch. Dist*., 984 F.3d 213, 219 (2d Cir. 2021); Kosuke Imai & Kabir Khanna, *Improving ecological inference by predicting individual ethnicity from voter registration records*, 24, no. 2 POL. ANALYSIS 263-272 (2016); Matt Barreto, et al., *A Novel Method for Showing Racially Polarized Voting: Bayesian Improved Surname Geocoding* 46 N. Y. U. Rev. of L & Soc. Change, 1-42 (2022). Ari Decter-Frain, et al., *Comparing Methods for Estimating Demographics in Racially Polarized Voting Analyses*, SOCIOLOGICAL METHODS & RSCH. (2025).

Ecological Inference Tables Using BISG validated vote

**Table 1: Hazleton School Board Democratic Primary 2021 - White vs. non-White vote**

| Candidate | White - EI | Non-White - EI | White - RxC | Non-White - RxC |
|---|---|---|---|---|
| DeCosmo | 16.7 | 9.4 | 16.9 | 8.6 |
| Feissner | 15.2 | 0 | 14.5 | 4.5 |
| Shemansky | 14.2 | 0.8 | 13.5 | 6.7 |
| Ryba | 13.3 | 5.1 | 12.8 | 7.6 |
| Calderon | 6 | 16.5 | 6.5 | 13.5 |
| Eufracio Childs | 6.9 | 25.5 | 7.5 | 20.7 |
| Arroyo | 8.8 | 20.6 | 9.4 | 16 |
| Rodriguez | 7.5 | 21.1 | 7.8 | 17.4 |
| Hoekelen | 11.6 | 0.4 | 11 | 4.9 |

**Table 2: Hazleton School Board Democratic Primary 2021 - White vs. Hispanic vote**

| Candidate | White - EI | Hispanic - EI | White - RxC | Hispanic - RxC |
|---|---|---|---|---|
| DeCosmo | 16.8 | 5.2 | 16.7 | 8.9 |
| Feissner | 15.2 | 0.4 | 14.3 | 4.4 |
| Shemansky | 14.2 | 0.3 | 13.4 | 5.6 |
| Ryba | 13.2 | 2.7 | 12.7 | 6.8 |
| Calderon | 6 | 18.6 | 6.6 | 13.5 |

| | | | | |
|---|---|---|---|---|
| Eufracio Childs | 8.8 | 24 | 9.7 | 15.7 |
| Rodriguez | 7 | 25.3 | 7.7 | 23.6 |
| Arroyo | 7.4 | 22.4 | 8.1 | 17.3 |
| Hoekelen | 11.7 | 0.2 | 10.8 | 4.2 |

**Table 3: Hazleton School Board Republican Primary 2021 - White voters**

| Candidate | White - EI | White - RxC |
|---|---|---|
| DeCosmo | 18.8 | 18.9 |
| Ryba | 18.7 | 18.8 |
| Shemansky | 18.7 | 19 |
| Feissner | 19.1 | 18.5 |
| Hoekelen | 13.9 | 14.2 |
| Rodriguez | 4.1 | 4 |
| Eufracio Childs | 6.7 | 6.7 |

63. Of the seven school director elections since 2019, at least six candidates with Hispanic/Spanish surnames ran in three Democratic primaries, but only one advanced to the general election.

64. These primary results indicate that differences between the voting patterns of Hispanic and non-Hispanic voters cannot be explained by partisan

affiliation. Rather, as demonstrated by the results of the primaries, Hispanic voters and non-Hispanic voters diverge in preference even within party elections.

***Totality of the Circumstances and Reasonable Inference of Discrimination***

65. The *Gingles* analysis, as refined by *Callais*, does not require proof of intentional discrimination to prevail in a Section 2 case. *Callais*, 146 S. Ct. at 1144-45, 1157. Rather, Section 2 is violated where "a districting scheme denies members of a racial group the same 'opportunity' as other voters to elect the candidates they prefer" and the "circumstances give rise to a strong inference that intentional discrimination occurred." *Id*. at 1156, 1162.

66. "'Current data' and 'current political conditions,'" as opposed to discrimination that occurred long before even the passage of the Voting Rights Act, are more probative when determining whether the evidence supports an inference of discrimination. *Id*. at 1160 (quoting *Shelby County v. Holder*, 570 U.S. 529, 552-553 (2013)).

67. Hispanics have suffered and continue to suffer intense contemporaneous discrimination in the HASD. These instances of discrimination continue to impact HASD students, parents of these students, and Hispanic residents throughout the HASD.

***Discrimination Against Hispanic Students and Parents in the HASD***

68. Beginning as early as 2014 and continuing through at least 2025, the U.S. Department of Education received and investigated complaints against the HASD alleging discrimination on the basis of race and national origin.

69. A 2014 Department of Education Office of Civil Rights (OCR) compliance review found that the HASD ESL program consistently failed to identify students who need ESL services; failed to provide adequate staffing for the ESL program; failed to properly identify limited-English proficient (LEP) parents and failed to provide meaningful access to information given to English-proficient parents; failed to ensure that skilled and trained interpreters and translators were available to LEP parents; failed to notify LEP parents of available language services and methods of access to those services; and failed to provide LEP parents with Spanish translations of important programs, activities, and documents.

70. Complaints made between 2021 and 2025 to the U.S. Department of Education concern HASD's failure to provide adequate services and communications to LEP students and parents.

71. Despite these complaints and continuing issues of language access persisting to the point where students have to serve as translators for their fellow

students, the HASB remains unconcerned with ensuring proper LEP staffing.[7] HASB president Ellen McBride recently stated it would be "nonsense' to expect the district to keep up with the rapid growth in ESL students and staff requirements."[8]

72. Hispanic students also face disproportionately high levels of punishment in the HASD. The Pennsylvania Human Relations Commission (PHRC) has received numerous complaints about discrimination in the HASD, including regarding student punishment.

73. The PHRC investigated discriminatory policing at Hazleton Area High School after a video went viral of a school police officer punching a student of color and pushing her head into a cafeteria table.[9] The video led to protests by Hispanic students at a school board meeting in February 2019. At this meeting, Hispanic community leaders asked for the HASB to hire more Hispanic and Spanish-speaking teachers, police, and other employees. To date, HASB has failed to do so.[10]

---

[7] Sydney Allabaugh, *Students, staff voice concern over language challenges at Hazleton Area Board Meeting*, TIMES LEADER (April 24, 2026), https://www.timesleader.com/news/1739775/students-staff-voice-concern-over-language-challenges-at-hazleton-area-board-meeting.

[8] *Id.*

[9] Jamie Longazel, *A Viral Video Captured a Travesty at Hazleton High School. It Can't Be Allowed to Repeat Itself,* PA. CAPITAL-STAR (Mar. 6, 2019, 6:30 AM), https://www.penncapital-star.com/commentary/a-viral-video-captured-a-travesty-at-hazleton-high-school-it-cant-be-allowed-to-repeat-itself-opinion.

[10] *Id.*

74. As recently as 2024, the PHRC filed a complaint against the HASD for discrimination against Hispanic students.

75. The HASD disproportionately disciplines Hispanic students and students of color. In the 2020-2021 school year, Hispanics and students of color comprised 100% of in-school suspensions and 73% of students with one or more out-of-school suspensions. Hispanic and students of color comprised 90.9% of expulsions the 2017-2018 school year, the most recent year including that data.[11]

76. This trend continues. During the 2023-2024 school year, Hispanic students constituted 80 out of 98 (or 81.6%) of all total student arrests.

77. Former Hispanic students of the HASD report experiencing direct discrimination at the hands of teachers and administrators, ranging from disproportional discipline to use of racial slurs.

78. In 2019, 98.6% of the teachers in Hazleton identified as White. At the same time, there was only one Hispanic teacher for every 1,146 Hispanic students.[12]

---

[11] *Civil Rights Data Collection*, UNITED STATES DEPARTMENT OF EDUCATION OFFICE FOR CIVIL RIGHTS, https://civilrightsdata.ed.gov (last visited June 1, 2026).
[13] Professional and Support Personnel, PA DEPARTMENT OF EDUCATION, https://www.pa.gov/agencies/education/data-and-reporting/school-staff/professional-and-support-personnel#accordion-c5cf13b887-item-22b2751d52 (last visited July 9, 2026).

As of the 2025-2026 school year only 2.6% of all teachers in the HASD identified as Hispanic.[13]

79. Hispanic applicants to and employees of the HASD report discrimination in the hiring and promotion within the District.

80. There has been a significant lack of responsiveness on the part of elected HASB officials to the particularized needs of the Hispanic community in the HASD. This includes, but is not limited to, disregard for serious concerns relating to disparate student discipline, student registration procedures founded on unfair stereotypes, inadequate school staffing, lack of qualified translators, and lack of effective methods of communication with parents.

***Discrimination in the Broader Hazleton Area***

81. There is a history of official discrimination against Hispanics in the HASD that affects the rights of Hispanic residents to register, vote, and participate in the democratic process. This history is recent.

82. Between July 2006 and March 2007, the Hazleton City Council passed a series of ordinances collectively referred to as the "Illegal Immigration Relief Act"

[13] Professional and Support Personnel, PA DEPARTMENT OF EDUCATION, https://www.pa.gov/agencies/education/data-and-reporting/school-staff/professional-and-support-personnel#accordion-c5cf13b887-item-22b2751d52 (last visited July 9, 2026).

setting penalties for landlords and employers accused of renting to or hiring anyone the city classified as an "illegal alien."

83. The goal of these ordinances was to stoke fear and arouse suspicion of the rapidly growing Hispanic population. Supporters of the ordinances said their goal was to drive "illegal aliens" out of town. Hazleton's then-Mayor, Lou Barletta, vowed to make the city "one of the toughest places in the United States" for an "illegal" to live.

84. The law was eventually struck down in court.

85. Hispanics in the HASD have been targeted by law enforcement, unfairly blamed for rising crime rates, denied language assistance by municipal officials, subjected to overtly discriminatory laws, and have otherwise been subject to harassment and discrimination on account of their race.

86. The City of Hazleton has a complicated history with Spanish language assistance. For example, in 2021 the City reached an agreement with the Department of Justice following an investigation regarding the Hazleton Police Department's prior failures to provide appropriate language assistance.

87. Evidence also shows that the overwhelmingly White Hazleton Police Department regularly harasses and targets the local Hispanic population by profiling

Hispanic individuals and executing surprise raids on private gatherings by Hispanics under the guise of noise or liquor code violations.[14]

88. Local politicians, including city council members and White community leaders, have blamed rising crime rates on the Hispanic population, and used this to publicly lobby for an increase in funding for police, despite the city being financially distressed.[15]

89. Community and economic redevelopment efforts by the City of Hazleton have historically excluded Hispanic organizations and businesses, despite a substantial increase in new businesses founded by Hispanics.

90. Hispanic residents have faced disproportionally high obstacles when trying to open or expand their own businesses.

91. The Hispanic population of HASD continues to suffer the effects of discrimination in education, policing, and employment, including employment within the HASD, which hinders their ability to participate effectively in the political process.

---

[14] Mike Kelly, *'We have hate here.' This city is on the fault line of the U.S. immigration divide*, NORTHJERSEY.COM (Oct. 10, 2018), https://www.northjersey.com/story/news/columnists/mike-kelly/2018/10/10/us-immigration-divide-stands-hazleton-pa/1381233002/?gnt-cfr=1&gca-cat=p&gca-uir=false&gca-epti=z1116xxe1116xxv000030&gca-ft=131&gca-ds=sophi .

[15] Roger DuPuis, *Hazleton: Violence up, more cops needed*, TIMES LEADER (July 25, 2015), https://www.timesleader.com/news/374972/hazleton-violence-up-more-cops-needed.

92. Socioeconomic disparities exist between White and Hispanic residents of the HASD. Among other things, Hispanics are significantly more likely to live under the poverty line. These disparities hinder the ability of Hispanics to participate effectively in the political process.

93. Local elections are characterized by practices and procedures that impair Hispanic electoral success. These practices include lack of proper translators available for LEP voters, destruction of campaign materials of Hispanic candidates, and failure of white candidates to campaign in Hispanic populated areas in the HASD.

94. The U.S. Supreme Court has expressly recognized that at-large elections schemes pose “greater threats to minority voter participation.” *Growe,.* , 507 U.S. at 40 . Such elections schemes “violate the Fourteenth Amendment if ‘conceived or operated as purposeful devices to further racial discrimination’ by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population.” *Rogers*, 438 U.S. at 617 (internal citations omitted). These districts are particularly impactful on minorities, due to "their winner-take-all aspects, their tendency to submerge minorities and to overrepresent the winning party.” *Whitcomb v. Chavis*, 403 U.S. 124, 158-159 (1971).

95. The HASB is well aware that the Hispanic community has repeatedly sought representation on the Board but has been unable to successfully elect their Hispanic preferred candidate due to the at-large election system.

96. Not only have many Hispanic candidates run for HASB, but multiple Hispanic residents have also requested Hispanic candidates be considered when there are vacancies on the Board that the HASB itself votes to fill.

97. HASB has never appointed a Hispanic person to fill an opening on the HASB.

98. There is no partisan or other race neutral reason to maintain the at-large election scheme. The totality of the circumstances supports a strong inference of racial discrimination and Plaintiffs' claim that Hispanic voters in the HASD have less opportunity than other members of the electorate to participate in the political process and elect school directors of their choice.

## Causes of Action
## Violation of Section 2 of the VRA
## 52 U.S.C. § 10301 and 42 U.S.C. § 1983

99. Paragraphs 1 through 98 of this Complaint are incorporated by reference as if set forth fully herein.

100. A voting scheme violates Section 2 of the VRA when minority voters do not have "the chance enjoyed by nonminority voters to secure the election of their preferred candidates." *Callais,* 146 S. Ct. at 1154.

101. All the Gingles preconditions are satisfied, and the totality of the circumstances gives rise to a strong inference of racial discrimination.

102. The at-large system used by the HASD denies Hispanic voters "the same 'opportunity' as other voters to elect the candidates they prefer." *Id*. at 1162.

103. Unless enjoined, HASD will continue violating Section 2 of the VRA by administering and conducting future elections for the HASB using the at-large method of election.

**Violation of the Fourteenth Amendment**
**42 U.S.C. § 1983**

104. Paragraphs 1 through 98 of this Complaint are incorporated by reference as if set forth fully herein.

105. The Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

106. An at-large election system maintained for the purpose of denying minorities equal access to the political processes is unconstitutional. *See, e.g.*, *Rogers v. Lodge*, 458 U.S. 613 (1982).

107. The continued use of the at-large system of electing school directors denies Hispanic citizens equal access to the political process in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

108. Unless enjoined, Plaintiffs will continue to suffer deprivation of their right to equal protection in violation of the Fourteenth Amendment to the U.S. Constitution.

**Prayer for Relief**

WHEREFORE, Plaintiffs pray that this Court:

1. Issue a declaratory judgment finding that the current at-large election system for the HASB violates Section 2 of the VRA and the Fourteenth Amendment to the U.S. Constitution;

2. Permanently enjoin HASD, and all persons acting in concert with HASD, from administering, implementing, or conducting any future elections for school director under the current at-large election system;

3. Order implementation of an alternate election system for the HASB that complies with Section 2 of the VRA and the Fourteenth Amendment to the U.S. Constitution;

4. Adjudge all costs against HASD, including reasonable attorneys' fees, case expenses, expert fees, and costs;

5. Award Plaintiffs $1 in nominal damages for violation of their rights;

6. Retain jurisdiction to render any and all further orders that this Court may deem appropriate; and

7. Grant such other and further relief to which Plaintiffs may show

themselves to be entitled.

Date: August 3, 2026

Respectfully submitted:

Bernadette Reyes*
Chad Dunn*
Sonni Waknin*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90020
(310) 400-6019
chad@uclavrp.org
bernadette@uclavrp.org
sonni@uclavrp.org

Daniel T. Brier (PA ID 53248)
Patrick J. Brier (PA ID 44711)
Donna A. Walsh (PA ID 74833)
Timothy E. Gates (PA ID 202305)
Richard L. Armezzani (PA ID 322804)
Myers, Brier & Kelly, LLP
425 Biden Street, Suite 200
Scranton, PA 18503
(570) 342-6100
dbrier@mbklaw.com
pbrier@mbklaw.com
dwalsh@mbklaw.com
tgates@mbklaw.com
rarmezzani@mbklaw.com

Peter D. Winebrake (PA ID 80496)
Winebrake & Santillo, LLC
715 Twining Road, Suite 211
Dresher, PA 19025
(215) 884-2491
pwinebrake@winebrakelaw.com

Frederick P. Rooney (PA ID 46492)
7 West Morton Street
Bethlehem, PA 18105
(484) 554-4492
fredprooney@gmail.com

*Attorneys for Plaintiffs, Brendalis Lopez and Emmanuel Martinez*